RANDAZZA LEGAL GROUP
Marc J. Randazza, Esq. (NV Bar No. 12265)
Ronald D. Green, Esq. (NV Bar No. 7360)
3625 S. Town Center Drive, Suite 150
Las Vegas, NV 89135
Telephone: 702-420-2001
Facsimile: 305-437-7662
ecf@randazza.com

Attorneys for Plaintiff,
AMA Multimedia, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| AMA MULTIMEDIA, LLC, a Nevada limited liability company,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>BORJAN SOLUTIONS, S.L. d/b/a SERVIPORNO, a Spanish company; and BORJAN MERA URRESTARAZU, an individual,<br><br>　　　　　Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**(1) Copyright Infringement**<br>**(2) Contributory Copyright Infringement**<br>**(3) Vicarious Copyright Infringement**<br>**(4) Inducement of Copyright Infringement**<br>**(5) Violation of 17 U.S.C. § 1202(b)**<br>**(6) Breach of Contract**<br>**(7) Breach of Contract**<br><br>**JURY DEMAND** |

## COMPLAINT

Plaintiff AMA Multimedia, LLC, through its counsel Randazza Legal Group, brings this Complaint against Defendants Borjan Solutions, S.L. d/b/a Serviporno and Borja Mera Urrestarazu as follows:

/ / /

/ / /

**THE PARTIES**

1.     Plaintiff AMA Multimedia, LLC ("AMA")[1] is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada. AMA produces adult audiovisual material, which it distributes via the World Wide Web under such well-known brands as "Passion-HD" and "Porn Pros," among others.

2.     Defendant Borjan Solutions, S.L. d/b/a Serviporno ("Serviporno") is a Spanish company, operating within the Principality of Asturias. Serviporno owns and operates the website located at <serviporno.com>, as well as the other websites referenced in this Complaint.

3.     Defendant Borjan Mera Urresarazu ("Borjan") is the principal of Serviporno and is responsible for the operations of the website located at <serviporno.com>, as well as the other websites referenced in this Complaint.

**JURISDICTION**

4.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

5.     This Court has personal jurisdiction over Defendants based upon the following: (a) they operate a series of interactive websites on the World Wide Web that are accessible to residents of the State of Nevada, including several that are specifically marketed to U.S. residents; (b) Defendants intentionally stole copyrighted material owned by Plaintiff, whom Defendants knew to reside in the State of Nevada at the time of the theft; and (c) Defendants intentionally breached a Settlement Agreement with Plaintiff, who is a resident of the State of Nevada.

---

[1] Some of the facts alleged in this Arbitration Complaint were taken by AMA's predecessor-in-interest, SSC Group, LLC.

1   6.   Defendants are residents of a foreign country who have sufficient

2   contacts with the U.S. to render jurisdiction proper in any U.S. court, including

3   the United States District Court for the District of Nevada. *See* Fed. R. Civ. P.

4   4(k)(2); 28 U.S.C. § 1391.

5   7.   Defendants have purposefully availed themselves of doing business

6   in the U.S. and are properly subject to jurisdiction in any U.S. court.

7   8.   Defendants have a large portion of users in the United States, and

8   much of the stolen content distributed by Defendants on the World Wide Web

9   originates from the U.S., including Plaintiff's content.

10   9.   The illegal distribution of Plaintiff's works takes place partially, if not

11   entirely, in the U.S.

**FACTUAL ALLEGATIONS**

**The Parties' Initial Dispute**

14   10.   In mid-2013, AMA learned that Defendants were engaged in large-

15   scale copyright infringement of Plaintiff's works and the works of other adult

16   entertainment content producers on the website located at <serviporno.com>.

