JAMES D. BOYLE, Esq.
Nevada Bar No. 08384
HOLLEY DRIGGS WALCH FINE WRAY PUZEY & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702-791-0308
Facsimile: 702-791-1912
Email:  jboyle@nevadafirm.com

VALENTIN D GURVITS (*pro hac vice applications forthcoming*)
MATTHEW SHAYEFAR (*pro hac vice application forthcoming*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
Email:  vgurvits@bostonlawgroup.com
Email:  matt@bostonlawgroup.com

EVAN FRAY-WITZER (*pro hac vice application forthcoming*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-507-8043
Email:  evan@CFWLegal.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| AMA MULTIMEDIA, LLC, a Nevada limited liability company,<br><br>        Plaintiff,<br><br>        v.<br><br>BORJAN SOLUTIONS, S.L. d/b/a SERVIPORNO, a Spanish company; and BORJAN MERA URRESTARAZU, an individual,<br><br>        Defendants. | Case No. 2:15-cv-01673-JCM-(GWF)<br><br>**DEFENDANTS' MOTION TO DISMISS AND FOR AN AWARD OF CONTRACTUAL COSTS AND FEES** |

**INTRODUCTION**

In a complaint replete with misrepresentations, irrelevancies, and outright absurdities, a few true (and salient) facts stand out: (1) the parties voluntarily entered into a settlement agreement, (2) the settlement agreement contains a binding arbitration clause, and (3) the binding arbitration clause covers all of the claims raised in the Plaintiff's complaint. This should be, of course, all that the Court needs to know to rule on Defendants' Motion to Dismiss. Nevertheless, the Plaintiff's attempts to intentionally muddy what should be relatively clear waters should be addressed.

Indeed, reading Plaintiff AMA Multimedia, LLC's ("AMA") Complaint, one might be tempted to believe that AMA (and its counsel) are simply ignorant: ignorant of the terms of the settlement agreement that it entered into with Defendants; ignorant of the effects of settlement agreements generally; ignorant of the vast body of case law in Nevada and the 9th Circuit governing the enforceability of mandatory arbitration clauses; and ignorant of the concept of conditions precedent to initiating arbitration (and litigation). In reality, however, neither AMA nor its counsel is ignorant in the least: AMA is a sophisticated litigant and its counsel amongst the most experienced in this area of law in the country.

Once ignorance is eliminated as a possibility, however, only bad faith remains. And, truly, no other explanation exists for AMA's initiation of the present litigation – which cannot possibly survive a motion to dismiss – other than it was brought as part of a deliberate attempt to drive up Defendants' legal costs, in the hope that Defendants would pay money to settle the case, rather than fight frivolous litigation. It is conduct that mandates not only the immediate dismissal of AMA's Complaint, but also an award of attorney's fees, pursuant to the terms of the Parties' Settlement Agreement.

In the alternative, while Defendants believe that this lawsuit should not have been filed in the first place, Defendants also state that this Court has no personal jurisdiction over them and therefore must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).[1]

In support of this Motion, Defendants state as follows.

## FACTUAL BACKGROUND

AMA spends much of its Complaint recounting events which – even if they had been accurately portrayed (and the accuracy of which Defendants dispute) – predate the Parties' Settlement Agreement and Release and are, therefore, irrelevant to any claims which AMA might hope to pursue. Even so, AMA directly alleges as follows[2]:

- In mid-2013, AMA concluded that the defendants were "engaged in large-scale copyright infringement of Plaintiff's works." *Complaint*, ¶ 10.

- AMA believed that, in addition to user uploads, the Defendants were themselves uploading infringing material to their websites. *Complaint*, ¶¶ 14, 17, 21.

- AMA prepared to file litigation in 2013 concerning all of the allegedly infringing materials on the Defendants' websites, including both material allegedly uploaded by users and material allegedly uploaded by the Defendants themselves. *Complaint*, ¶¶ 18-22.

- In August of 2013, the parties entered into a comprehensive Settlement Agreement and Mutual Release (the "Settlement Agreement") covering all of the allegedly infringing materials. *Complaint*, ¶ 22 and, generally, Settlement Agreement (Exhibit 2 to *Complaint*).

- In November of 2014, AMA came to believe that Defendants were breaching the settlement agreement. *Complaint*, ¶ 24.

- On January 6, 2015, AMA sent the Defendants a purported Cease and Desist letter. *Complaint*, ¶ 32.

---

[1] Although Defendants might ordinarily present only arguments concerning the mandatory arbitration agreement – since it is so fundamental that the Complaint must be dismissed on that basis alone – Defendants are cognizant that they are required by the Rules of Federal Procedure to also raise their personal jurisdiction arguments either by motion or responsive pleading at the first available opportunity. *Fed. R. Civ. P.* 12(h). *See also Hendricks v. Bank of Am., N.A.*, 398 F.3d 1165, 1172 (9th Cir. 2005) (personal jurisdiction argument not waived since it was raised in first responsive pleading).

[2] Defendants dispute these allegations but, for the purposes of the present motion only, accept them as true.

