JAMES D. BOYLE, ESQ.
Nevada Bar No. 08384
HOLLEY DRIGGS WALCH FINE WRAY PUZEY & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702-791-0308
Facsimile: 702-791-1912
Email: jboyle@nevadafirm.com

VALENTIN D GURVITS (*pro hac vice application forthcoming*)
MATTHEW SHAYEFAR (*pro hac vice application forthcoming*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
Email: vgurvits@bostonlawgroup.com
Email: matt@bostonlawgroup.com

EVAN FRAY-WITZER (*pro hac vice application forthcoming*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-507-8043
Email: evan@CFWLegal.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| AMA MULTIMEDIA, LLC a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>BORJAN SOLUTIONS, S.L. d/b/a SERVIPORNO, a Spanish company; and BORJAN MERA URRESTARAZU, an individual,<br><br>Defendants. | Case No. 2:15-cv-01673-JCM-(GWF)<br><br>**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT AND FOR AN AWARD OF CONTRACTUAL COSTS AND FEES** |

## INTRODUCTION

Having first filed a complaint that it understood could not survive Defendants' Motion to Dismiss (the "First Motion to Dismiss") (Dkt. No. 7), Plaintiff AMA Multimedia, LLC's ("AMA") chose not to oppose the Defendants' First Motion to Dismiss, but rather try again with an Amended Complaint. The result, an Amended Complaint which seemingly suffers from a serious case of multiple personality disorder, also runs into two insurmountable hurdles: the facts and the law.

Unlike its original complaint, which sought to actively ignore the fact that each of its claims was subject to a mandatory arbitration provision, AMA now admits that, yes, its claims are indeed subject to arbitration, but nonetheless insists that both this Court and any arbitration forum are required to ignore the arbitration agreement's mandatory pre-filing conditions precedent. In short, AMA has refused to comply with the mandatory conditions precedent to which it agreed, choosing instead to stamp its feet and shout that it wants what it wants.

As AMA now acknowledges, there are indeed certain facts which are not in dispute: (1) the parties voluntarily entered into a settlement agreement, (2) the settlement agreement contains a binding arbitration clause, and (3) the binding arbitration clause covers all of the claims raised in the Plaintiff's complaint. From there, though, AMA ties itself into logical and linguistic knots attempting to explain away its failure to abide by the agreement's conditions precedent to the filing of an arbitration action. Because those terms are clear on their face and because AMA has failed to meet the requisite conditions precedent: (1) its Amended Complaint should be dismissed, (2) its Motion to Compel should be denied, and (3) the Defendants should be awarded their reasonable costs and attorney's fees, as provided for in the underlying settlement agreement. In support of this Motion to Dismiss Amended Complaint and For An Award of Contractual Costs and Fees (the "Second Motion to Dismiss"), the Defendants state as follows.

///

///

## FACTUAL BACKGROUND

AMA spends much of its Amended Complaint recounting events which – even if they had been accurately portrayed, which Defendants dispute – predate the Parties' Settlement Agreement and Release and are, therefore, irrelevant to any claims which AMA might hope to pursue. Even so, AMA directly alleges as follows[1]:

- In mid-2013, AMA concluded that the defendants were "engaged in large-scale copyright infringement of Plaintiff's works." *Amended Complaint*, ¶ 13.

- AMA believed that, in addition to user uploads, the Defendants were themselves uploading infringing material to their websites. *Amended Complaint*, ¶¶ 17-18, 30, 47.

- AMA prepared to file litigation in 2013 concerning all of the allegedly infringing materials on the Defendants' websites, including both material allegedly uploaded by users and material allegedly uploaded by the Defendants themselves. *Amended Complaint*, ¶¶ 21.

- In August of 2013, the parties entered into a comprehensive Settlement Agreement and Mutual Release (the "Settlement Agreement") covering all of the allegedly infringing materials and allegations of infringement. *Amended Complaint*, ¶ 24 and, generally, Settlement Agreement (Exhibit 2 to Plaintiffs' Amended Complaint).

- In November of 2014, AMA came to believe that Defendants were breaching the settlement agreement. *Amended Complaint*, ¶ 27.