17   11.   On an Internet forum for adult industry webmasters, located at

18   <gfy.com>, Borjan started a thread to advertise his services. (*See* GFY.com

19   thread entitled "Cumlouder: a new crazy company in the adult industry," dated

20   December 3, 2012 and attached hereto as **Exhibit 1**.)

21   12.   One GFY user confronted Borjan regarding the rampant copyright

22   infringement on Serviporno, stating that the site had "tons of full videos from all

23   major major content [sic] producers of the world" and asked Borjan why he was

24   posting videos from "content producers who didn't give [him] permission to

25   broadcast their scenes in full." (*See id.*)

26   13.   Another GFY user noted that Serviporno contained "full length

27   videos from the biggest programs, their own watermarks over the copyright

28

owner's watermark," while another user emphatically stated that most of the content on Serviporno was stolen from other content producers. (*See id.*)

14.    Borjan admitted that he was unlawfully taking videos from other tube sites and uploading them to Serviporno. (*See id.*) Borjan implied that he knew his actions were unlawful but that he did not think he was doing any damage to the copyright owners whose works he was infringing. (*See id.*)

15.    Following Borjan's admission, a GFY user wrote that if he does not "have a license for the content, own the content or have user uploaded content covered by a takedown policy then [he] shouldn't have it [on Serviporno]." Shortly thereafter, Borjan responded "we know it, is the way we choose to open," causing another content producer to question "How do you know you don't make any damage to our company by showing our full scenes with your logo on it?" (*See id.*)

16.    As more and more GFY forum users complained that Borjan and Serviporno were stealing content from them and replacing their watermarks with Defendants' watermarks, Borjan abandoned the thread that he started to promote his business.

17.    Borjan's and Serviporno's content theft was particularly offensive to Plaintiff AMA (and to the content producers participating in the GFY thread Borjan started to promote his business) because Defendants were brazenly stealing and posting content, admitting to it online, and insisting that their actions were not harming content producers and were an acceptable business practice.

**The Initial Settlement**

18.    After AMA learned of Defendants' infringement and investigated the Serviporno website, it began making plans to file suit against Serviporno in the U.S. District Court for the Northern District of Texas, the location of

Defendants' servers at the time. Currently, Defendants' servers are located in Los Angeles, California.

19.     Before filing the litigation, AMA attempted to engage in settlement discussions with Respondent.

20.     These discussions were productive, leading AMA to believe that Defendants were willing to resolve the issues between the parties without the necessity of litigation.

21.     The parties agreed upon a settlement, but Borjan and Serviporno insisted that all of the content on Serviporno was uploaded by users and refused to admit otherwise. While AMA knew this to be false, its main concern was getting its copyrighted content off of the Serviporno website and keeping it off, so AMA entered into a settlement agreement ("the Agreement") with Defendants (see Settlement Agreement and Mutual Release, attached hereto as **Exhibit 2**).

22.     In August 2013, the parties executed the Agreement, which was designed to ensure that Defendants would stop stealing and posting AMA's content on the Serviporno website. It additionally required Defendants to take down all content that infringed upon AMA's copyrights and to enforce its repeat infringer policy.

23.     For about one year after the parties executed the Agreement, they enjoyed a cordial relationship. Plaintiff provided Respondent with approved, short videos meticulously curated for promotional purposes that are approximately 8-10 minutes in length with adequate watermarks and branding. Defendants posted them along with links and banners to Plaintiff's membership-based pay sites where Internet users could purchase subscriptions to watch Plaintiff's full-length videos. Defendants would be paid a commission on any sales they generated for AMA.

**Defendants Resume Infringement**

24.    Approximately one year after the execution of the Agreement, Defendants stopped posting AMA's approved and legal videos. Instead, their old, infringing activities resumed in earnest, with AMA's full length videos appearing on the Serviporno website with AMA's branding removed.

25.    On November 24, 2014, AMA's principal confronted Borjan and Serviporno about their theft and was provided insufficient excuses by Borjan for the infringement. Borjan's excuses proved to be particularly deficient when he subsequently admitted that he reviews and manually approves every video before it is posted on Serviporno. No video is ever posted on the site without Defendants' explicit approval.