3

- The terms of the Settlement Agreement specifically require the parties to resolve all disputes "arising out of or otherwise relating to the Agreement." Settlement Agreement, ¶ 20.1. More specifically, the Agreement provides that:

> If a dispute arises between the Parties arising out of or otherwise relating to this Agreement, the Parties shall first meet and negotiate in good faith to attempt to resolve the dispute. If, after meeting in person for informal negotiations, the Parties are unable to resolve the dispute, then either party may demand that the dispute be submitted to formal mediation.... If the Parties are unable to resolve the dispute through direct negotiations and/or formal mediation then, except as otherwise provided herein, either Party must submit the issue to binding arbitration in accordance with applicable Arbitration laws and statutes Claims subject to arbitration ("Arbitral Claims") shall include, but are not limited to, contract, tort, and intellectual property claims of all kinds, and all claims based on any federal, state or local law, statute, or regulation, excepting only claims seeking injunctions, attachment, garnishment, and other equitable relief.

*Id.*

- AMA freely admits that the Settlement Agreement is "valid and binding" and that it requires the parties to submit all claims to binding arbitration. *Complaint,* ¶¶ 126-28.

## LEGAL ARGUMENT

A.   AMA'S COMPLAINT MUST BE DISMISSED BECAUSE THE CLAIMS AT ISSUE ARE SUBJECT TO A BINDING MANDATORY ARBITRATION CLAUSE.

Federal law, as expressed through the Federal Arbitration Act, 9 U.S.C. § 1 et seq., establishes a "federal policy favoring arbitration" and requires federal courts to "rigorously enforce agreements to arbitrate." *SEIU, Local 707 v. Connex-ATC*, 2006 U.S. Dist. LEXIS 78606 (N.D. Cal. 2006) (*quoting Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). *See also KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25 (2011) ("The Federal Arbitration Act reflects an emphatic federal policy in favor of arbitral dispute resolution."); *Marmet Health Care Center, Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (same).

In practice, then, the District Court's role is "therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the

dispute at issue.  If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Kilgore v. KeyBank, N.A.,* 673 F.3d 947, 955-56 (9th Cir. 2012) (*quoting Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir. 2000)) (internal citation omitted).  *See also Telepet USA, Inc. v. Qualcomm Inc.,* 2015 U.S. Dist. LEXIS 159368, *4 (D. Nev. Nov. 24, 2015) ("[A] district court's role is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."); *Rodriguez v. AT&T Services, Inc.,* 2015 U.S. Dist. LEXIS 142398, *9 (D. Nev. Oct. 20, 2015) (same); *Cardiovascular Biotherapeutics, Inc.,* 2015 U.S. Dist. LEXIS 20745, *6 (D. Nev. Feb. 19, 2015) (same).

Once the Court determines that the two factors have been satisfied, it is without discretion to proceed; the case *must* be dismissed in favor of an arbitral resolution.  *See, e.g., Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *Countrywide Home Loans, Inc. v. Mortgage Guaranty Insurance Co.*, 642 F.3d 849, 854 (9th Cir. 2011) ("[T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *KPMG LLP v. Cocchi,* 132 S. Ct. 23, 25-26 (2011) ("[T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *Telepet, supra* at *5 ("If the court finds that an arbitration clause is valid, it should stay or dismiss the action to allow the arbitration to proceed."); *Cardiovascular Biotherapeutics, Inc., supra* at *5 ("The standard for demonstrating arbitrability is not high. . . .  The Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district court but instead mandates that the district courts direct the parties to proceed to arbitration on issues to which an arbitration agreement has been signed.");

*Rodriguez, supra* at \*9 ("If a court decides that an arbitration agreement is valid and enforceable, then it should either stay or dismiss the claims subject to arbitration.").

In the present case there is no question but that both prongs of the arbitrability test are met because *the plaintiff specifically alleges that they were met.*  Because AMA's Complaint alleges both that a valid agreement to arbitrate exists and (2) that the agreement encompasses the dispute at issue the Court has no discretion to adjudicate AMA's claims, but rather is obliged to dismiss AMA's claims, which AMA may then pursue in arbitration.

**B.    AMA HAS MISUNDERSTOOD AND MISREPRESENTED WHAT TRANSPIRED BETWEEN THE PARTIES WITH RESPECT TO ARBITRATION.**

Although the Court need not proceed any further, AMA has attempted in its Complaint to allege that it is somehow relieved of its obligation to arbitrate disputes arising out of or relating to the Settlement Agreement (while simultaneously arguing that the agreement is fully enforceable) because the Defendants supposedly "refused" to participate in the arbitration process.  Nothing could be further from the truth.[3]

And, although, as a general rule, the Court may only consider the Complaint (and its attachments) on a 12(b)(6) motion, an exception to that rule exists for documents referred to in the Complain, but not attached thereto. *In re MGM Mirage Sec. Litig.,* 2013 U.S. Dist. LEXIS 139356, 11-12 (D. Nev. Sept. 26, 2013) ("When ruling on a motion to dismiss, the Court may take into account matters of public record, any exhibits attached to the complaint, and any documents referred to therein." (citation omitted)); *Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir. 2000) ("The court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court… and may consider documents that are referred to in the complaint whose authenticity no party questions." (citation omitted)).