- On December 23, 2014, AMA gave notice to Defendants of alleged infringement. *Amended Complaint*, ¶ 35. On January 6, 2015, AMA sent the Defendants a purported Cease and Desist letter. *Amended Complaint*, ¶ 36.

- The terms of the Settlement Agreement specifically require the parties to resolve all disputes "arising out of or otherwise relating to the Agreement" through the use of binding arbitration. Settlement Agreement, ¶ 20.1. More specifically, the Agreement provides that:

    If a dispute arises between the Parties arising out of or otherwise relating to this Agreement, the Parties shall first meet and negotiate in good faith to attempt to resolve the dispute. If, after meeting in person for informal negotiations, the Parties are unable to resolve the dispute, then either party may demand that the dispute be

---

[1] Defendants dispute these allegations but, for the purposes of the present motion only, accept them as true.

3

>   submitted to formal mediation.... If the Parties are unable to resolve the dispute through direct negotiations and/or formal mediation then, except as otherwise provided herein, either Party must submit the issue to binding arbitration in accordance with applicable Arbitration laws and statutes Claims subject to arbitration ("Arbitral Claims") shall include, but are not limited to, contract, tort, and federal, state or local law, statute, or regulation, excepting only claims seeking injunctions, attachment, garnishment, and other equitable relief.

*Id.*

- AMA freely admits that the Settlement Agreement is "valid and binding" and that it requires the parties to submit all claims to binding arbitration. *Amended Complaint*, Claims for Relief ¶¶ 1-19.[2]

## LEGAL ARGUMENT

A.  CAUSES 2 – 8 of AMA'S AMENDED COMPLAINT MUST BE DISMISSED BECAUSE THE CLAIMS AT ISSUE ARE SUBJECT TO THE BINDING MANDATORY ARBITRATION CLAUSE.

Despite now admitting that its ***only*** path forward is through binding arbitration (and then only if and when AMA decides first to meet the conditions precedent to initiating such an arbitration), AMA nonetheless includes in its Amended Complaint each of the claims from its Original Complaint, while asking the Court to stay the case on those claims while the case moves forward to arbitration. Oddly, AMA does so despite its own recognition that, if the parties have entered into an enforceable arbitration agreement (and everyone agrees that they have) and if the claims raised are covered by that agreement (and everyone agrees they are), the only option open to the Court is to dismiss the complaint in its entirety in favor of arbitration. *See, AMA's Motion to Compel Arbitration,* pp. 7-12; *see also, Kilgore v. KeyBank, N.A.,* 673 F.3d 947, 955-956 (9th Cir. 2012) ("In practice, then, the District Court's role is 'therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms'" (*quoting*

---

[2] Plaintiff's complaint restarts its paragraph numbering at 1 with the start of its Claims for Relief.

4

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (internal citation omitted))); *see also Telepet USA, Inc. v. Qualcomm Inc.*, 2015 U.S. Dist. LEXIS 159368, *4 (D. Nev. Nov. 24, 2015) ("[A] district court's role is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue...."); *Rodriguez v. AT&T Services, Inc.*, 2015 U.S. Dist. LEXIS 142398, *9 (D. Nev. Oct. 20, 2015) (same); *Cardiovascular Biotherapeutics, Inc.*, 2015 U.S. Dist. LEXIS 20745, *6 (D. Nev. Feb. 19, 2015) (same); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *Countrywide Home Loans, Inc. v. Mortgage Guaranty Insurance Co.*, 642 F.3d 849, 854 (9th Cir. 2011) ("the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25-26 (2011) ("[T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *Cardiovascular Biotherapeutics, Inc.*, *supra* at *5 ("The standard for demonstrating arbitrability is not high.... The Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district court but instead mandates that the district courts direct the parties to proceed to arbitration on issues to which an arbitration agreement has been signed.").

In the present case there is no dispute. The parties are in complete agreement that both prongs of the arbitrability test are met. This being the case, there is no case that can proceed in this Court and whether the Court orders the parties to proceed to arbitration or finds (as the Defendants argue) that such an order would be premature because AMA has failed to meet the conditions precedent to such an order compelling arbitration, the remaining counts of the complaint should be dismissed since there is no conceivable situation under which the Court

would have jurisdiction to resolve Causes 2-8, which are all covered by the arbitration agreement.