26.    AMA tested Defendants' upload tool, a mechanism that allows a website visitor to upload content to the website's server for viewing on the website, on December 2, 2014. AMA attempted to upload videos on four separate occasions, and none was ever published on <serviporno.com>.

27.    The videos that AMA attempted to upload were never published to the site because Defendants' upload tool is a façade designed to cover up Defendants' own posting of infringing videos to the website.

28.    Most tube sites have an active user community uploading videos to the sites. However, Defendants' Serviporno site has no apparent user community. The videos on the site do not even identify which user uploaded each video – a standard feature on tube sites from ones that feature adult entertainment to YouTube and Vine.

29.    As further evidence that users are not uploading videos on the site, the Serviporno website does not feature a community page or user profiles like other tube sites.

30.     Most tube sites prominently feature their "sign in" or "registration" links on the front page of the website in order to encourage website visitors to join and begin uploading videos to the site. Serviporno's "sign in" and "registration" links are obscured as small links at the bottom of the site's front page next to the site's terms and conditions and privacy policy. In other words, Defendants have placed those links on an area of the page where website visitors are least likely to see them.

31.     Plaintiff AMA also discovered that many of the videos on the Serviporno site exceeded the 100MB size limit of uploads permitted on the Serviporno site, demonstrating that it was impossible that third party users of Serviporno uploaded the videos. The uploads must have been done by Defendants themselves.

32.     On January 6, 2015, AMA sent a cease and desist letter to Defendants, which indicated that many of the videos on the Serviporno website exceed the maximum upload size Defendants permitted.

33.     In response, on January 8, 2015, Defendants increased the file size upload limit to 1,000MB. However, Defendants still maintained that third party users uploaded the videos in spite of massive evidence to the contrary.

34.     Defendants asserted that the upload limit was different depending upon where the Internet user was accessing the Serviporno site. For example, while the upload size limit for the United States might be 100MB, the upload limit for another country may be greater or smaller.

35.     Plaintiff did not find Defendants' assertion to be truthful.

36.     Indeed, Defendants' assertion regarding geographically determined upload limits was a lie. Plaintiff tested Defendants' argument and used a proxy service to test the upload page from Spain, Germany, France, and England to see if file size limits actually varied by location. They did not.

37.    On January 26, 2015, Plaintiff issued a valid subpoena to Defendants regarding certain infringing videos on Serviporno pursuant to the DMCA. The Agreement required that Defendants would provide all information in their possession regarding the user that uploaded the videos, including the other videos that the user had uploaded, and would not object to jurisdiction. (*See* **Exhibit 2** at ¶¶ 3.1, 3.3.)

38.    The user identification was particularly important to AMA because, unlike other tube sites, Serviporno does not identify the user that uploads a particular video, leaving it impossible for Plaintiff to investigate infringing users itself.

39.    Since the evidence shows that in many cases it was technically impossible for anyone but the Defendants to upload the infringed material, providing them with a subpoena pursuant to the DMCA or otherwise informing them that AMA's content was unlawfully on their site was a futile exercise.

40.    Defendants' response to the subpoena on March 11, 2015 failed to provide all information Defendants possessed regarding the infringer, including all other videos that the user had uploaded, and also objected to jurisdiction.

**Defendants' Related Websites**

41.    Plaintiff AMA recently discovered that Defendants' infringements of the copyrighted works of AMA and others extends far beyond the Serviporno website.

42.    Defendants actually operate a network of geographically targeted websites. Infringing and rebranded content appears on all of them.

43.    Plaintiff cannot be sure whether it has discovered every website Defendants use to further their copyright infringement. Currently, Plaintiff is aware of three "rings" of websites that Defendants use to infringe upon and profit from the copyrights of others.