---

[3] Even if AMA's allegations bore an even passing resemblance to the truth, the Plaintiff's recourse would be to file a motion to compel arbitration.  The Plaintiff has chosen not to do so, apparently preferring to simultaneously complain that the Settlement Agreement's arbitration clause is being thwarted and pretend that the arbitration clause doesn't exist.

In support of its allegation that the Defendants somehow "refused" to participate in arbitration, AMA refers to (a) communications between the parties, and (b) communications between the Defendants and ADR Solutions. Tellingly, although the Complaint refers to such communications, AMA chose not to attach them to the Complaint. This is not surprising. Preliminarily, the communications referenced make it clear that the Defendants were *not* refusing to arbitrate AMA's claims: rather, the Defendants believed (and believe) that the arbitrator should dismiss AMA's claims because AMA failed to meet the contractually mandated conditions precedent to arbitration. And, secondarily, the actual documents showed that, not only did the Defendants not make any disparaging comments about proposed arbitrators (as the Complaint insinuates), but AMA *did* make incredibly disparaging and inappropriate comments about former Federal Judge Irma Gonzalez.

More specifically, on May 28, 2015, AMA attorney Ronald Green wrote to Defendants stating that, because settlement discussions had not been successful, AMA intended to pursue formal arbitration. Attorney Green proposed as an arbitrator former Judge Philip M. Pro, now with JAMS. *See Exhibit 1*, email thread between counsel. In response, Attorney Val Gurvits *specifically stated that the defendants "agree to arbitrate"* and proposed former Judge Irma Gonzalez, also with JAMS.[4]  *Id.*  In rejecting Judge Gonzalez, Attorney Marc Randazza wrote:

> *Irma Gonzalez is not in Las Vegas, and is a lazy dipshit who I'm not about to agree to.*
>
> *What I like about Pro is that he became an arbitrator because he could not stand retirement. He works hard and will dig into the issues with the requisite attention. Gonzalez became a judge so that she could become an arbitrator and be lazy.*
>
> *If we can't agree, which it appears clear that we can't, we will just initiate the arbitration and we can do the old fashioned ranking game.*

*See Exhibit 1.*

---

[4] Contrary to AMA's allegation, Judge Gonzalez *does* arbitrate cases in Las Vegas, as indicated by her JAMS biography page, attached hereto as *Exhibit 2.* Defendants proposed Judge Gonzalez precisely because she does arbitrate cases in Las Vegas, as required by the Settlement Agreement.

On June 26, 2015, Attorney Green wrote to Attorney Gurvits again suggesting Judge Pro as an arbitrator, along with two other potential arbitrators. *See Exhibit 3.* In response, Attorney Gurvits wrote:

> *Ron –*
>
> *We rejected Pro before; we reject him now. We proposed Gonzalez; you rejected her.*
>
> *A month ago Marc wrote and said you wanted to go the "old fashioned ranking way," so we invited your client to initiate arbitration, even though we think any claims asserted will be frivolous and subject your client to the attorney's fee provisions of the agreement.*
>
> *It's clear we're not going to agree on an arbitrator. We don't even agree that arbitration is warranted, as we believe any filing you make will be in bad faith. File, or don't file. If you do file and we are forced to respond, we will utilize the ranking system employed by JAMS. Other than that, we're really not interested in spending more time discussing arbitrators.*
>
> *Val*

*See Exhibit 4.*

Attorney Randazza responded, stating that, unless the Defendants agreed to use Judge Pro, the Plaintiffs would not use JAMS at all. *See Exhibit 5.* Attorney Gurvits then wrote:

> *You shouldn't use anyone. But if you choose to file, you are going to have to use a nationally recognized arbitration forum. Uncle Bob's Arbitration and Weddings of Las Vegas won't cut it.*

*See Exhibit 5.*[5]

It is tempting, again, to think that Plaintiff's counsel are simply confused – that they misunderstand the difference between refusing to participate in an arbitral proceeding and moving to dismiss for the plaintiff's failure to meet the conditions precedent to arbitration. Tempting, but wrong. The Plaintiffs are represented by sophisticated and experienced counsel who know better. The Complaint was brought in direct contradiction of the expressed terms

---

[5] Contrary to the allegations of the complaint, it is quite clear that Attorney Gurvits' statement was *not* aimed at any particular arbitrator, but rather Attorney Randazza's assertion that AMA would not use JAMS if Defendants did not acquiesce to the selection of Judge Pro.

agreed to by the party and, in order to mislead the Court into thinking otherwise, AMA misquoted the communications between the parties. It is the hallmark of a complaint brought in bad faith and in derogation of counsel's obligations under Rule 11.