Accordingly, Causes 2-8 of the Complaint must be dismissed as they are subject to (and governed by) the Parties' arbitration agreement.

B. **AMA'S SUGGESTION THAT CLAIMS THAT DEFENDANTS THEMSELVES POSTED INFRINGING MATERIALS ARE NOT COVERED BY THE ARBITRATION AGREEMENT ARE BELIED BY THE PLAIN TERMS OF THE AGREEMENT.**

AMA's argument that claims that the Defendants themselves uploaded infringing materials are exempted from the arbitration provision are absurd on their face. Prior to entering into the Settlement Agreement, AMA accused the Defendants of directly uploading infringing materials. The settlement agreement was specifically designed to address *all* of the claims raised. And the plain language of the settlement agreement makes clear that *no claim* for infringement can be brought by AMA.

Specifically, paragraph 2.1 of the Settlement Agreement, entitled "Pre-suit Requirements and Protections Against Future Litigation," reads:

> The Parties acknowledge that this Agreement is intended to resolve all pending issues between the Parties relating to their operation of the Websites, in an effort to both address previous claims **and to prevent future litigation. Therefore, prior to the filing of any future litigation against the Respondents, either individually or collectively, relating to intellectual property rights infringement, [AMA] agrees that it will afford [Defendants] an opportunity to remove any and all allegedly infringing material using the PornPro Removal Form and procedure described in paragraph 3.0 below. So long as [Defendants] discharge their obligations pursuant to paragraph 3.0, [AMA] shall not initiate any legal proceeding against the [Defendants]** or their agents, employees, successors, or assigns, relating to the allegedly infringing material.

Settlement Agreement, ¶ 2.1 (emphasis added).

Paragraph 4.0, entitled "Websites' Legal Status," reads:

> [Defendants] shall not be considered in breach of this Agreement, and shall not be liable for any legal claims based on infringement of [AMA's] copyrights or trademarks with respect to any [AMA] Content appearing on the Websites so long as [Defendants] comply with the obligations imposed by Section 3.0. [AMA]

6

further agrees that so long as [Defendants] perform their responsibilities under this Agreement, the operation of the Websites shall not be deemed as infringing by [AMA] or violative of [AMA's] intellectual property rights.

Given the clear language of the Settlement Agreement, there is no conceivable scenario under which claims for infringement (no matter who is alleged to have committed the infringement) can be exempted from the arbitration provision.

C.  THE COMPLAINT SHOULD BE DISMISSED AND THE PARTIES DIRECTED TO ARBITRATION WITH TWO IMPORTANT CAVEATS.

1.  ANY ORDER FROM THIS COURT SHOULD MAKE CLEAR THAT THE COURT HAS *NOT* DECIDED THE QUESTION OF WHETHER AMA HAS MET THE CONDITIONS PRECEDENT AND THAT THE ARBITRATORS MUST DECIDE THAT ISSUE IN THE FIRST INSTANCE.

Although the Defendants do not dispute that the present matter must be referred to arbitration, AMA is incorrect in its assertion that this Court should decide the question of whether the conditions precedent have been met and – because an order from this Court to arbitration might serve to confuse the arbitration forum on this crucial point – any such Order that the parties proceed to arbitration should make clear that the Court has ***not*** resolved the question of whether AMA has met the conditions precedent to arbitration.

AMA has argued that this Court should, in the first instance, decide the question of whether it has satisfied the conditions precedent to arbitration. *Plaintiff's Motion,* pp. 10. In so arguing, AMA claims that the resolution of this issue is the same as a determination of arbitrability, which *is* ordinarily left to the Court unless the parties have clearly indicated a contrary intent. AMA, however, has completely misunderstood the scope of the question reserved for the Court. The gateway question of arbitrability is precisely the two-prong analysis described above: whether the parties entered into an enforceable agreement to arbitrate and whether the claims at issue are subject to the arbitration agreement. After that, however, the question of conditions precedent is clearly left to the arbitrator to decide.

As the United States Supreme Court explained in *BG Group PLC v. Republic of Arg.*:

[C]ourts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the

7

use of arbitration.... [T]hey include the satisfaction of "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate." ... Revised Uniform Arbitration Act of 2000] §6(c) ("An arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled") ... §6, Comment 2 (explaining that this rule reflects "the holdings of the vast majority of state courts" and collecting cases).