44.     Regarding the first ring, Serviporno is part of a ring of websites that include the following:

    a.  <serviporno.com>, which targets the Spanish market;

    b.  <todayporn.com>, which targets the American market;

    c.  <voglioporno.com>, which targets the Italian market;

    d.  <pornodingue.com>, which targets the French market;

    e.  <einfachporno.com>, which targets the German market;

    f.  <pornodoido.com>, which targets the Brazilian market;

    g.  <pornozot.com>, which targets the Dutch market;

    h.  <pornoglu.com>, which targets the Turkish market;

    i.  <chikiporno.com>, which targets the Russian market; and

    j.  <seansporno.com>, which targets the Polish market.

Screenshots for each website within this first ring are attached hereto as **Exhibits 3.1** through **3.10**.

45.     Once a video is posted on one of these sites, it will appear on every other website within the ring with translation into the language of the target market.

46.     Each of these websites has the same design and style and was, at one time, all linked to each of the other websites within the ring. Currently, they are still linked together with the exception of <todayporn.com>. Defendants removed the link to <todayporn.com> immediately after the mediation, presumably to attempt to defeat U.S. jurisdiction should a lawsuit ever arise.

47.     Defendants' second ring of websites includes the following:

    a.  <pornburst.xxx>, which targets the American market;

    b.  <bundesporno.xxx>, which targets the German market;

    c.  <pornalia.xxx>, which targets the Italian market; and

    d.  <gauleporno.xxx>, which targets the French market.

RANDAZZA | LEGAL GROUP

1  Screenshots for each website in this second ring are attached hereto as **Exhibits**

2  **4.1** through **4.4**.

3  48.   The second ring of websites shares the same design and style and

4  operates identically to the first ring of websites.

5  49.   Defendants' third ring of websites includes the following:

6  a. <freemovies.tv>, which targets the American market;

7  b. <canalporno.com>, which targets the Spanish market;

8  c. <prendiporno.tv>, which targets the Italian market;

9  d. <pornodrome.tv>, which targets the French market;

10  e. <nedporno.com>, which targets the Dutch market;

11  f. <guterporn.com>, which targets the German market;

12  g. <sexoquente.tv>, which targets the Brazilian market;

13  h. <filmikiporno.tv>, which targets the Polish market;

14  i. <megaporno.tv>, which targets the Russian market; and

15  j. <pornovideolar.tv>, which targets the Turkish market.

16  Screenshots for each website in this third ring are attached hereto as **Exhibits 5.1**

17  through **5.10**.

18  50.   The third ring of websites shares the same design and style and

19  operates identically to the first and second rings of websites.

20  51.   The three rings of websites do not operate independently of each

21  other. Defendants often place the same infringing videos on each and every

22  website in all three rings but will typically have three distinct titles – one for each

23  ring of sites.

24  52.   It would be an understatement to say that it strains credibility to

25  argue that an Internet user would upload a video to all three rings of websites

26  with a distinctly different title for each ring and a translation of each title for

27  each website within each ring.

28

53.     Defendants are uploading videos to all three rings themselves and translating the video title for each website within each ring.

54.     On June 8, 2015, Plaintiff AMA discovered that Defendants had reviewed the entire Serviporno website and attempted to remove each video owned by AMA from the site. Because all AMA branding had been removed from the videos, it would have been difficult – if not impossible – for any person but the uploader himself to recognize the content as AMA's. Defendants were clearly trying to destroy or conceal as much evidence as possible in the middle of a legal dispute, as it happened days after the parties engaged in unsuccessful mediation and before the parties' legal issues were resolved.

55.     Defendants' removal of AMA's content is further evidence of their guilt. An innocent party would not remove content and destroy all evidence if that party was not liable under the Digital Millennium Copyright Act (the "DMCA") because third parties had uploaded the videos.

56.     The videos removed from Serviporno were removed from each and every Respondent website, regardless of which ring they were associated with. The videos Defendants failed to remove remained active on all of three rings. Thus, the video files are not associated with different users for each ring of sites but are connected in Defendants' backend, further demonstrating that Defendants are uploading the videos themselves.