C.   AMA FAILED TO MEET THE CONDITIONS PRECEDENT TO FILING A CLAIM FOR ARBITRATION.

Because the validity and enforceability of the Settlement Agreement and the arbitration clause are not in dispute, the question of whether AMA met the conditions precedent to arbitration is one which should be answered, in the first instance, by the arbitrator him or herself. Nevertheless, to the extent that the Court believes it can or should address the question of whether AMA has met the conditions precedent necessary for it to initiate arbitration (or even to the extent that the Court simply wants to understand the issue), Defendants state as follows.

With respect to the takedown of allegedly infringing materials, the Settlement Agreement required the Defendants to create:

> [A] specific web form for use by PornPros for the purpose of identifying allegedly infringing links on the Websites to materials owned by PornPros (hereinafter the "Porn Pros Removal Form") which will allow PornPros to fill in hyperlinks and submit any Website URL it believes to be infringing on its copyrights. Submission of one or more links on the Porn Pros Removal Form will then automatically result in the content being removed from the subject website within twenty-four (24) hours of submission of a link to material appearing on one or more of the Websites. . . . PornPros may use formal DMCA notices in lieu of this procedure, if deemed necessary, proper, or desirable, but should not use both this method and formal DMCA notices for the same link.

Settlement Agreement, ¶ 3.1.

As required by the Agreement, the Defendants promptly created the Porn Pros Removal Form. *See* Urrestarazu Affidavit, ¶ 4. In the two years since the Defendants created the Porn Pros Removal Form, AMA <u>never once</u> submitted a single URL for removal with that specialized tool. *Id.*, ¶ 5. During that same time period, AMA (or its agent) sent the Defendants fewer than a dozen DMCA takedown notices. *Id.*, ¶ 6. With respect to each of the URLs listed on the

takedown notices, the Defendants promptly took down the allegedly infringing files upon receipt of the DMCA takedown notice. *Id.*

As noted, above, the Complaint filed by AMA does not allege that the Defendants failed to take down a single file when served with a DMCA takedown notice, nor does it identify any file which the Defendants failed to take down after receiving notice from AMA.

With respect to the prevention of future infringement litigation, the Settlement Agreement is clear that: (a) claims for infringement could be brought only after AMA had first utilized the Porn Pros Removal Form or sent a formal DMCA takedown notice (and then only with respect to those files identified in the Porn Pros Removal Form or the formal DMCA takedown notice) and, (b) claims for infringement could be brought only if the Defendants -- once properly notified of specific allegedly infringing files – failed to takedown the files so identified. *See* Settlement Agreement, ¶¶ 2.1 and 4.0.

Specifically, paragraph 2.1 of the Settlement Agreement, entitled "Pre-suit Requirements and Protections Against Future Litigation," reads:

> The Parties acknowledge that this Agreement is intended to resolve all pending issues between the Parties relating to their operation of the Websites, in an effort to both address previous claims **and to prevent future litigation**. Therefore, **prior to the filing of any future litigation against the Respondents, either individually or collectively, relating to intellectual property rights infringement, PornPros agrees that it will afford respondents an opportunity to remove any and all allegedly infringing material using the PornPro Removal Form and procedure described in paragraph 3.0 below. So long as Respondents discharge their obligations pursuant to paragraph 3.0, PornPros shall not initiate any legal proceeding against the Respondents** or their agents, employees, successors, or assigns, relating to the allegedly infringing material.

Settlement Agreement, ¶ 2.1 (emphasis added).

Paragraph 4.0, entitled "Websites' Legal Status," reads:

> Respondents shall not be considered in breach of this Agreement, and shall not be liable for any legal claims based on infringement of PornPros' copyrights or trademarks with respect to any PornPros Content appearing on the Websites so long as Respondents comply with the obligations imposed by Section 3.0. PornPros further agrees that so long as Respondent perform their responsibilities

under this Agreement, the operation of the Websites shall not be deemed as infringing by PornPros or violative of PornPros' intellectual property rights.

Finally, although the Parties sought to limit the instances in which attorney's fees could be awarded to a prevailing party, the Settlement Agreement provides that the arbitrator or court may award such fees when it: "expressly finds that the non-prevailing party's claim or defense of a claim was frivolous, vexatious, or undertaken in bad faith."  Settlement Agreement, ¶ 8.0.

With those contractual constraints in mind, it is clear that AMA has failed to meet the conditions precedent to having a claim which can be decided (by arbitration or otherwise).[6] The terms of an agreement to arbitrate must be "rigorously enforce[d]." *Siy v. CashCall, Inc.*, 2014 U.S. Dist. LEXIS 1472 (D. Nev. Jan. 6, 2014).

AMA's ability to initiate arbitration is subject to strict conditions precedent, namely that arbitration may *only* be initiated if AMA has first utilized the PornPros Removal Form or a formal DMCA notice and only then if Defendants fail to take down those files located at the URLs identified by AMA.  Settlement Agreement, ¶¶ 2.1 and 4.0.