134 S. Ct. 1198, 1202, 1207 (2014). *See also Howsam v. Dean Witter Reynolds*, 537 U.S. 79 (2002) ("The [Federal Arbitration Act], states that an 'arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled.'").

2. **THE COURT SHOULD REFER THE PARTIES TO A NATIONALLY RECOGNIZED ARBITRATION PROVIDER SUCH AS JAMS OR THE AAA.**

As is discussed in detail in Defendants' Response to Plaintiff's Motion to Compel Arbitration, filed concurrently herewith, the fact that the Settlement Agreement is silent as to the arbitration provider to be selected does not mean that the Plaintiff may unilaterally select *any* provider of its choosing, but rather – as with any agreement – the court should imply a reasonable term to effectuate the intent of the parties. *See, e.g., United States v. Clarke*, 1995 U.S. App. LEXIS 38850 (9th Cir. 1996) ("It is well settled that where no time for performance is established in the agreement, the law implies that performance must occur within a reasonable time."); *Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1325 (9th Cir. 1982) ("Under general principles of contract law, where, as here, the parties make no express agreement on the contract price, the law implies an agreement for a reasonable price.").

D. **DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION IN THIS COURT.**

Even if the Court were to reject each of the Defendants' arguments concerning arbitration and somehow find AMA's Amended Complaint to be properly before this Court (on substantive grounds), the Complaint would have to be dismissed because the Defendants are not subject to personal jurisdiction in this Court.

Preliminarily, it is important to note that the Settlement Agreement specifically stated that the Defendants contended that there was no personal jurisdiction over them in the United States and that (other than the requirement that the parties mediate and/or arbitrate disputes in

8

Nevada) "nothing contained in this Agreement shall constitute consent to personal jurisdiction, or a waiver of any objection to personal jurisdiction that any party may assert in the future." *Settlement Agreement, Recital C and Section 20.1.*

With that in mind, the present action is brought against a Spanish company and a Spanish resident, neither of whom have any significant contacts with the United States. Affidavit of Borjan Mera Urrestarazu in Support of Defendants' [First] Motion to Dismiss, Docket No. 8 ["Urrestarazu Affidavit"], ¶¶ 1-2. Specifically, Borjan Solutions S.L. ("BSSL") is a Spanish company whose websites are managed entirely from Spain. *Id.*, ¶¶ 2, 8. All of BSSL's employees are located in Spain. *Id.*, ¶ 9.

BSSL does not engage, contract for, or purchase any servers in the United States to host its websites. *Id.*, ¶ 10. BSSL uses LeaseWeb, a hosting company from the Netherlands, for its hosting solutions. *Id.* As part of these hosting solutions, LeaseWeb provides a Content Delivery Network (CDN) for BSSL's websites. *Id.* A CDN delivers content to a user from the closest of many file storage locations around the world and LeaseWeb, like all other useful CDNs, has file storage locations around the whole world. *Id.* For example, if a user from China accesses a file on one of BSSL's websites, LeaseWeb may serve that file from a file storage location it has in China. *Id.* Therefore, although it is possible that LeaseWeb (without BSSL's specific request to do so) may replicate some of the files from BSSL's websites onto a server in the United States so that it can then serve it to a user in the United States, BSSL does not itself host any content in the United States and has not selected or requested that LeaseWeb host any content in the United States. *Id.* In short, to the extent that any of BSSL's websites are served from within the United States, it is not because BSSL chose to have it served from the United States. *Id.*, ¶ 11. It is because of the way a CDN works. *Id.*

BSSL does not aim its websites at any particular country, but rather its websites are aimed at the entire world of internet users who speak the language used on each particular website. *Id.*, ¶ 12. Each of BSSL's websites have visitors from countries all around the world. *Id.*, ¶ 13.

BSSL has never had a presence in or significant contacts with the United States. BSSL does not have (and has never had) any employees in the United States. BSSL does not have (and has never had) a bank account in the United States. BSSL does not own or lease (and has never owned or leased) real estate in the United States. BSSL does not pay (and has never paid) taxes in the United States. BSSL does not have (and has never had) an agent for the service of process in the United States. BSSL does not have (and has never had) a telephone number in the United States. *Id.*, ¶¶ 14-20.