57.     Defendants' sites contain a directory of "Pornstar" pages to allow users to find infringing videos featuring their favorite adult stars. Each pornstar page has a manually cropped image of the star along with a biography. Website users would have no mechanism for altering these images, the biography text, or the pornstar page itself.

58.     Defendants had three infringed images on three unique pornstar pages across their Websites. The AMA images that were stolen and uploaded by

1  Defendants for their "Pornstar" biography pages were taken from video

2  productions that occurred in 2014, at least 6 months from the execution of the

3  Agreement.

4  59.   Defendants were not able to locate or remove all of Plaintiff's

5  videos from the sites. Currently, AMA is aware that sixteen (16) of its videos are

6  still contained on Defendants' sites. AMA is additionally aware that three (3) of

7  its images are located on Defendants' sites.

8  60.   This number is far less than the amount of videos previously on

9  Defendants' sites.

10  61.   Each and every time Defendants think that AMA has discovered a

11  different part of Defendants' illegal scheme, Defendants alter the websites in an

12  attempt to frustrate Plaintiff's claims.

13  **Defendants' Refusal to Arbitrate**

14  62.   The Agreement executed by the parties in 2013 required them to

15  attempt to resolve any future disputes through informal negotiations to be

16  followed by formal mediation.

17  63.   If neither negotiations nor mediation resulted in a resolution, the

18  Agreement required the parties to arbitrate the dispute in Clark County,

19  Nevada. The Agreement was silent with regard to the arbitration service and

20  arbitrator that AMA would choose to hear the claim.

21  64.   The Agreement did not limit Plaintiff's options when choosing an

22  arbitration service, nor did it give Defendants any right to participate in the

23  selection of the arbitration service.

24  65.   When Plaintiff AMA discovered that Defendants had resumed their

25  infringing activities, Plaintiff scheduled informal negotiations to occur in Las

26  Vegas, Nevada. Those negotiations occurred on January 23, 2015 and were

27  unsuccessful.

28

66.     The parties engaged in mediation on May 21, 2015 at the offices of AMA's counsel. A representative of and counsel for AMA appeared in person on AMA's behalf. Counsel for Borjan and Serviporno appeared on Defendants' behalf while Borjan appeared via videoconference on behalf of himself and Serviporno. Las Vegas attorney Clyde DeWitt served as mediator. The parties were unable to resolve the dispute.

67.     Following the mediation, Plaintiff AMA attempted to commence the arbitration but was thwarted by Defendants at every turn.

68.     Plaintiff initially suggested that the parties arbitrate through JAMS using the Honorable Philip M. Pro as the arbitrator. Defendants rejected Judge Pro as not having "the necessary IP background to properly understand" the dispute. Contrary to the Agreement, Defendants insisted upon using an arbitrator from Los Angeles.

69.     Plaintiff suggested Joseph Bongiovi and Ara Shirinian as potential mediators, both of whom are experienced and well-regarded locally and nationally. Defendants' counsel rejected them immediately and stated that he would not consent to use "Uncle Bob's Arbitration and Weddings of Las Vegas."

70.     Seeking to resolve this matter pursuant to the terms of the Agreement, Plaintiff attempted to initiate arbitration through ADR Services, a nationally recognized arbitration body with offices in Las Vegas, Los Angeles, Century City, San Francisco, Silicon Valley, Orange County, and San Diego.

71.     On or about August 3, 2015, Plaintiff transmitted a Demand for Arbitration and an Arbitration Complaint to ADR Services and to counsel for Defendants.

72.     Shortly after Plaintiff transmitted the documents, Defendants made changes to their websites to address some of the allegations in the Arbitration Complaint, which are also made in this Complaint.

73.     Defendants' changes to the websites resulted in the deletion of relevant evidence. Specifically, Defendants changed the images on their "Pornstar" bio pages so that they no longer included Plaintiff's copyrighted photographs and terminated their use of <freemovies.tv>, redirecting all traffic to <pornjam.com>.