AMA's Complaint fails to allege that *either* condition precedent was met: it does not allege that AMA ever utilized the PornPros Removal Form or that it sent any formal DMCA takedown notices, nor does it allege that, having received a PornPros Removal Form or formal takedown notice, Defendants failed to remove identified files.  Those failures of condition precedent preclude arbitration of AMA's substantive claims.  *See, e.g., Clark County Sch. Dist. v. Richardson Constr., Inc.,* 123 Nev. 382, 395 (Nev. 2007) ("Generally, the plaintiff has the burden to plead and prove that it fulfilled conditions precedent in order to recover on a breach of contract claim." (citing NRCP 9(c))); *Arbor Acres Farm v. Gre Ins. Group*, 2002 U.S. Dist. LEXIS 1131 (E.D. Cal. Jan. 23, 2002) ("The satisfaction of conditions precedent is a necessary element of any breach of contract claim. . . .  Failure to allege that such conditions are satisfied

---

[6] AMA's allegation that the Defendants did not raise their "condition precedent" arguments at mediation are absurd not simply because they are patently untrue – Attorney Gurvits raised the argument repeatedly at mediation – but also because the allegation is completely irrelevant.  The Settlement Agreement does not specify conditions precedent to a party requesting mediation (hence defendants' appearance at the mediation), it requires that the conditions precedent be met before the Plaintiff can file for *arbitration*.  It is this requirement that AMA has ignored.

amounts to failure to state a claim for relief." (citations omitted)); *Orlando v. Carolina Cas. Ins. Co.*, 2007 U.S. Dist. LEXIS 56409, 15-16 (E.D. Cal. July 26, 2007) ("Where contractual liability depends upon the satisfaction or performance of one or more conditions precedent, the allegation of such satisfaction or performance is an essential part of the cause of action. . . . The failure to allege the satisfaction, waiver, or excuse of a condition precedent amounts to a failure to state a claim for relief." (numerous citations omitted)). Given that AMA failed to satisfy the conditions precedent to arbitration, an arbitrator would have to dismiss any arbitration filed for failure to state a claim upon which relief may be granted.

AMA's wholesale failure to allege the satisfaction of conditions precedent (in both its Complaint and the Complaint it filed with ADR Services) is not accidental: AMA has not alleged satisfaction of the conditions precedent because it *cannot* allege these crucial facts.

AMA's failure to plead the satisfaction of the conditions precedent (indeed, its failure to *actually* satisfy the conditions precedent) will require the immediate dismissal of AMA's Arbitration Complaint (assuming that it again files one). This does not mean that AMA cannot file (yet another) frivolous complaint with an arbitrator; it simply means that the arbitrator, in his or her power, will need to dismiss the complaint and award the Defendants their attorneys' fees, just as this Court should do.

E.    **DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION IN THIS COURT.**

Even if the Court were to reject each of the Defendants' arguments concerning arbitration and somehow find AMA's complaint to be properly before this Court (on substantive grounds), the Complaint would have to be dismissed because the Defendants are not subject to personal jurisdiction in this Court.

Preliminarily, it is important to note that the Settlement Agreement specifically stated that the Defendants contended that there was no personal jurisdiction over them in the United States and that (other than the requirement that the parties mediate and/or arbitrate disputes in Nevada) "nothing contained in this Agreement shall constitute consent to personal jurisdiction,

or a waiver of any objection to personal jurisdiction that any party may assert in the future." *Settlement Agreement, Recital C and Section 20.1.*

With that in mind, the present action is brought against a Spanish company and a Spanish resident, neither of whom have any significant contacts with the United States. Urrestarazu Affidavit, ¶¶ 1-2. Specifically, Borjan Solutions S.L. ("BSSL") is a Spanish company whose websites are managed entirely from Spain. *Id.*, ¶¶ 2, 8. All of BSSL's employees are located in Spain. *Id.*, ¶ 9.

BSSL does not engage, contract for, or purchase any servers in the United States to host its websites. *Id.*, ¶ 10. BSSL uses LeaseWeb, a hosting company from the Netherlands, for its hosting solutions. *Id.* As part of these hosting solutions, LeaseWeb provides a Content Delivery Network (CDN) for BSSL's websites. *Id.* A CDN delivers content to a user from the closest of many file storage locations around the world and LeaseWeb, like all other useful CDNs, has file storage locations around the whole world. *Id.* For example, if a user from China accesses a file on one of BSSL's websites, LeaseWeb may serve that file from a file storage location it has in China. *Id.* Therefore, although it is possible that LeaseWeb (without BSSL's specific request to do so) may replicate some of the files from BSSL's websites onto a server in the United States so that it can then serve it to a user in the United States, BSSL does not itself host any content in the United States and has not selected or requested that LeaseWeb host any content in the United States. *Id.* In short, to the extent that any of BSSL's websites are served from within the United States, it is not because BSSL chose to have it served from the United States. *Id.*, ¶ 11. It is because of the way a CDN works. *Id.*

BSSL does not aim its websites at any particular country, but rather its websites are aimed at the entire world of internet users who speak the language used on each particular website. *Id.*, ¶ 12. Each of BSSL's websites have visitors from countries all around the world. *Id.*, ¶ 13.