Similarly, Mr. Urrestarazu does not have any significant contacts with the United States. He does not maintain (and has never maintained) a bank account in the United States; does not pay (and has never paid) taxes in the United States; and does not have (and has never had) a telephone number in the United States. *Id.*, ¶¶ 21-24. Mr. Urrestarazu's visits to the United States have been limited to short vacations and to attend trade conventions. *Id.*, ¶ 25. He does not direct or control the content that appears on BSSL's websites. *Id.*, ¶ 26.

In its Complaint, AMA asserts that personal jurisdiction over the Defendants is proper under FRCP 4(k)(2), sometimes referred to as the "Federal Long Arm Statute." Rule 4(k)(2) provides for personal jurisdiction where: (1) the claim against the defendant arises under federal law; (2) the defendant is not subject to the jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of jurisdiction over the defendant comports with the due process requirements of the United States Constitution. *Holland America Line, Inc. v. Wartsila North America, Inc.*, 485 F.3d 450, 461 (9th Cir. 2007). In the present case, it is only the third element which is dispute.

Plaintiff also asserts that personal jurisdiction over Defendants is proper under Nevada's long-arm statute, N.R.S. § 14.065, which states that "A court of this state may exercise jurisdiction over a party to a civil action on any basis not inconsistent with the Constitution of this state or the Constitution of the United States." Because Nevada's long-arm statute extends to the limits of the Constitution, the only element that must be analyzed thereunder is also the third element under Rule 4(k)(2) – due process. *See, e.g.*, *Computerized Screening, Inc. v.*

*Healthspot Int.*, 2015 WL 4562342, at * 3 (D. Nev. July 28, 2015) ("Because Nevada's long-arm statute ... permits Nevada court to exercise jurisdiction to the same extent as the Constitution, this Court need only consider the constitutional principles of due process" (citing *Walden v Fiore*, 134 S.Ct. 1115, 1121 (2014))); *Ruhlmann v. Rudolsky*, 2015 WL 5692054, * 4 (D. Nev. Sept. 27, 2015) (similar).

In order to satisfy the due process requirement of the third factor, the foreign defendant "must have 'minimum contacts' with the forum state[3] such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 315 (1945)). The Ninth Circuit employs a three-part test to determine whether sufficient "minimum contacts" exist to exercise personal jurisdiction, requiring that (1) the defendant has "purposefully availed himself of the privileges of conducting activities in the forum," (2) the claim results from this purposeful availment, and (3) "the exercise of jurisdiction is reasonable." *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Because minimum contacts do not exist as to the Defendants, this Court cannot exercise personal jurisdiction over the Defendants.

The Ninth Circuit has refined the first prong of the "minimum contacts" test to whether the defendant has "either (1) 'purposefully availed' himself of the privilege of conducting activities in the forum, or (2) 'purposefully directed' his activities toward the forum." *Pebble Beach Co.*, 453 F.3d at 1155 (*citing Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). Because the Defendants have not purposefully taken any action actually in the United States,[4] and AMA has not alleged otherwise, the first possibility of "availment" is

---

[3] When personal jurisdiction is being determined pursuant to Rule 4(k)(2), the analysis is "nearly identical" to the traditional personal jurisdiction analysis with the difference that instead of considering contacts with a specific forum state the court considers contacts with a nation as a whole. *See Holland America Line*, 485 F.3d at 462.

[4] To the extent that Plaintiffs allege otherwise, *e.g.*, that Defendants engage in activities *in* the United States, any such activities are not purposeful. *See* Urrestarazu Affidavit, ¶¶ 10-11 ("BSSL does not engage, contract for or purchase any servers in the United States. BSSL uses LeaseWeb, a hosting company from the Netherlands, for its hosting solutions. As part of these hosting solutions, LeaseWeb provides a Content Delivery Network (CDN) for BSSL's websites. To my understanding, a CDN delivers content to a user from the closest of many file storage locations around the world and LeaseWeb, like all other useful CDNs, has file storage locations around the whole

completely inapplicable to the current analysis regarding the Defendants. *Id.* ("Evidence of availment is typically action *taking place in the forum* ...." (emphasis added)). Therefore, based on the allegations in AMA's Complaint, the test must proceed, if at all, under the purposeful direction analysis. *Id.* ("Evidence of direction generally consists of action taking place outside the forum that is directed at the forum.").