74.     On or about August 11, 2015, Plaintiff's counsel spoke with ADR Services' case manager, who informed him that ADR Services would not take the case unless Defendants agreed to participate in the arbitration or a court order required them to participate. The case manager stated that ADR Services was calling Defendants' counsel later that day to discuss.

75.     After hearing nothing for one week, Plaintiff's counsel spoke with ADR Services' case manager on August 18, 2015. The case manager informed counsel that he had called Defendants' counsel regarding the arbitration but that Defendants' counsel had not called him back.

76.     The case manager stated that it was his impression that Defendants' counsel was ignoring his call and would not participate in the arbitration. As a result, ADR Services would not agree to accept the case.

77.     On or about August 19, 2015, Defendants transmitted a document entitled "Motion to Dismiss Arbitration for Complainant's Failure to Meet Conditions Precedent to the Filing of Arbitration and for the Award of Contractual Attorneys' Fees" to Plaintiff's counsel and ADR Services.

78.     Defendants and their counsel had participated in the informal negotiation and mediation required by the Agreement and engaged in bad faith discussions with Plaintiff regarding the arbitration body that should hear the matter. Throughout all of those negotiations, Defendants never indicated that they believed Plaintiff had not met the required "conditions precedent."

79.     Defendants intended that their "Motion" would frustrate the arbitration, and it did. ADR Services informed Plaintiff's counsel on August 25, 2015 that it would not take the matter, leaving Plaintiff with no choice but to assert its claims against Defendants in this Court.

**CLAIMS FOR RELIEF**

**First Claim for Relief – Copyright Infringement (17 U.S.C. § 501)**

80.     Plaintiff repeats and realleges each and every preceding paragraph as if set forth fully herein.

81.     AMA is the owner of at least nineteen (19) timely registered works that are or were copied and/or distributed, without authorization, on one or more of the websites controlled and operated by Defendants.

82.     The number of infringements on Defendants' websites grows daily.

83.     Defendants reproduced, reformatted, and distributed AMA's copyrighted works through servers and other hardware that they owned, operated, or controlled.

84.     Defendants infringed AMA's copyrights through their reproduction and distribution of Plaintiff's works through the websites referenced herein without AMA's approval or authorization.

85.     Defendants knew or should have known that they did not have authorization to exploit AMA's copyrighted works and that their actions constituted copyright infringement.

86.     Defendants engaged in intentional, knowing, negligent, or willfully blind conduct that demonstrates they engaged actively in the unlawful collection and distribution of AMA's copyrighted works.

87.     The copyrighted files on Defendants' websites increased the appeal of those sites, increasing Defendants' revenue.

88. Defendants actively encourage the users of the websites to upload infringing material.

89. Defendants upload infringing material to the websites themselves.

90. On information and belief, Defendants uploaded some or all of the infringing videos onto the websites themselves.

91. Defendants' conduct was willful within the meaning of 17 U.S.C. § 101 *et seq.* At minimum, Defendants acted with willful blindness and reckless disregard of AMA's registered copyrights.

92. Defendants are liable to Plaintiff for copyright infringement.

93. Under 17 U.S.C. § 504, AMA may recover damages, including readily ascertainable direct losses and all profits Defendants made by their wrongful conduct; alternatively, the law permits AMA to recover statutory damages. *Id.* § 504(c).

94. Since infringement was willful, AMA is entitled to enhanced statutory damages of $150,000 per instance of infringement. *Id.* § 504(c)(2).

**Second Claim for Relief – Contributory Copyright Infringement**

95. Plaintiff repeats and realleges each and every preceding paragraph as if set forth fully herein.

96. Defendants had actual or constructive knowledge regarding the infringement occurring on their websites or were willfully blind to the infringements.