BSSL has never had a presence in or significant contacts with the United States. BSSL does not have (and has never had) any employees in the United States. BSSL does not have (and

has never had) a bank account in the United States. BSSL does not own or lease (and has never owned or leased) real estate in the United States. BSSL does not pay (and has never paid) taxes in the United States. BSSL does not have (and has never had) an agent for the service of process in the United States. BSSL does not have (and has never had) a telephone number in the United States. *Id.*, ¶¶ 14-20.

Similarly, Mr. Urrestarazu does not have any significant contacts with the United States. He does not maintain (and has never maintained) a bank account in the United States; does not pay (and has never paid) taxes in the United States; and does not have (and has never had) a telephone number in the United States. *Id.*, ¶¶ 21-24. Mr. Urrestarazu's visits to the United States have been limited to short vacations and to attend trade conventions. *Id.*, ¶ 25. He does not direct or control the content that appears on BSSL's websites. *Id.*, ¶ 26.

In its Complaint, AMA asserts that personal jurisdiction over the Defendants is proper under FRCP 4(k)(2), sometimes referred to as the "Federal Long Arm Statute." Rule 4(k)(2) provides for personal jurisdiction where: (1) the claim against the defendant arises under federal law; (2) the defendant is not subject to the jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of jurisdiction over the defendant comports with the due process requirements of the United States Constitution. *Holland America Line, Inc. v. Wartsila North America, Inc.*, 485 F.3d 450, 461 (9th Cir. 2007). In the present case, it is only the third element which is dispute.

In order to satisfy the due process requirement of the third factor, the foreign defendant "must have 'minimum contacts' with the forum state[7] such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 315 (1945)). The Ninth Circuit employs a three-part test to determine whether sufficient "minimum

---

[7] When personal jurisdiction is being determined pursuant to Rule 4(k)(2), the analysis is "nearly identical" to the traditional personal jurisdiction analysis with the difference that instead of considering contacts with a specific forum state the court considers contacts with a nation as a whole. *See Holland America Line*, 485 F.3d at 462.

contacts" exist to exercise personal jurisdiction, requiring that (1) the defendant has "purposefully availed himself of the privileges of conducting activities in the forum," (2) the claim results from this purposeful availment, and (3) "the exercise of jurisdiction is reasonable." *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Because minimum contacts do not exist as to the Defendants, this Court cannot exercise personal jurisdiction over the Defendants.

The Ninth Circuit has refined the first prong of the "minimum contacts" test to whether the defendant has "either (1) 'purposefully availed' himself of the privilege of conducting activities in the forum, or (2) 'purposefully directed' his activities toward the forum." *Pebble Beach Co.*, 453 F.3d at 1155 (*citing Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). Because the Defendants have not taken any action actually in the United States, and AMA has not alleged otherwise, the first possibility of "availment" is completely inapplicable to the current analysis regarding the Defendants. *Id.* ("Evidence of availment is typically action *taking place in the forum* . . . ." (emphasis added)). Therefore, based on the allegations in AMA's Complaint, the test must proceed, if at all, under the purposeful direction analysis. *Id.* ("Evidence of direction generally consists of action taking place outside the forum that is directed at the forum.").

In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that a foreign act, in order to satisfy the purposeful direction requirement must be both aimed at and have an effect in the forum state. *See Bancroft*, 223 F.3d at 1087. However, in the Ninth Circuit, it is not enough for the plaintiff to show that the defendant committed an act and that the plaintiff felt an effect in the United States. The plaintiff must show even more than whether the defendant's acts had a foreseeable effect in the forum. *Pebble Beach Co.*, 453 F.3d at 1160.

The Ninth Circuit has been exceedingly cautious to require that the plaintiff show "something more" – specifically that the defendant expressly aimed its actions at United States. *See, e.g., Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000) ("[*Calder*] cannot stand for the broad proposition that a foreign act with foreseeable effects in the

forum state always gives rise to specific jurisdiction.  We have said that there must be 'something more' . . . .  We now conclude that 'something more' is what the Supreme Court described as 'express aiming' at the forum state.").  "The 'something more' additional requirement is important simply because the effects cited may not have been caused by the defendant's actions of which the plaintiff complains."  *Pebble Beach Co.*, 453 F.3d at 1160.  Considering these stringent requirements, AMA's allegations are far from sufficient to demonstrate sufficient "purposeful direction."

The Ninth Circuit has recognized that it is a rare occurrence indeed for a foreign defendant to be subject to jurisdiction under Rule 4(k)(2).  In *Holland America Line, Inc.,* the Ninth Circuit specifically noted that "in the fourteen years since Rule 4(k)(2) was enacted, none of our cases has countenanced jurisdiction under the rule."  485 F.3d at 462.