In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that a foreign act, in order to satisfy the purposeful direction requirement must be both aimed at and have an effect in the forum state. *See Bancroft*, 223 F.3d at 1087. However, in the Ninth Circuit, it is not enough for the plaintiff to show that the defendant committed an act and that the plaintiff felt an effect in the United States. The plaintiff must show even more than whether the defendant's acts had a foreseeable effect in the forum. *Pebble Beach Co.*, 453 F.3d at 1160.

The Ninth Circuit has been exceedingly cautious to require that the plaintiff show "something more" – specifically that the defendant expressly aimed its actions at United States. *See, e.g., Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000) ("[*Calder*] cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction. We have said that there must be 'something more'.... We now conclude that 'something more' is what the Supreme Court described as 'express aiming' at the forum state."). "The 'something more' additional requirement is important simply because the effects cited may not have been caused by the defendant's actions of which the plaintiff complains." *Pebble Beach Co.*, 453 F.3d at 1160. Considering these stringent requirements, AMA's allegations are far from sufficient to demonstrate sufficient "purposeful direction."

---

world. For example, if a user from China accesses a file on one of BSSL's website, LeaseWeb may serve that file from a file storage location it has in China. Therefore, although it is possible that LeaseWeb (without our specific request to do so) may replicate some of the files from BSSL's websites onto a server in the United States so that it can then serve it to a user in the United States, BSSL does not itself host any content in the United States and has not selected or requested that LeaseWeb host any content in the United States. In short, to the extent that any of BSSL's websites are served from the United States, it is not because BSSL chose to have it served from the United States. It is because of the way a CDN works.").

The Ninth Circuit has recognized that it is a rare occurrence indeed for a foreign defendant to be subject to jurisdiction under Rule 4(k)(2). In *Holland America Line, Inc.*, the Ninth Circuit specifically noted that "in the fourteen years since Rule 4(k)(2) was enacted, none of our cases has countenanced jurisdiction under the rule." 485 F.3d at 462.

In *Pebble Beach Co.*, the Ninth Circuit found that the plaintiff could not satisfy the purposeful direction requirement despite having alleged that: (a) the defendant used a ".com" domain name, which allegedly showed that the United States was its primary market and that it was directly advertising its services to the United States, (b) the defendant used the name "Pebble Beach" to target the United States because it is a famous trademark in the United States, (c) the defendant intended to advertise to the United States by locating itself in a resort town that catered to Americans, and (d) "a majority of [the defendant]'s business in the past has been with Americans." 453 F.3d at 1159.

In the present case, the Plaintiffs do nothing more than (a) make a naked legal conclusion that the Defendants have purposefully availed themselves of doing business in this forum, and (b) allege (without any evidence) that a large portion of the users of BSSL's websites are within the United States. Multiple federal courts outside the Ninth Circuit have considered identical factual circumstances as those presented in this case have concluded that they lacked personal jurisdiction over foreign website operators accused of copyright infringement. *See, e.g., Liberty Media Holdings v. Letyagin,* Case No. 11-62107, Docket No. 47 (S.D. Fla. 2011) (discussing plaintiff's Rule 4(k)(2) argument: "Plaintiff has not shown that Defendant's conduct can, in line with the Constitution, subject it to jurisdiction in this forum. Plaintiff contends that Defendant has 'considerable' web traffic originating from the United States and has presented an exhibit showing that fifteen percent of the visitors to its website are from the United States.... Precedent, however, establishes that maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there; those users must be directly targeted, such that the defendant can foresee having to defend a lawsuit.... Here, Plaintiff has alleged that Defendant's website receives traffic and business from United States customers but has not met its burden of

showing that Defendant did anything to target customers from the United States or even that anyone from the United States made a purchase on Defendant's website.") and *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359, *24-25 (N.D. Iowa Jan. 17, 2012) ("Although I accept as true Fraserside's allegations that xHamster intentionally infringed Fraserside's registered copyrights and trademarks, these allegations, alone, fail to demonstrate that xHamster 'uniquely or expressly aimed' its tortious acts at Iowa.... Although xHamster's website is both commercial and interactive, as an Iowa district court noted in a case presenting similar facts, such a website 'is arguably no more directed at Iowa than at Uzbekistan.'").[5]