97. Defendants' infringement was committed by third-party users of Defendants' websites, who distributed AMA's works without permission.

98. Defendants induced, caused, or materially contributed to this third party infringement by providing the websites, and specifically through certain features the websites designed to encourage users to upload copyright protected videos.

99.    Defendants assisted these third parties in organizing these infringing works on its website.

100.    Defendants received a direct financial benefit from the third party copyright infringement and are liable to Plaintiff.

**Third Claim for Relief – Vicarious Copyright Infringement**

101.    Plaintiff repeats and realleges each and every preceding paragraph as if set forth fully herein.

102.    Defendants had specific (or at least general) knowledge of copyright infringement occurring on their websites.

103.    Defendants had the right and ability to control access to, remove, or disable the infringing materials.

104.    Defendants profited from the infringement.

105.    Defendants declined their right to delete or disable infringing content and are liable to Plaintiff.

**Fourth Claim for Relief – Inducement of Copyright Infringement**

106.    Plaintiff repeats and realleges each and every preceding paragraph as if set forth fully herein.

107.    Defendants designed and distributed technology and induced individuals to use this technology to promote the copyrighted material on Defendants' websites, including material belonging to Plaintiff.

108.    As a direct and proximate result of Defendants' inducement, users of Defendants' websites infringed Plaintiff AMA's works through Defendants' websites.

109.    Defendants' inducement was willful, knowing, willfully blind, or negligent. At all pertinent times, Defendants acted with disregard for and indifference to AMA's copyrights.

/ / /

**Fifth Cause of Action – Violation of 17 U.S.C. § 1202(b)**

110.   Plaintiff repeats and realleges each and every preceding paragraph as if set forth fully herein.

111.   Defendants affixed the logos of their websites to every infringing work on the Defendants' website.

112.   Defendants attached their logos to the infringing works without AMA's knowledge or permission.

113.   Defendants' use of their logos constitutes "false copyright management information," as it falsely informs the public that Defendants are the owners, rights owners, and licensees of the infringing videos and that they have the right to show them.

114.   Defendants knowingly added this copyright management information to the infringing works with the intent to induce, enable, facilitate, and conceal infringement.

**Sixth Cause of Action – Breach of Contract**

115.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if set forth fully herein.

116.   On or about August 19, 2013, Plaintiff and Defendants entered into the Agreement to resolve their dispute regarding the presence of Plaintiff's copyrighted content on Respondent's Serviporno webpage.

117.   In that Agreement, Defendants agreed to remove all infringing AMA material upon notification by AMA and to provide AMA with all information in their possession about the uploader, including links to all of the uploader's uploads. (*See* **Exhibit 2**, at ¶ 3.1.)

118.   Defendants additionally agreed to comply with any subpoena sent to them by Plaintiff pursuant to the DMCA and to not challenge any subpoena from Plaintiff for lack of jurisdiction. (*See id.*, at ¶ 3.3.)

119.   The Agreement is valid and binding.

120.   Plaintiff has performed in full all of its obligations, covenants, and conditions contained in the Agreement, except for those obligations, covenants, and conditions from which it has been lawfully excused from performing.

121.   On January 26, 2015, Plaintiff issued a valid subpoena to Defendants regarding infringement upon the Serviporno website. On March 11, 2015, Defendants violated the Agreement by objecting to the subpoena with regard to personal jurisdiction and not providing all information in their possession regarding who was uploading the infringing videos onto Serviporno, including the other content that the user had uploaded for AMA's review.

122.   Defendants additionally breach the Agreement on a regular and continuing basis by either uploading infringing videos themselves or turning a blind eye to website users who upload infringing videos.

123.   As a direct and proximate result of Defendants' breaches of contract, Plaintiff AMA has been damaged in an amount to be determined at arbitration.

124.   Plaintiff AMA has been forced to retain legal counsel to pursue its rights and seeks recovery of its attorneys' fees and costs.