In *Pebble Beach Co.*, the Ninth Circuit found that the plaintiff could not satisfy the purposeful direction requirement despite having alleged that: (a) the defendant used a ".com" domain name, which allegedly showed that the United States was its primary market and that it was directly advertising its services to the United States, (b) the defendant used the name "Pebble Beach" to target the United States because it is a famous trademark in the United States, (c) the defendant intended to advertise to the United States by locating itself in a resort town that catered to Americans, and (d) "a majority of [the defendant]'s business in the past has been with Americans."  453 F.3d at 1159.

In the present case, the Plaintiffs do nothing more than (a) make a naked legal conclusion that the Defendants have purposefully availed themselves of doing business in this forum, and (b) allege (without any evidence) that a large portion of the users of BSSL's websites are within the United States.  Multiple federal courts outside the Ninth Circuit have considered identical factual circumstances as those presented in this case have concluded that they lacked personal jurisdiction over foreign website operators accused of copyright infringement. *See, e.g., Liberty Media Holdings v. Letyagin,* Case No. 11-62107, Docket No. 47. (S.D. Fla. 2011) (discussing plaintiff's Rule 4(k)(2) argument: "Plaintiff has not shown that Defendant's conduct can, in line

16

with the Constitution, subject it to jurisdiction in this forum. Plaintiff contends that Defendant has 'considerable' web traffic originating from the United States and has presented an exhibit showing that fifteen percent of the visitors to its website are from the United States. . . . Precedent, however, establishes that maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there; those users must be directly targeted, such that the defendant can foresee having to defend a lawsuit. . . . Here, Plaintiff has alleged that Defendant's website receives traffic and business from United States customers but has not met its burden of showing that Defendant did anything to target customers from the United States or even that anyone from the United States made a purchase on Defendant's website.") and *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359, *24-25 (N.D. Iowa Jan. 17, 2012) ("Although I accept as true Fraserside's allegations that xHamster intentionally infringed Fraserside's registered copyrights and trademarks, these allegations, alone, fail to demonstrate that xHamster 'uniquely or expressly aimed' its tortious acts at Iowa. . . . Although xHamster's website is both commercial and interactive, as an Iowa district court noted in a case presenting similar facts, such a website 'is arguably no more directed at Iowa than at Uzbekistan.'").[8]

The Defendants do not "expressly aim" their conduct towards the United States. As a starting point, the Plaintiff's attempt to aggregate the contacts of all of the Defendants is wholly and utterly impermissible. "Each defendant's contacts with the forum state must be assessed individually rather than simply viewing them collectively." *Calder v. Jones*, 465 U.S. 783, 790

---

[8] *See also be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) ("If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution."); *Toys "R" Us, Inc. V. Step Two, S.A.*, 318 F.3d 446, 452-54 (3d Cir. 2003) ("[T]he mere operation of a commercially interactive web site should not subject the operator to jurisdiction . . . . Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the [jurisdiction]."); *Instabook Corp. v. Instapublisher.com*, 469 F. Supp. 2d 1120, 1127 (S.D. Fla. 2006) (finding insufficient contacts in a patent infringement case since, among other reasons, "Defendant could not reasonably anticipate being haled into court in Florida based on its operation of interactive websites accessible in Florida and its sales to two Florida residents" in the absence of "targeting or solicitation of Florida residents."); *ESAB Group, Inc. v. Centricut, L.L.C.*, 34 F. Supp. 2d 323, 331 (D.S.C. 1999) ("While it is true that anyone, anywhere could access Centricut's home page, including someone in South Carolina, it cannot be inferred from this fact alone that Centricut deliberately directed its efforts toward South Carolina residents."); *Johnson v. Arden*, 614 F.3d 785, 797-98 (8th Cir. 2010) ("[T]he Johnsons have failed to prove that www.BoutiqueKittens.com is uniquely or expressly aimed at Missouri; thus *Calder* provides no support for their Lanham Act claim.").

(1984). *See also Rush v. Savchuk,* 444 U.S. 320, 331-32 (1980) ("The Minnesota court also attempted to attribute State Farm's contacts to Rush by considering the 'defending parties' together and aggregating their forum contacts in determining whether it had jurisdiction.  The result was the assertion of jurisdiction over Rush based solely on the activities of State Farm.  Such a result is plainly unconstitutional."); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").

With regard to Mr. Urrestarazu, then, the Complaint does not actually state *any* allegations as to why jurisdiction is appropriate.