The Defendants do not "expressly aim" their conduct towards the United States. As a starting point, the Plaintiff's attempt to aggregate the contacts of all of the Defendants is wholly and utterly impermissible. "Each defendant's contacts with the forum state must be assessed individually rather than simply viewing them collectively." *Calder v. Jones*, 465 U.S. 783, 790 (1984). *See also Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980) ("The Minnesota court also attempted to attribute State Farm's contacts to Rush by considering the 'defending parties' together and aggregating their forum contacts in determining whether it had jurisdiction. The result was the assertion of jurisdiction over Rush based solely on the activities of State Farm. Such a result is plainly unconstitutional."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").

---

[5] *See also be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) ("If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution."); *Toys "R" Us, Inc. V. Step Two, S.A.*, 318 F.3d 446, 452-54 (3d Cir. 2003) ("[T]he mere operation of a commercially interactive web site should not subject the operator to jurisdiction .... Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the [jurisdiction]."); *Instabook Corp. v. Instapublisher.com*, 469 F. Supp. 2d 1120, 1127 (S.D. Fla. 2006) (finding insufficient contacts in a patent infringement case since, among other reasons, "Defendant could not reasonably anticipate being haled into court in Florida based on its operation of interactive websites accessible in Florida and its sales to two Florida residents" in the absence of "targeting or solicitation of Florida residents"); *ESAB Group, Inc. v. Centricut, L.L.C.*, 34 F. Supp. 2d 323, 331 (D.S.C. 1999) ("While it is true that anyone, anywhere could access Centricut's home page, including someone in South Carolina, it cannot be inferred from this fact alone that Centricut deliberately directed its efforts toward South Carolina residents."); *Johnson v. Arden*, 614 F.3d 785, 797-98 (8th Cir. 2010) ("[T]he Johnsons have failed to prove that www.BoutiqueKittens.com is uniquely or expressly aimed at Missouri; thus *Calder* provides no support for their Lanham Act claim.").

14

With regard to Mr. Urrestarazu, then, the Complaint does not actually state *any* allegations as to why jurisdiction is appropriate.

With regard to BSSL, like most every other website operating on the Internet, BSSL's websites are available to anyone with access to the Internet. AMA's only allegation (unsupported though it is) is that a "large portion" of the website's users come from the United States and that it utilizes a Content Delivery Network[6] which serves the website to those users and every other user in the world. As the Ninth Circuit explained in *Pebble Beach*, however, the number of visitors from the United States "go[es] to effects rather than express aiming." *Pebble Beach*, 453 F.3d at 1160. Other federal courts to have considered the question have rejected the idea that allegations concerning the number of visitors to a website originating from the United States is sufficient to support personal jurisdiction. *See, e.g., Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359 (N.D. Iowa Jan. 17, 2012) (rejecting personal jurisdiction despite allegations that "xHamster's website www.xHamster.com is visited daily by over 1,500,000 internet users worldwide with roughly 20 percent of the site's visitors being from the United States"); *Fraserside IP, L.L.C. v. Youngtek Solutions, Ltd.*, 2013 U.S. Dist. LEXIS 3779 (N.D. Iowa Jan. 10, 2013) (allegations that "17 to 20 percent of visitors to Youngtek's websites are U.S. citizens"); *Fraserside IP L.L.C. v. Netvertising Ltd.*, 2012 U.S. Dist. LEXIS 180949 (N.D. Iowa Dec. 21, 2012) (allegations that "16.7% percent of HardSexTube's website's daily visitors are from the United States"); *Fraserside IP L.L.C. v. Letyagin*, 885 F. Supp. 2d 906 (N.D. Iowa 2012) (allegations that "eighteen percent of SunPorno's website's 2,500,000 daily visitors are from the United States); *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.*, 2012 U.S. Dist. LEXIS 98041 (N.D. Iowa July 16, 2012) (allegations that "the EmpFlix.com website is allegedly visited daily by over 1,500,000 internet users worldwide with approximately 16.9 percent of the site's visitors coming from the United States. The TNAFlix.com website is allegedly visited daily by over 3,000,000 internet users worldwide with approximately 21.5

---

[6] See Urrestarazu Affidavit, ¶¶ 10-11 and Footnote 4 *supra*.

percent of the site's visitors coming from the United States"). Indeed, AMA has not alleged any facts to suggest that BSSL conducted a level of commercial activity in the United States, or any activity specifically targeted at the United States, sufficient to subject BSSL to personal jurisdiction within the U.S., consistent with due process.