**Seventh Cause of Action – Breach of Contract**

125.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if set forth fully herein.

126.   On or about August 19, 2013, Plaintiff and Defendants entered into the Agreement to resolve their dispute regarding the presence of Plaintiff's copyrighted content on Respondent's Serviporno webpage.

127.   That Agreement provided that any future disputes would be adjudicated via binding arbitration in Clark County, Nevada. The Agreement

did not specify that any particular arbitration service would hear the arbitration, nor did it give Defendants any right to participate in the selection of the arbitration service.

128. The Agreement is valid and binding.

129. Plaintiff has performed in full all of its obligations, covenants, and conditions contained in the Agreement, except for those obligations, covenants, and conditions from which it has been lawfully excused from performing.

130. As detailed herein, Defendants have unreasonably and without justification rejected every arbitration service and/or arbitrator proposed by Plaintiff.

131. Defendants have refused to communicate with the case manager for ADR Services after Plaintiff submitted a demand for arbitration to ADR Services. Instead, they submitted documents to ADR Services challenging jurisdiction.

132. As a direct and proximate result of Defendants' breaches of contract, Plaintiff AMA has been damaged in an amount to be determined at arbitration.

133. Plaintiff AMA has been forced to retain legal counsel to pursue its rights and seeks recovery of its attorneys' fees and costs.

**PRAYER FOR RELIEF**

AMA respectfully requests that the Court hereby:

A.     Enter a judgment that Defendants willfully infringed upon AMA's rights in federally registered copyrights pursuant to 17 U.S.C. § 501 through direct, contributory, vicarious, and/or inducing acts;

B.     Issue injunctive relief against Defendants, their agents, representatives, employees, attorneys, successors, and assigns, and all others

1    acting with or on behalf of Defendants and enjoin Defendants from copying,

2    posting, or making any other infringing use of AMA's audiovisual works pursuant

3    to 17 U.S.C. § 502;

4            C.     Issue     injunctive     relief     against     Defendants,     their     agents,

5    representatives, employees, attorneys, successors, and assigns, and all others

6    acting with or on behalf of Defendants and enjoin Defendants from engaging in

7    further copyright infringement; and if they are unable or unwilling to comply, to

8    issue an order shutting down each and every website owned or controlled by

9    Defendants, including but not limited to the ones listed in this Arbitration

10    Complaint;

11           D.     Enter an order enjoining Defendants from disposition of any

12    property, including their domain names, until full and final settlement or

13    payment of any and all money damage judgments;

14           E.     Enter an order requiring a full and complete accounting of all

15    amounts due and owed to AMA as a result of Defendants' illegal or improper

16    activity, whether criminal or civil in nature;

17           F.     Enter an order directing Defendants to pay AMA statutory damages

18    of maximum enhanced statutory damages of $150,000 per infringed work

19    pursuant to 17 U.S.C. § 504(c)(2), for Defendants' willful infringement of AMA's

20    copyrights;

21           G.     Enter an order directing Defendants to pay AMA statutory damages

22    of $25,000 per instance of placing false copyright management information on

23    the infringing works pursuant to 17 U.S.C. § 1203(c)(3)(A);

24           H.     Enter an order directing Defendants to pay AMA both the costs of

25    the action and reasonable attorneys' fees incurred in prosecuting the action

26    pursuant to 17 U.S.C. § 505;

27

28

I.      Enter an order directing Defendants to pay pre- and post-judgment interest at the highest legal rate; and

J.      Grant AMA all further relief in law and equity that the Arbitrator deems appropriate.


Dated this 28th day of August, 2015.

Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, Esq.
Nevada Bar No. 12265
Ronald D. Green, Esq.
Nevada Bar No. 7360
RANDAZZA LEGAL GROUP
3625 S Town Center Dr., Ste. 150
Las Vegas, NV 89135
Tel: (702) 420-2001
Fax: (702) 420-2003
ecf@randazza.com

Complaint