With regard to BSSL, like most every other website operating on the Internet, BSSL's websites are available to anyone with access to the Internet.  AMA's only allegation (unsupported though it is) is that a "large portion" of the website's users come from the United States.  As the Ninth Circuit explained in *Pebble Beach,* however, the number of visitors from the United States "go[es] to effects rather than express aiming."  453 F.3d at 1160.  Other federal courts to have considered the question have rejected the idea that allegations concerning the number of visitors to a website originating from the United States is sufficient to support personal jurisdiction.  *See, e.g., Fraserside IP L.L.C. v. Hammy Media, LTD,* 2012 U.S. Dist. LEXIS 5359 (N.D. Iowa Jan. 17, 2012) (rejecting personal jurisdiction despite allegations that "xHamster's website www.xHamster.com is visited daily by over 1,500,000 internet users worldwide with roughly 20 percent of the site's visitors being from the United States"); *Fraserside IP, L.L.C. v. Youngtek Solutions, Ltd.,* 2013 U.S. Dist. LEXIS 3779 (N.D. Iowa Jan. 10, 2013) (allegations that "17 to 20 percent of visitors to Youngtek's websites are U.S. citizens"); *Fraserside IP L.L.C. v. Netvertising Ltd.,* 2012 U.S. Dist. LEXIS 180949 (N.D. Iowa Dec. 21, 2012) (allegations that "16.7% percent of HardSexTube's website's daily visitors are from the United States"); *Fraserside IP L.L.C. v. Letyagin,* 885 F. Supp. 2d 906 (N.D. Iowa 2012) (allegations that "eighteen percent of SunPorno's website's 2,500,000 daily visitors are from the United States); *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.,* 2012 U.S. Dist. LEXIS 98041 (N.D. Iowa July 16, 2012) (allegations that "the EmpFlix.com website is allegedly visited

daily by over 1,500,000 internet users worldwide with approximately 16.9 percent of the site's visitors coming from the United States.  The TNAFlix.com website is allegedly visited daily by over 3,000,000 internet users worldwide with approximately 21.5 percent of the site's visitors coming from the United States").  Indeed, AMA has not alleged any facts to suggest that BSSL conducted a level of commercial activity in the United States, or any activity specifically targeted at the United States, sufficient to subject BSSL to personal jurisdiction within the U.S., consistent with due process.

Given that AMA has not shown (and cannot show) sufficient facts to satisfy the first prong of the *Bancroft* test (purposeful availment or direction), it is unnecessary to discuss the other two factors.  However, it is easy to see that neither of those factors could be satisfied either even if the first factor was satisfied.  First, because Defendants actions were not directed at the United States, there is no way that a claim in the United States could arise.  Second, given the essentially non-existence contacts and the lack of direction to the United States, exercise of jurisdiction would not be reasonable but instead would offend traditional notions of fair play and substantial justice.

Because AMA has not shown (and cannot show) sufficient facts to support a finding that BSSL expressly aimed its conduct at the United States, as would be required by the Due Process Clause of the Constitution, and satisfy the other requirements to support a finding of personal jurisdiction over the Defendants, the Court cannot properly assert personal jurisdiction over BSSL (or Mr. Urrestarazu) and the case against them must be dismissed.

F.    DEFENDANTS ARE ENTITLED TO RECOVER THEIR COSTS AND FEES.

Although the terms of the Settlement Agreement limit those instances in which the court may award attorney's fees, it does provide that such fees **shall** be awarded when the "authority adjudicating the dispute" finds that the non-prevailing party's claim or defenses are frivolous, vexatious, or undertaken in bad faith.

"An action becomes frivolous when the result appears obvious or the arguments are wholly without merit." *Smarasek v. Nevada*, 2014 U.S. Dist. LEXIS 128731 (D. Nev. Apr. 16,

2014) (citations omitted). In the present case, AMA's claims were clearly frivolous, vexatious, and undertaken in bad faith: the terms of the negotiated Settlement Agreement are not ambiguous, nor is the case law in dispute. There is no rational basis under which AMA can argue that its claims do not have to be dismissed in favor of arbitration – indeed, the allegations of AMA's complaint *mandate* such a result.

Because AMA's claims are frivolous, vexatious, and brought in bad faith, the Respondents are entitled to recover their costs and attorney's fees.

DATED this 24th of December, 2015.

,

**HOLLEY DRIGGS WALCH FINE WRAY PUZEY & THOMPSON**

*/s/ James D. Boyle*
JAMES D. BOYLE, ESQ.
Nevada Bar No. 08384
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
@nevadafirm.com

**CIAMPA FRAY-WITZER, LLP**

Evan Fray-Witzer, Esq. *(pro hac vice forthcoming)*
20 Park Plaza, Suite 804
Boston, Massachusetts 02116

**BOSTON LAW GROUP, PC**

Valentin Gurvits, Esq. *(pro hac vice forthcoming)*
Matthew Shayefar, Esq. *(pro hac vice forthcoming)*
825 Beacon Street, Suite 20
Newton, Massachusetts 02459

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I certify that I caused the document entitled **DEFENDANTS' MOTION TO DISMISS AND FOR AN AWARD OF CONTRACTUAL COSTS AND FEES** to be electronically filed and served this 24th day of December, 2015 to the following:

| Attorneys of Record | Parties Represented | Method of Service |
| --- | --- | --- |
| Marc J. Randazza, Esq.<br>Ronald D. Green, Esq.<br>Randazza Legal Group<br>3625 South Town Center Drive<br>Suite 150<br>Las Vegas, Nevada 89135<br>ecf@randazza.com | AMA Multimedia, LLC | ☐ Personal Service<br>■ Email/E-File<br>☐ Fax Service<br>☐ Mail Service |

DATED this 24th day of December, 2015.

_____
An Employee of Holley Driggs Walch Fine Wray Puzey & Thompson