Given that AMA has not shown (and cannot show) sufficient facts to satisfy the first prong of the *Bancroft* test (purposeful availment or direction), it is unnecessary to discuss the other two factors. However, it is easy to see that neither of those factors could be satisfied either even if the first factor was satisfied. First, because Defendants actions were not directed at the United States, there is no way that a claim in the United States could arise. Second, given the essentially non-existence contacts and the lack of direction to the United States, exercise of jurisdiction would not be reasonable but instead would offend traditional notions of fair play and substantial justice.

Because AMA has not shown (and cannot show) sufficient facts to support a finding that BSSL expressly aimed its conduct at the United States, as would be required by the Due Process Clause of the Constitution, and satisfy the other requirements to support a finding of personal jurisdiction over the Defendants, the Court cannot properly assert personal jurisdiction over BSSL (or Mr. Urrestarazu) and the case against them must be dismissed.

E.  DEFENDANTS ARE ENTITLED TO RECOVER THEIR COSTS AND FEES.

Although the terms of the Settlement Agreement limit those instances in which the court may award attorney's fees, it does provide that such fees *shall* be awarded when the "authority adjudicating the dispute" finds that the non-prevailing party's claim or defenses are frivolous, vexatious, or undertaken in bad faith.

"An action becomes frivolous when the result appears obvious or the arguments are wholly without merit." *Smarasek v. Nevada*, 2014 U.S. Dist. LEXIS 128731 (D. Nev. Apr. 16, 2014) (citations omitted). In the present case, AMA's claims were clearly frivolous, vexatious, and undertaken in bad faith: the terms of the negotiated Settlement Agreement are not ambiguous, nor is the case law in dispute. AMA as much as acknowledged this when it amended

its complaint to add a count to compel arbitration in response to Defendants' First Motion to Dismiss (based on the mandatory arbitration clause). There is no rational basis under which AMA can argue that its claims did not have to be dismissed in favor of arbitration – indeed, the allegations of AMA's original complaint *mandated* such a result. And, to the extent that, even now, AMA's Amended Complaint contains counts other than the one for arbitration, it remains frivolous.

Because AMA's claims are frivolous, vexatious, and brought in bad faith, the Defendants are entitled to recover their costs and attorney's fees.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant the Second Motion to Dismiss, and award Defendants their attorneys' fees and costs incurred herein.

DATED this 25th day of January, 2016.

**HOLLEY DRIGGS WALCH FINE WRAY PUZEY & THOMPSON**

/s/ *James D. Boyle*
JAMES D. BOYLE, ESQ.
Nevada Bar No. 08384
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

**CIAMPA FRAY-WITZER, LLP**

Evan Fray-Witzer, Esq. (*pro hac vice forthcoming*)
20 Park Plaza, Suite 505
Boston, Massachusetts 02116

**BOSTON LAW GROUP, PC**

Valentin Gurvits, Esq. (*pro hac vice forthcoming*)
Matthew Shayefar, Esq. (*pro hac vice forthcoming*)
825 Beacon Street, Suite 20
Newton, Massachusetts 02459

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I certify that I caused the document entitled **DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT AND FOR AN AWARD OF CONTRACTUAL COSTS AND FEES** to be electronically filed and served this 25th day of January, 2016 to the following:

| Attorneys of Record | Parties Represented | Method of Service |
|---|---|---|
| Marc J. Randazza, Esq.<br>Ronald D. Green, Esq.<br>Randazza Legal Group<br>3625 South Town Center Drive<br>Suite 150<br>Las Vegas, Nevada 89135<br>ecf@randazza.com | AMA Multimedia, LLC | ☐ Personal Service<br>■ Email/E-File<br>☐ Fax Service<br>☐ Mail Service |

DATED this 25th day of January, 2016.

*Evelyn M. Pastor*
An Employee of Holley Driggs Walch Fine Wray Puzey & Thompson