# <u>EXHIBIT 10</u>

The Costs of Arbitration

Public Citizen

# The Costs of Arbitration



**Congress Watch**
April 2002

## Acknowledgments

Legislative Counsel Jackson Williams wrote this report, based on extensive research conducted by Civil Justice Fellows Elisabeth Strawn and Bobby Zafarnia, and Legislative Assistants Andrew Benore and Morgan Lynn.  Frank Clemente, Director of Public Citizen's Congress Watch, provided substantial editorial direction.

Public Citizen would also like to thank Paul Bland, John Vail, Cliff Palefsky, John Hudson, Pat Sadler and Stephanie Paul for their assistance in providing material for this report.  Florence Peterson of the American Arbitration Association and Ed Anderson of the National Arbitration Forum also assisted Public Citizen by answering numerous queries about their organizations' billing practices.

## About Public Citizen

Public Citizen is a non-profit 150,000 member organization based in Washington, D.C., representing consumer interests through lobbying, litigation, research and public education. Since its founding by Ralph Nader in 1971, Public Citizen has fought for consumer rights in the marketplace, safe and secure health care, fair trade, clean and safe energy sources, and corporate and government accountability. Public Citizen has six divisions and is active in every public forum: Congress, the courts, governmental agencies and the media.



**Public Citizen's Congress Watch**
**215 Pennsylvania Avenue SE**
**Washington, D.C. 20003**

**Phone: 202-546-4996**
**Fax: 202-547-7392**
**www.citizen.org**
©2002 Public Citizen.  All rights reserved.

Call Public Citizen's Publication Office, 1-800-289-3787, for additional orders.  The report's publication number is B9028.  Price is $50.  Or consult our web site at www.citizen.org.
Major credit cards accepted.  Or write to:

Members Services
Public Citizen
1600 20th Street, N.W.
Washington, D.C. 20009

# Table of Contents

Executive Summary ................................................................................................ 1

Introduction ........................................................................................................... 4

Section One
Exhibits and Case Studies ..................................................................................... 6
    Exhibit A: Arbitration Sticker Shock .............................................................. 6
    Exhibit B: Justice Delayed Is… Very Expensive ........................................... 8
    Exhibit C: An Arbitration Tripple Play ......................................................... 16
    Exhibit D: Arbitration Costs Are Not Chicken Feed ................................... 19
    Exhibit E: We *Can* Make Arbitration Cheap, But We *Won't* ...................... 21
    Exhibit F: Arbitration Crap Shoot ................................................................. 25
    Exhibit G: From Each According to His Ability… ....................................... 27
    Exhibit H: Market of Choice? ........................................................................ 29
    Exhibit I: Justice?  I Can Get It for You Wholesale ..................................... 32
    Exhibit J: "…real benefits to the enforcement of arbitration provisions…" ................... 34
    Exhibit K: Going to Court .............................................................................. 38

Section Two
Arbitration Costs and Court Costs Compared ..................................................... 40
    Arbitration Costs: Four Hypothetical Cases ................................................. 40
    Chart: Court Costs versus Arbitration Costs ................................................ 42
    How Arbitration Costs Add Up ...................................................................... 43

Section Three
Analysis: A Closer Look at Arbitration Costs ..................................................... 52
    I. Impact of Arbitration Costs on the Ability to Vindicate Rights ................ 52
    II. Economics of Arbitration Costs ................................................................ 59
    III. Consequences of Arbitration Costs ......................................................... 77

Conclusion ............................................................................................................ 80

Endnotes ............................................................................................................... 81

# Executive Summary

**"The speed and affordability of arbitration are perhaps its most discussed benefits…"** [1]
**-U.S. Chamber of Commerce**

**"Arbitration can save parties 70-80% of the cost of litigating these cases."** [2]
**-Ed Anderson, National Arbitration Forum**

**"Arbitration still costs less than litigation"** [3]
**-*The Wall Street Journal***

**"Less costly"** [4]
**-AT&T Broadband**

**"Cost-effective"** [5]
**-Sen. Jeff Sessions**

**"Usually it is quicker, less expensive, and more informal than litigation. Not always…"** [6]
**-Florence Peterson, American Arbitration Association**

Remarkably, although the claim is frequently made that arbitration costs less than litigation, no research has ever been undertaken to substantiate it. No interest group has commissioned a study. No Member of Congress has asked for a General Accounting Office report.

Writing in 1992 about court-annexed ADR[7], Stanford law professor Deborah Hensler cautioned, "Whether alternative dispute resolution procedures will reduce private litigation costs is still an open question. Court-administered arbitration has shown mixed results in this regard." Recently she repeated her caveat about a paucity of empirical research, explaining, "Because public support for ADR is so frequently justified on cost savings grounds, program administrators especially fear cost-benefit assessments."[8]

Here, Public Citizen presents the first comprehensive collection of information on arbitration costs. We find:

- The cost to a plaintiff of initiating an arbitration is almost always higher than the cost of instituting a lawsuit. Our comparison of court fees to the fees charged by the three primary arbitration provider organizations demonstrates that *forum costs*—the costs charged by the tribunal that will decide the dispute—can be up to five thousand percent higher in arbitration than in court litigation. These costs have a deterrent effect, often preventing a claimant from even filing a case.

Public Citizen's survey of costs finds that, for example, the forum fee for a $60,000 employment discrimination claim in the Circuit Court of Cook County, Illinois is $221. The forum fees for the same claim before the National Arbitration Forum (NAF) would be $10,925, 4,943% higher. An $80,000 consumer claim brought in Cook County would cost $221, versus $11,625 at NAF, a 5,260% difference. These high costs are not restricted to NAF; for the same $80,000 claim, the American Arbitration Association (AAA) would charge the plaintiff up to $6,650, and Judicial Arbitration and Mediation Services (JAMS) would charge up to $7,950, amounting to a 3,009% and 3,597% difference in cost, respectively.

- Arbitration costs are high under a pre-dispute arbitration clause because there is no price competition among providers. Companies that want to use arbitration costs as a barrier, to prevent consumers and others from asserting their legal rights, have no incentive to arrange low-cost arbitration services. Instead, it is to their advantage to seek out the highest-cost arbitration providers. While experience has shown that many lawyers are willing to serve as arbitrators for nominal fees, the market provides no mechanism to match volunteer arbitrators to cases in which they are needed the most.

  The mandatory arbitration clause's negative effect on price competition can be seen in AAA's handling of insurance claim arbitration. From 1989 to 2000, in cases submitted to AAA on a *post-dispute* basis, AAA charged each party a total of only $300 for administration and arbitrator fees. But cases arising under a *pre-dispute clause* were governed by AAA's Commercial Rules, with much higher filing fees and regular hourly arbitrator fees. For example, a health insurer's denial of coverage for a bone marrow transplant, submitted post-dispute under the Insurance Claims Procedures, would cost the consumer $300. But for a case governed by a pre-dispute clause, AAA charged a much higher fee. Tammy Sharpton, who arbitrated such a case in 1997, was charged $5,290.23, *eighteen times* what AAA would have charged had it been competing with other arbitration providers and the courts.

- Arbitration costs will probably always be higher than court costs in any event, because the expenses of a private legal system are so substantial. The same support personnel that expedite cases at a courthouse, such as file clerks and court administrators, are also necessary to manage arbitration cases. But because arbitration provider organizations handle fewer cases over larger geographic areas, the economy of scale in a court clerk's office cannot be achieved, increasing the administrative cost per case. Thus, while it costs the Clerk of the Circuit Court of Cook County an average of $44.20 to administer a case, AAA's administrative cost per case averages $340.63, about 700 percent more.

- Arbitration saddles claimants with a plethora of extra fees that they would not be charged if they went to court. For example, the National Arbitration Forum charges $75 to issue a subpoena. A lawsuit litigant can obtain a subpoena form for free from the court, oftentimes downloading it off the Internet. NAF also charges fees for discovery requests ($150) and continuances ($100), occurrences so ubiquitous in litigation that they must be viewed as inevitable. The American Arbitration Association (AAA) charges extra fees for use of a hearing room.

- Taking a case to arbitration does not guarantee that a consumer or employee will stay out of court, making arbitration still more costly. First, a plaintiff bound by a *one-way arbitration clause*, the most common type, may be forced to go to court to litigate the same issues that are being decided in the arbitration. This is because the other party to the clause has retained its right to sue in court. Second, if crucial documents or testimony must come from a third party, court litigation is necessary to enforce subpoenas. In fact, due to a quirk in arbitration law, sometimes two different federal lawsuits are necessary to enforce one subpoena. Third, if a plaintiff wins a case in arbitration but the defendant refuses to honor the award, the plaintiff must ask a judge to enforce the award.

- The costs of arbitration are so high that even some businesses that choose to include arbitration clauses in contracts with consumers and farmers have refused to pay the fees.

- High arbitration costs can also be used to bludgeon an adversary. For instance, the party being sued can file a motion to dismiss or a motion for summary judgment. The claimant must then advance additional funds to pay the arbitrator to decide the motion, even if the motion has no merit. The defendant can also refuse to provide discovery information, in which case the claimant must advance funds to the arbitrator to decide the discovery dispute. In one case, for which we have reproduced copies of the arbitration bills, the claimant was unable to pay and had to abandon the case.

- The oft-cited benefits that arbitration can offer in exchange for higher fees will seldom benefit consumer litigants. Not only is there is no evidence that arbitration reduces the overall *transaction costs of litigation* (e.g. witness fees, attorney fees, discovery costs), but nobody has expounded a coherent theory to explain how arbitration *could* reduce such costs except in a few categories of cases. Indeed, Public Citizen's careful examination of the cost savings claim demonstrates that in the vast majority of cases, arbitration will necessarily *increase* the transaction costs of litigation.

# The Costs of Arbitration

<u>Introduction</u>

**"It is regrettable perhaps, but the AAA and its arbitrators do not provide their services for free."**
**-AAA Arbitrator Eliot Disner**

Imagine this: you've invited someone to join you at a restaurant for drinks and hors d'ouvres—it could be a date, or a colleague. You've been seated and the waiter is on his way, but you need to leave the table for a moment. You ask your companion to order some wine and an appetizer. When you return, you find that, instead of getting a glass of chablis and oysters, your companion has ordered a bottle of Dom Perignon champagne and a plate of beluga caviar. The waiter brings a check for $600, about $570 more than you had expected to pay.

A quite similar situation faces consumers, non-union workers, small investors, franchisees, and contract farmers who have unwittingly signed on to binding, pre-dispute arbitration clauses. They have entered into transactions relying on the good faith of others, assuming that the seller, employer, or business partner would not charge to them the equivalent of a $500 bottle of champagne. But when a dispute arises, they find that it will be resolved through an expensive private legal system designed for large, wealthy corporations, not for individuals of modest means.

Just as expensive food and drinks are appropriate for some special occasions, so is arbitration. Some disputes, especially those among businesses, can be resolved more efficiently when referred to an expert on a particular matter. Even some types of disputes between consumers and businesses may be resolved more expeditiously by arbitration (although, when that is the case, businesses generally decline to arbitrate unless mandated to do so by law).

The threat posed to individuals by arbitration arises from its use in cases in which it is not cost-effective for both parties. In such situations, which comprise the majority of disputes likely to face a consumer, worker, or small businessperson, the costs associated with arbitration may be so great as to force abandonment of a claim. For this reason, most corporate counsel have ordered the inclusion of arbitration clauses in contracts with less affluent parties.

To understand the impact of arbitration costs, it is necessary to break down the *transaction costs of litigation* into three parts. The first element is *attorney fees*. Attorney fees may be charged on flat, hourly, or contingency basis. Claimants in most consumer or employment disputes are charged on a contingency basis, meaning they do not have to deposit fees with their attorney and the attorney is paid only upon conclusion of a successful case.

The second element is *litigation expenses*. These are the costs of preparing and presenting a case. Generally, the largest items in this category are discovery costs, which include requests,

---

retrieval, copying, and delivery of documents and the taking and transcribing of depositions; and expert witness' fees. Other expenses include travel, exhibits, and the parties' time.

Finally, there are *forum costs*—the fees that must be paid to the institution that will adjudicate the dispute. Ordinarily, this institution is a public (federal, state, or municipal) court system that charges a nominal filing fee, usually between $75 and $225. In arbitration, forum costs are substantially higher because arbitration providers are not publicly subsidized. Forum costs are the central focus of this report.

Arbitration was conceived as an expedited process that would reduce the costs of attorney fees and litigation expenses, more than offsetting the increased forum costs. As this report demonstrates, net cost savings will not materialize in the vast majority of consumer and employee claims.

In researching this report, Public Citizen sought copies of arbitration providers' invoices to illustrate arbitration costs. This task was difficult, because few consumers have actually navigated the process—most individuals, when confronted by the costs, are forced to drop their claims.

Section I of this report includes copies of invoices and correspondence relating to several individuals' claims. In each instance, a person or family had experienced a dramatic event that led to financial hardship. It was in the face of such hardship that they were required to advance arbitration costs.

Section II compares forum costs among three arbitration provider organizations and a public court system.

Section III contains a detailed analysis of arbitration costs.

<u>Section One</u>

# Exhibits and Case Studies

### Exhibit A: Arbitration Sticker Shock

The economic boom of the 1990s meant that nearly every American had a job. But full employment had a downside—a shortage of skilled workers in the building trades. Many homebuilders, unwilling to turn away business, resorted to hiring poorly skilled laborers. This, in turn, meant more disputes over construction quality. Faced with potential lawsuits over poorly-built homes, builders found a safe haven within the American Arbitration Association's Construction Industry Tribunal. The stiff fees charged by AAA and its arbitrators frighten many consumers away.

Charles and Mary Betzler of Houston, Texas had signed a contract to purchase a new home from the Ryland Corporation that contained a mandatory arbitration clause.  Upon moving in, the Betzlers discovered numerous defects. They entered into a negotiated settlement with  Ryland, but the settlement fell apart when promised repair work was not completed. Their engineering consultant confirmed that improperly installed roofing, doors, and wiring had not been replaced.

The following AAA document illustrates the upfront payments that consumers must make to initiate arbitration. The Betzlers paid an initial filing fee of $1,500 to cover AAA's administrative costs, but this did not cover the arbitrator's compensation. Exhibit A shows the AAA "Compensation Stipulation" in which the parties agree to pay the arbitrator $1,600 per day. The Betzlers soon after received a letter from the arbitrator requiring her compensation to be deposited in advance. In this case, the Betzlers were required to advance a total of $7,563.75. ($2,580 was later refunded when a hearing anticipated to take two days was completed in one.) These fees were in addition to the fees the Betzlers paid to their attorney and expert consultants.

# American Arbitration Association

1005 First City Tower, 1001 Fannin Street, Houston, TX 77002–6708
Telephone: (713) 739–1302 • Fax: (713) 739–1702



Glen H. Spencer
*Regional Vice President*

## AMERICAN ARBITRATION ASSOCIATION

### COMPENSATION STIPULATION

**IN RE: 70 110 0260 95K**

Mr. & Mrs. Charles E. Betzler, III   vs. Ryland Homes        – Locale: Houston, Texas

The following is hereby stipulated and agreed upon by the parties to the above entitled proceedings.

1. The neutral arbitrator serving in this proceeding shall be compensated at the rate of $1600.00 per day for each day of hearing or portion thereof, commencing with the first day of hearing.  Each arbitrator shall serve uncompensated for the first preliminary hearing, and thereafter at 1\2 the above indicated per diem for every subsequent preliminary hearing.

   Furthermore, the neutral arbitrator serving in this proceeding shall be compensated for one day of deliberation at the rate of $1600.00 for every third day of hearing.

   In addition, in the event the hearing takes one to two days, the first three (3) hours of study time shall be uncompensated.  for up to ten (10) hours of study time thereafter, I shall be compensated at the rate of $125.00 per hour.  Any additional study time after ten hours shall be uncompensated.

2. The undersigned parties shall bear the costs of such compensation equally, ____ as directed by the arbitrator (if applicable), or as specified below.

3. This agreement represents an independent obligation of the parties.  It is understood that the AAA has no liability, directly or indirectly, for such payment.  Each party shall promptly make such deposits with the AAA as required by the administrator and pursuant to the AAA rules in use on this case.

4. The administrator will make payment to neutral(s) in accordance with this agreement from the funds deposited as provided for in Number 3.

5. The neutral shall include in the award (if applicable) a provision allocating the neutral or neutrals' compensation as provided for in Number 2.

Morris Tabak, Esq.                    Pamela Batterson

**P L E A S E   S I G N  &  R E T U R N   T O   A A A**
Via facsimile – (713) 739–1702

Mediation • Arbitration • Elections • Education • Training



EXHIBIT

A

## Exhibit B: Justice Delayed Is... Very Expensive

After being victimized in a sexual assault, Stephanie Paul sought legal representation from the firm of Allred, Maroko & Goldberg in Los Angeles, California.  She did not realize that her retainer agreement included a mandatory arbitration clause. When she filed a claim against the firm for legal malpractice, she was forced into arbitration.

The initial administrative fee for filing her claim was $5,000. Although she was unemployed and had not yet begun receiving Social Security Disability payments, AAA denied her request for a fee deferral. After the initial fees were charged, the "meter" began running, with $150 in "processing fees" payable each quarter. The assessment of a quarterly processing fee meant that the defendant could increase the plaintiff's costs by putting off responses to discovery requests, or by not cooperating in scheduling depositions or hearings. An illness suffered by Ms. Paul's attorney also delayed the case, adding to the cost. (AAA no longer charges the "processing fee.")

A defendant can also increase costs by filing summary judgment motions. In this case, AAA and the arbitrator charged Ms. Paul $2,425 to dispose of one such motion.

A second summary judgment motion was pending in January 2000 when Ms. Paul, frustrated by a process that had not gone to trial after three-and-a-half years, asked the California courts to assume jurisdiction over her case. She argued that the decision in <u>Engalla v. Permanente Medical Group</u>, holding that a court may intervene when a defendant improperly delays an arbitration, applied to her case.

The California Court of Appeal found that while the defendants "did not adequately or timely respond to discovery," it was Ms. Paul's responsibility to "persist" in demanding that the arbitrator order compliance. This places a heavy burden on the plaintiff, because the arbitrator's fees to rule on a discovery dispute can amount to hundreds of dollars. It means that if a defendant can think of a pretext for withholding important documents it can compound a party's arbitration costs.

The court denied Ms. Paul's request to intervene, and sent the case back to arbitration. But a high hurdle awaited her. The arbitrator denied the law firm's second summary judgment motion, but with this caveat:

> Having considered this matter, I have concluded that the parties are best served by a determination of the merits as to Claimant's claims.  This is provided, of course, the parties pay for the administration of justice.  It is regrettable perhaps, but the AAA and its arbitrators do not provide their services for free.
>
> As a condition then of continuing this arbitration proceeding, Claimant must pay all sums due to the AAA forthwith.  Additionally, the parties must commit to deposit with the AAA an additional $3,750.00.  That sum is calculated at 9-hours of arbitration time, 6-hours of post arbitration activity, at my discounted fee of $250 per hour.

> If the previously owing sums, plus half the deposit are not paid by claimant to the AAA by May 12, 2000, this matter will be dismissed with prejudice…

Unable to deposit additional fees to the arbitrator, Ms. Paul had to end her participation in the arbitration and drop her malpractice claim.

 **American Arbitration Association**

*Dispute Resolution Services Worldwide*          335 Madison Avenue, 10th Floor
                                                  New York, NY 10017

| STMT. DATE | AMOUNT DUE |
|---|---|
| 8/22/01 | .00 |
| CASE # | |
| 72- 194-00473-96 01 MBR -R | |

## INVOICE / STATEMENT

Payment Due Upon Receipt

Gerald P Cunningham
Law Offices of Gerald Cunningham          Representing Stephanie Hundley-Paul
3699 Wilshire Blvd., Suite 700            Re: Lisa Bloom, Esq. and Allred, Maroko & Goldborg
Los Angeles CA 90010

---

Please Detach and Return with Payment to the Above Address          Please Indicate Case No. on Check

✂ -------------------------------------------------------------------------------------------------

 **American Arbitration Association**

*Dispute Resolution Services Worldwide*          335 Madison Avenue, 10th Floor
                                                  New York, NY 10017

NAME      Gerald P Cunningham
          Law Offices of Gerald Cunningham          Representing Stephanie Hundley-Paul
          3699 Wilshire Blvd., Suite 700            Re: Lisa Bloom, Esq. and Allred, Maroko & Goldborg
          Los Angeles CA 90010

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 8/22/01 | 72- 194-00473-96 01 MBR -R | .00 | 12,762.00- | 12,762.00 | .00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 5/10/96 | 7218073 | Initial Administrative Fee | 750.00 | | |
| 5/10/96 | 1313 | Payment recvd from: Allan S. Cohen | | 750.00- | |
| 11/05/96 | 7223542 | Fee for Increased Claim | 4,250.00 | | |
| 11/07/96 | 1335 | Payment recvd from: Allan S. Cohen | | 4,250.00- | |
| 11/05/96 | 9964513 | Processing Fee # 1 | 150.00 | | |
| 1/31/97 | 1977 | Payment recvd from: Allan S. Cohen | | 150.00- | |
| 2/03/97 | 9975871 | Processing Fee # 2 | 150.00 | | |
| 4/07/97 | 2008 | Payment recvd from: Allan S. Cohen | | 150.00- | |
| 5/05/97 | 9986928 | Processing Fee # 3 | 150.00 | | |
| 7/03/97 | 2048 | Payment recvd from: Allan S. Cohen | | 150.00- | |
| 8/04/97 | 7233822 | 1/2 share of conference call held on July 30, 1997 @ $24.00 | 12.00 | | |
| 11/05/97 | 2108 | Payment recvd from: Allan S. Cohen | | 12.00- | |

Remarks:

TOTAL BALANCE DUE

Please Indicate Case No. on Check



EXHIBIT
B



## American Arbitration Association
*Dispute Resolution Services Worldwide*

335 Madison Avenue, 10th Floor
New York, NY  10017

| STMT DATE | AMOUNT DUE |
|---|---|
| 8/22/01 | .00 |
| CASE # | |
| 72- 194-00473-96 01 MBR -R | |

Payment Due Upon Receipt

# INVOICE / STATEMENT

Gerald P Cunningham
Law Offices of Gerald Cunningham
3699 Wilshire Blvd., Suite 700
Los Angeles CA 90010

Representing Stephanie Hundley-Paul
Re: Lisa Bloom, Esq. and Allred, Maroko & Goldberg

---

**Please Detach and Return with Payment to the Above Address**          **Please Indicate Case No. on Check**

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## American Arbitration Association
*Dispute Resolution Services Worldwide*

335 Madison Avenue, 10th Floor
New York, NY  10017

NAME

Gerald P Cunningham
Law Offices of Gerald Cunningham
3699 Wilshire Blvd., Suite 700
Los Angeles CA 90010

Representing Stephanie Hundley-Paul
Re: Lisa Bloom, Esq. and Allred, Maroko & Goldberg

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 8/22/01 | 72- 194-00473-96 01 MBR -R | .00 | 12,762.00- | 12,762.00 | .00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 8/04/97 | 9995927 | Processing Fee # 4 | 150.00 | | |
| 11/05/97 | 2108 | Payment recvd from: Allan S. Cohen | | 150.00- | |
| 8/15/97 | 7234428 | Hearing fees for 2 days of hearing. $150 / single Arbitrator. | 300.00 | | |
| 8/15/97 | 7234428 | 1/2 share Arb. Comp. for 10 hrs. hearing, 7 hrs. delib. @ $250/hour. | 2,125.00 | | |
| 6/02/98 | 537544843 | Payment recvd from: HOME SAVINGS OF AMERICA | | 300.00- | |
| 1/19/99 | 1466 | Payment recvd from: STEPHANIE PAUL | | 2,125.00- | |
| 10/31/97 | 9903538 | Processing Fee # 5 | 150.00 | | |
| 1/19/99 | 1466 | Payment recvd from: STEPHANIE PAUL | | 150.00- | |
| 1/29/98 | 9909854 | Processing Fee # 6 | 150.00 | | |
| 1/19/99 | 1466 | Payment recvd from: STEPHANIE PAUL | | 150.00- | |
| 4/29/98 | 9914215 | Processing Fee # 7 | 150.00 | | |
| 1/19/99 | 1466 | Payment recvd from: STEPHANIE PAUL | | 150.00- | |

Remarks:

**TOTAL BALANCE DUE** ▶

Please Indicate Case No. on Check



## American Arbitration Association
*Dispute Resolution Services Worldwide*

335 Madison Avenue, 10th Floor
New York, NY  10017

| STMT. DATE | AMOUNT DUE |
|---|---|
| 8/22/01 | .00 |
| CASE | |
| 72- 194-00473-96 01 MBR -R | |

# INVOICE / STATEMENT

**Payment Due Upon Receipt**

Gerald P Cunningham
Law Offices of Gerald Cunningham
3699 Wilshire Blvd., Suite 700
Los Angeles CA 90010

Representing Stephanie Hundley-Paul
Re: Lisa Bloom, Esq. and Allred, Maroko & Goldberg

---

Please Detach and Return with Payment to the Above Address          Please Indicate Case No. on Check

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



## American Arbitration Association
*Dispute Resolution Services Worldwide*

335 Madison Avenue, 10th Floor
New York, NY  10017

NAME   Gerald P Cunningham
Law Offices of Gerald Cunningham
3699 Wilshire Blvd., Suite 700
Los Angeles CA 90010

Representing Stephanie Hundley-Paul
Re: Lisa Bloom, Esq. and Allred, Maroko & Goldberg

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 8/22/01 | 72- 194-00473-96 01 MBR -R | .00 | 12,762.00- | 12,762.00 | .00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 7/28/98 | 9918973 | Processing Fee # 8 | 150.00 | | |
| 1/19/99 | 1466 | Payment recvd from: STEPHANIE PAUL | | 12.00- | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 138.00- | |
| 10/27/98 | 9923042 | Processing Fee # 9 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |
| 1/25/99 | 9926453 | Processing Fee # 10 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |
| 4/26/99 | 9929528 | Processing Fee # 11 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |
| 5/24/99 | 7267204 | 1/2 share Arb. Comp. for 3 hrs. of review & prep. docs. @ $250/hr. | 375.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 375.00- | |
| 7/26/99 | 9932887 | Processing Fee # 12 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |

Remarks:

TOTAL BALANCE DUE ▶

Please Indicate Case No. on Check



# American Arbitration Association

*Dispute Resolution Services Worldwide*

335 Madison Avenue, 10th Floor
New York, NY  10017

| STMT. DATE | AMOUNT DUE |
|---|---|
| 8/22/01 | .00 |

**CASE #**

72- 194-00473-96 01 MBR -R

Payment Due Upon Receipt

## INVOICE / STATEMENT

Gerald P Cunningham
Law Offices of Gerald Cunningham
3699 Wilshire Blvd., Suite 700
Los Angeles CA 90010

Representing Stephanie Hundley-Paul
Re: Lisa Bloom, Esq. and Allred, Maroko & Goldberg

---

Please Detach and Return with Payment to the Above Address                    Please Indicate Case No. on Check

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# American Arbitration Association

*Dispute Resolution Services Worldwide*

335 Madison Avenue, 10th Floor
New York, NY  10017

NAME    Gerald P Cunningham
Law Offices of Gerald Cunningham
3699 Wilshire Blvd., Suite 700
Los Angeles CA 90010

Representing Stephanie Hundley-Paul
Re: Lisa Bloom, Esq. and Allred, Maroko & Goldberg

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 8/22/01 | 72- 194-00473-96 01 MBR -R | .00 | 12,762.00- | 12,762.00 | .00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 10/22/99 | 9935778 | Processing Fee # 13 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |
| | | | | | |
| 11/19/99 | 1862177 | 1/2 share Arb. Comp. for 20.4 hours | 2,550.00 | | |
| | | including hrg time and delib @ $250/hr. | | | |
| 8/08/00 | | Cancellation: 1/2 share Arb. Comp. for 20.4 hours | | 2,388.00- | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 162.00- | |
| | | | | | |
| 1/20/00 | 9938603 | Processing Fee # 14 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |
| | | | | | |
| 4/19/00 | 9941528 | Processing Fee # 15 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |
| | | | | | |
| 7/18/00 | 9943803 | Processing Fee # 16 | 150.00 | | |
| 7/27/00 | 61601 | Payment recvd from: Allred, Maroko & Goldberg | | 150.00- | |

**Remarks:**
For any inquiry please call: 212-716-5800
This is a final closing statement showing all amounts due by you on this case. Please pay the
total balance due, as shown on this statement.

**TOTAL BALANCE DUE** ▶ .00

Please Indicate Case No. on Check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 5,000.00 | 5,000.00 | |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 2,700.00 | 2,700.00 | |
| | REALLOCATION AT CASE END FEES | | | |
| | NEUTRAL COMPENSATION/EXPENSES | 2,674.00 | 2,674.00 | |

EIN: 13-0429745

Law Offices

# ERVIN, COHEN & JESSUP LLP

**ECJ**

W. EDGAR JESSUP, JR.
MELVIN S. SPEARS
BERTRAM K. MASSING
MARVIN H. LEWIS
DAVID P. KASSOY
GARY J. FREEDMAN*
LEE SILVER
ROGER J. HOLT
ELIOT G. DISNER*
ALLAN B. COOPER
JOHN A. MEYERS
DAVID R. EANDI
GARY G. MICHEL*
JOAN S. VELAZQUEZ

E. A. OLLIFF III
ROBERT M. WAXMAN
REEVE B. CHUDD
KENNETH A. LUER
SUSAN A. WOLF
PHILIP STARR
BARRY MacNAUGHTON
KELLY O. SCOTT
SYLVIA D. LAUTSCH
HOWARD Z. BERMAN
LAYTON L. PACE
MARK T. KAWA
BARI J. COOPER
DARCY L. SIMON

ELLEN B. KORNBLUM
KEVIN K. HAAM
NICOLAS M. KUBLICKI
MICHELLE LEE FLORES
DONALD A. FISHMAN
CHRISTOPHER R. BAKER
RICHARD A. MARSHALL
T. EDWARD SMITH
ANTHONY M. FAY
KARIMA B. STERMAN
YOLANDA T. DOLAK
RICHARD R. CIPRA
DANIEL J. WEINROT
YAB Y. BARAVARIAN

JOHN W. ERVIN
1917-1983

LEONARD COHEN
RETIRED

DEBRA L. JAMES
MARTIN LIPSIC
DAPHNE M. STEGMAN
PAMELA A. GARVON
OF COUNSEL

9401 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212-2974
310.273.6333 ▼ Fax 310.859.2325
www.ecjlaw.com

*A PROFESSIONAL CORPORATION

April 21, 2000

Writer's Direct Dial/E-Mail:

(310) 281-6339
edisner@ecjlaw.com

Our File No.

9509-1

John S. West, Esq.
Allred, Maroko & Goldberg
6300 Wilshire Blvd., Ste. 1500
Los Angeles, California 90048

Gerald P. Cunningham, Esq.
Wilshire-Serrano Building
3699 Wilshire Boulevard
Suite 700
Los Angeles, CA 90010

Re:  *Hundley-Paul v. Bloom*
    **AAA File No. 72 194 00473 96**

Gentlemen:

I have reviewed the Motion of Respondents for entry of an award in Respondent's favor due to Claimant's abandonment of arbitration. Having considered the matter, I have concluded that the parties are best served by a determination of the merits as to Claimant's claims. This is provided, of course, the parties "pay for" this administration of justice. It is regrettable perhaps, but the AAA and its arbitrators do not provide their services for free.

As a condition then of continuing this arbitration proceeding, Claimant must pay all sums due the AAA forthwith. Additionally, the parties must commit to deposit with the AAA an additional $3750. That sum is calculated at nine hours of arbitration time and six hours of pre- and post arbitration activity (review of briefs, writing opinion, etc.) at my discounted rate of $250 per hour.

If the previously owing sums, plus half of the deposit are not paid by Claimant to the AAA by May 12, 2000, this matter will be dismissed with prejudice for the reasons stated in Respondent's brief. If Respondents fail to timely pay their half of the deposit, that will be treated as a concession of liability to Claimant. Please send me a courtesy copy of the record of any payments you make to the AAA.

279620.1

LAW OFFICES
ERVIN, COHEN & JESSUP LLP

John S. West, Esq.
Gerald P. Cunningham, Esq.
April 21, 2000
Page 2

        If you have any questions about this matter, please put them to me in writing and I will do my best to respond promptly.

                                        Sincerely,

                                        Eliot G. Disner
                                        A Professional Corporation

EGD/rf    .

cc:    Ms. Katherine C. DeLarwell
       Case Administrator

279620.1

## Exhibit C: An Arbitration Triple Play

In 1997 the Malkani family of Austin, Texas entered into a contract with Number One Custom Homes to build a home designed by their architect within 275 days for $605,000.  During construction, many disputes arose over what the Malkanis felt was substandard work.  Unable to resolve these disputes, the Malkanis fired the homebuilders fifteen months into construction and hired another company, which noticed numerous construction defects and recommended that the Malkanis hire a home inspector.

Compelled into arbitration against Number One, the Malkanis paid AAA an initial administrative fee of $3,500, followed by $1,375 in other miscellaneous fees. But because AAA's Construction Industry Tribunal rules require panels of three arbitrators for high-stakes cases, the largest element of their costs was the arbitrators' compensation. The Malkanis were required to advance over $10,000 in arbitrator fees and over $1,000 in arbitrator expenses.

The Malkanis were awarded $18,818.93. Although the Malkanis ultimately prevailed, the arbitrators did not require the builder to pay their attorney fees or the administrative fees. (While a court would not order the losing side to pay attorneys' fees, it would order payment of court filing fees.) The arbitrators did reallocate their own fees so that the builder paid half, resulting in a small refund.

Total cost of arbitration to consumer: $13,068.67

 **American Arbitration Association**

*Dispute Resolution Services Worldwide* Two Galleria Tower, 13455 Noel Road, Suite 1750

Dallas, TX 75240

| STMT DATE | AMOUNT DUE |
|-----------|-----------|
| 6/18/01 | .00 |

CASE

70- 110-00267-98 01 MGM -R

## INVOICE / STATEMENT

Payment Due Upon Receipt

Brian K Hammer
Brian K. Hammer
313 West Mary Street
Austin TX 78704

Representing Tulsi, Indru & Raja Malkani
Re: #1 Custom Homes
- Austin, Texas

---

**Please Detach and Return with Payment to the Above Address**          Please Indicate Case No. on Check

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 **American Arbitration Association**

*Dispute Resolution Services Worldwide*

Two Galleria Tower, 13455 Noel Road, Suite 1750

Dallas, TX 75240

NAME

Brian K Hammer
Brian K. Hammer
313 West Mary Street
Austin TX 78704

Representing Tulsi, Indru & Raja Malkani
Re: #1 Custom Homes
- Austin, Texas

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|-----------|--------|-----------------|-----------------|-------------|-------------------|
| 6/18/01 | 70- 110-00267-98 01 MGM -R | .00 | 19,851.33- | 19,851.33 | .00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|------|-------|-------------|--------|---------|---------|
| 8/24/98 | 7125691 | Initial Administrative Fee | 3,500.00 | | |
| 8/25/98 | 2852 | Payment recvd from: INDRU MALKANI | | 2,000.00- | |
| 9/01/98 | 2812 | Payment recvd from: INDRO MALKANI | | 1,500.00- | |
| 12/16/98 | 7130684 | Arbitrator's Compensation | 6,020.00 | | |
| 2/24/99 | 3016 | Payment recvd from: INDRU MALKANI | | 6,020.00- | |
| 12/16/98 | 7130685 | Expenses to be Reimbursed to Arbitrator | 525.00 | | |
| 2/24/99 | 3016 | Payment recvd from: INDRU MALKANI | | 525.00- | |
| 12/16/98 | 7130686 | Administrative Fee for Hearing | 750.00 | | |
| 2/24/99 | 3016 | Payment recvd from: INDRU MALKANI | | 750.00- | |
| 12/16/98 | 7130687 | Miscellaneous Expenses | 75.00 | | |
| 2/24/99 | 3016 | Payment recvd from: INDRU MALKANI | | 75.00- | |
| 4/28/99 | 7136449 | Postponement of 03 hrng(s) from 05/05/99 | 125.00 | | |
| 8/11/99 | 1089 | Payment recvd from: RAJA I. MALKANI | | 125.00- | |

Remarks:

TOTAL
BALANCE
DUE

Please Indicate Case No. on Check

 EXHIBIT C



## American Arbitration Association

*Dispute Resolution Services Worldwide*

Two Galleria Tower, 13455 Noel Road, Suite 1750
Dallas, TX  75240

| STMT DATE | AMOUNT DUE |
|---|---|
| 6/18/01 | .00 |
| CASE | |
| 70- 110-00267-98 01 MGM -R | |

Payment Due Upon Receipt

# INVOICE / STATEMENT

Brian K Hammer
Brian K. Hammer
313 West Mary Street
Austin TX 78704

Representing Tulsi, Indru & Raja Malkani
Re: #1 Custom Homes
   - Austin, Texas

---

**Please Detach and Return with Payment to the Above Address**          **Please Indicate Case No. on Check**

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## American Arbitration Association

*Dispute Resolution Services Worldwide*

Two Galleria Tower, 13455 Noel Road, Suite 1750
Dallas, TX  75240

NAME
Brian K Hammer
Brian K. Hammer
313 West Mary Street
Austin TX 78704

Representing Tulsi, Indru & Raja Malkani
Re: #1 Custom Homes
   - Austin, Texas

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 6/18/01 | 70- 110-00267-98 01 MGM -R | .00 | 19,851.33- | 19,851.33 | .00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 8/20/99 | 7143694 | Arbitrator's Compensation | 4,515.00 | | |
| 9/28/99 | | Cancellation: Arbitrator's Compensation | | 3,391.33- | |
| 8/30/99 | 3213 | Payment recvd from: INDRU TULDI MAKANI | | 4,515.00- | |
| 9/28/99 | | Refund: Refund on Expenses | 3,391.33 | | |
| 8/20/99 | 7143695 | Expenses to be Reimbursed to Arbitrator | 350.00 | | |
| 8/30/99 | 3213 | Payment recvd from: INDRU TULDI MAKANI | | 350.00- | |
| 8/20/99 | 7143696 | Administrative Fee for Hearing | 500.00 | | |
| 8/30/99 | 3213 | Payment recvd from: INDRU TULDI MAKANI | | 500.00- | |
| 8/20/99 | 7143697 | Miscellaneous expenses | 100.00 | | |
| 8/30/99 | 3213 | Payment recvd from: INDRU TULDI MAKANI | | 100.00- | |

**Remarks:**   For any inquiry please call:  800-214-3495

This is a final closing statement showing all amounts due by you on this case. Please pay the
total balance due, as shown on this statement.

TOTAL BALANCE DUE ▶  .00

Please Indicate Case No. on Check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 3,500.00 | 3,500.00 | |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 1,375.00 | 1,375.00 | |
| | REALLOCATION AT CASE END FEES | | | |
| | NEUTRAL COMPENSATION/EXPENSES | 8,193.67 | 8,193.67 | |

EIN: 13-0429745

## Exhibit D: Arbitration Costs Are not Chicken Feed

Roy Gatlin first contracted with Sanderson Farms to grow chickens for the company in 1980, when Gatlin and his wife were buying their farm in Jones County, Mississippi. Later, Sanderson Farms authorized him to build two additional broiler houses on his farm based on his ranking in the top percent of the company's growers. The Gatlins pledged their farm, which included their home and four broiler houses, as security on a mortgage of over $250,000 to build the new barns. In January 1997, Sanderson Farms presented a new 15-year contract to Roy Gatlin, which contained for the first time a mandatory arbitration clause. The arbitration clause provided that "the cost of such arbitration will be divided equally among the parties to the arbitration."

Some time after Gatlin and Sanderson Farms signed the 15-year 1997 contract, Gatlin was told that Sanderson Farms was going to find a way to terminate the contract because of his earlier questioning of the company's management procedures. On Christmas Day, 1997, Sanderson Farms called Gatlin and told him to be in their office the next day. Sanderson Farms terminated its contract with Gatlin on December 26, 1997, with 14 years remaining on the contract. Sanderson Farms then took its most recent shipment of chickens from the Gatlins' farm and delivered them to another grower. Gatlin immediately contacted every poultry processing company in his area, but all of these companies refused to deliver him any chickens.

In February 1998, Roy Gatlin filed a demand for arbitration against Sanderson Farms based on the company's unilateral termination of the Broiler Production Agreement. Gatlin paid half of the $2,000 arbitration filing fee to the American Arbitration Association. Sanderson Farms refused to pay any of this arbitration filing fee when AAA requested payment of the balance, claiming that its arbitration clause's reference to the "cost of arbitration" was not intended to include the filing fee. Gatlin paid the full $2,000 arbitration filing fee to AAA. In July 1999, less than two weeks before the arbitration hearing was to be held, Gatlin received a billing statement from AAA requiring him to pay an additional $8,250 in arbitration costs, including $6,900 in arbitrators' compensation and $1,000 in arbitrators' expenses. Added to his prior payments, Roy Gatlin was required to pay at least $11,000 before getting his arbitration hearing. Unable to afford these costs, he was forced to abandon the arbitration.



# American Arbitration Association
*Dispute Resolution Services Worldwide*

Two Galleria Tower, 13455 Noel Road, Suite 1750
Dallas, TX 75240

| STMT DATE | AMOUNT DUE |
|---|---|
| 7/22/99 | 8,250.00 |

**CASE #**

69-M180-00037-98 01 KLE -R

Payment Due Upon Receipt

## INVOICE / STATEMENT

J. Dudley Butler
Lobrano, Butler & Kirk
607 D Highway 51
Ridgeland MS 39157

Representing Roy Gatlin
Re: Sanderson Farms, Inc.
- Laurel, Mississippi

Please Detach and Return with Payment to the Above Address          Please Indicate Case No. on Check

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



# American Arbitration Association
*Dispute Resolution Services Worldwide*

Two Galleria Tower, 13455 Noel Road, Suite 1750
Dallas, TX 75240

NAME

J. Dudley Butler
Lobrano, Butler & Kirk
607 D Highway 51
Ridgeland MS 39157

Representing Roy Gatlin
Re: Sanderson Farms, Inc.
- Laurel, Mississippi

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 7/22/99 | 69-M180-00037-98 01 KLE -R | .00 | 2,750.00- | 11,000.00 | 8,250.00 |

| DATE | REF | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 2/26/98 | 7119175 | Initial Administrative Fee | 2,000.00 | | |
| 2/27/98 | 1097 | Payment recvd from: ROY GATLIN | | 1,250.00- | |
| 3/23/98 | 1103 | Payment recvd from: ROY GATLIN | | 750.00- | |
| 6/17/98 | 7123134 | Mediator's Compensation | 750.00 | | |
| 6/29/98 | 1160 | Payment recvd from: ROY GATLIN | | 750.00- | |
| 7/22/99 | 7141641 | Arbitrator's Compensation | 6,900.00 | | 6,900.00 |
| 7/22/99 | 7141642 | Expenses to be Reimbursed to Arbitrator | 1,000.00 | | 1,000.00 |
| 7/22/99 | 7141643 | Administrative Fee for Hearing | 250.00 | | 250.00 |
| 7/22/99 | 7141644 | Miscellaneous Expenses | 100.00 | | 100.00 |

Remarks:  For any inquiry please call:  888-774-6907
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 8,250.00 |
|---|---|

Please Indicate Case No. on Ch

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 2,000.00 | 2,000.00 | |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 250.00 | | 250.00 |
| | REALLOCATION AT CASE END FEES | | | |
| | NEUTRAL COMPENSATION/EXPENSES | 8,750.00 | 750.00 | 8,000.00 |



**EXHIBIT**

D

## Exhibit E: We *Can* Make Arbitration Cheap, But We *Won't*

Central Reserve denied insurance coverage for chemotherapy and peripheral stem cell rescue treatment that Dorothy Marello's doctor at the Mayo Clinic recommended for her primary amyloidosis. Ms. Marello's insurance policy had an arbitration clause mandating submission of her claim to the Dispute Resolution Procedures for Insurance Claims (DRPIC) of the American Arbitration Association.  In the attached letter, Ms. Marello's attorney was informed that DRPIC had been discontinued, and its rules superceded by a new "Alternative Dispute Resolution Program."

AAA's decision to discontinue DRPIC added greatly to Ms. Marello's misfortune. Under those procedures, a claimant only needed to pay a $150 filing fee and $150 to cover the arbitrator's compensation. Instead of proceeding under this potentially consumer-friendly program, Ms. Marello's claim was shifted to AAA's Commercial Arbitration regime.  Under those rules, her claim in an amount between $150,000 and $300,000 would incur a non-refundable filing fee of $2,750, and a "case service fee" of $1,000 (refundable at the conclusion of the case if no hearing occurred).

In addition to those fees, the three arbitrators required under the new rules would bill the parties for their time, plus reimbursement for such out-of-pocket expenses as travel, parking, and the like.  AAA advised that per diem fees would range from $750-$1,800, and hourly fees from $200-$400. Ms. Marello, who is a waitress, would be required to deposit these fees in advance.

AAA says it abandoned its low-cost Dispute Resolution Procedures for Insurance Claims because they "were not being used at all." Did insurance companies insist on diverting claims to a more expensive tribunal, to erect a cost barrier for their insureds?

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

<u>Via Fax Only</u>

August 8, 2000

830 South Broad Street, Floor 12, Philadelphia, PA 19102-4199
telephone: 215 732 5260. facsimile: 215 732 5002
http://www.adr.org

R. Gerald Barris, Esq.
Sorling, Northrup, Hanna, Cullen
and Cochran, Ltd.
Suite 800 Illinois Building
607 East Adams Street
Springfield, IL 62705

<u>RE:  Costs of Arbitration</u>

Dear Mr. Barris:

This will confirm our telephone conversation today wherein you requested that I set forth in writing the costs involved in an arbitration as well as the application rules that would be used to administer the arbitration.

Since the Insurance Dispute Resolution Procedures are no longer in effect, your client's dispute would be arbitrated under the Commercial Arbitration Rules that are contained in the Commercial Dispute Resolution Procedures.

The filing fee for a claim in excess of $150,000 and up to $250,000 would be $2,000. This filing fee is nonrefundable and is based on the amount of the claim.  In addition, for each day of hearing before a single arbitrator, each party pays a hearing fee of $150.00. Other costs involved would be the cost of the hearing room and miscellaneous expenses such as conference calls and federal express charges for mailing.

Arbitrator compensation and expenses are separate charges.  Arbitrators received their per diem for each day of hearing and generally charge their hourly rate for study, review and preparation time.  The study time of an arbitrator varies from case to case depending on how much time the arbitrator spends on conference calls with the parties and reviewing issues, briefs, etc.  Some arbitrators charge their per diem for postponement of scheduled hearings or late cancellation charges.  Arbitrators are reimbursed for their out-of-pocket expenses for travel, parking and meals.  The per diems range from $750.00 – $1,800.00 and the hourly fees range from $200.00 - $400.00.

For cases filed as of September 1, 2000, the AAA's fees will change.  I have enclosed the new fee structure in the event your case is filed on or after that date.  Under the new fee structure, the Case Service Fee will replace the hearing fees and miscellaneous expenses contained under the old fee structure.  The Case Service Fee is only charged to a party

**EXHIBIT**

E

R. Gerald Barris, Esq.
Page 2
August 8, 2000

having a claim that proceeds to a hearing.  If the AAA is notified at least 24 hours before the first hearing that the case has settled, the Case Service Fee will be refunded.

Unless the parties' contract specifies otherwise, the cost of the arbitration is subject to allocation in the arbitrator's award.  If I can be of further assistance, please feel free to contact me.

Sincerely yours,

*Elaine McLaughlin*

Elaine McLaughlin
Supervisor, Case Administration

Encl.

AUG-08-2000  14:29     GORLING-LAW-OFFICE                2175223173     P.05/05

## ADMINISTRATIVE FEES

The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

## FEES

A nonrefundable filing fee is payable in full by a filing party when a claim, counterclaim or additional claim is filed.

A case service fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred.

However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the case service fee will remain due and will not be refunded. ·

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Case Service Fee |
|---|---|---|
| Above $0 to $10,000 | $500 | N/A |
| Above $10,000 to $75,000 | $750 | N/A |
| Above $75,000 to $150,000 | $1,250 | $750 |
| Above $150,000 to $300,000 | $2,750 | $1,000 |
| Above $300,000 to $500,000 | $4,250 | $1,250 |
| Above $500,000 to $1,000,000 | $6,000 | $2,000 |
| Above $1,000,000 to $7,000,000 | $8,500 | $2,500 |
| Above $7,000,000 to $10,000,000 | $13,000 | $3,000 |
| Above $10,000,000 | * | * |
| No Amount Stated ** | $3,250 | $750 |

*Contact your local AAA office for fees for claims in excess of $10 million.

** This fee is applicable when no amount can be stated at the time of filing, or when a claim or counterclaim is not for a monetary amount. The fees are subject to increase or decrease when the claim or counterclaim is disclosed.

The minimum fees for any case having three or more arbitrators are $2,750 for the filing fee, plus a $1,000 case service fee.

Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs.

## Hearing Room Rental

The fees described above do not cover the rental of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

## Exhibit F: Arbitration Crapshoot

Standard practice in the securities industry requires individual investors to arbitrate any disputes they have with brokers. Exhibit F, an invoice from NASD Dispute Resolution, shows $6,200 in fees assessed to a retired Iowa optometrist (whose name we have withheld) to initiate arbitration proceedings against a broker. The investor lost his entire retirement nestegg—more than $1 million accumulated over a lifetime.

But to appreciate the true cost of initiating this arbitration, one must know the context. A recent study by the General Accounting Office made this astonishing finding:

> On the basis of our survey of investors who received arbitration awards during 1998, we estimated that 49 percent of the awards were not paid, and an additional 12 percent were partially paid. Our estimates showed that these investors did not receive nearly 80 percent of the $161 million that they were awarded.[9]

This means that ripped-off investors must make a huge investment in arbitration costs while faced with the prospect of collecting little or no damages afterward. Meanwhile, delays caused by the arbitration requirement aid dishonest brokers in hiding or liquidating assets that could satisfy an award. It is likely to take more time for a small investor to raise the money to pay thousands in arbitration fees than to raise $150 in court filing fees.

Arbitrators cannot enforce their awards, so if the broker refuses to pay, the investor must file a lawsuit in the broker's home county to collect the money. This costs additional sums and provides further time to dispose of assets.

In response to pressure, the National Association of Securities Dealers changed its rules to permit direct court action against brokers who have left the industry. Yet this change may create a perverse incentive for sleazy or reckless brokers to remain in business, knowing that the costs of initiating arbitration, and its accompanying delays, will discourage many investors from seeking redress.

STATEMENT OF ACCOUNT

Office of Dispute Resolution
10 South LaSalle Street
Suite 1110
Chicago, IL  60603

As of:  09/14/2001

TO: John D. Hudson, Esq.
    Williams, Blackburn, Hudson & Maharry,
    317 Sixth Ave.
    #740
    Des Moines, IA  50309

FOR:

Invoice#: 01-00432-374-CH

Case Number: 01-00432
    Name:                                         et al v.
                                    , et al

| Date | Multiple Party | Description | Fees Owed | Credits | Check No. | Check Date |
|------|--------|-------------|-----------|---------|-----------|------------|
| 01/29/2001 | | Check No: 2137 | | $1,700.00 | | |
| 02/02/2001 | | Fee Balance | $1,700.00 | | | |
| 08/15/2001 | | Additional Hearing Session Deposit | $4,500.00 | | | |
| | | | | | | |
| Mediation Fee Total: | | | $.00 | | | |
| Arbitration Fee Total: | | | $6,200.00 | | | |
| Total Fees: | | | $6,200.00 | | | |
| Credits To Date: | | | | $1,700.00 | | |
| Credits By Others: | | | | $.00 | | |
| Less Credits To Others: | | | | $.00 | | |
| Less Refunds: | | | | $.00 | | |
| | | | | | | |
| Balance Due: | | | $4,500.00 | | | |

Please Make Check Payable to:

NASD Dispute Resolution, Inc.
Office of Dispute Resolution
10 South LaSalle Street
Suite 1110
Chicago, IL  60603

GOG: RF02A

EXHIBIT

F

## Exhibit G: From Each According to His Ability...?

Surely arbitration costs must be less for consumers than for sophisticated businesspeople?

It appears not. The bill in Exhibit G estimates arbitration costs at $7,375 for an ordinary business-to-business breach of contract dispute. The Betzlers, Malkanis, and Stephanie Paul all were charged more for their arbitrations.

Arbitration was conceived as an efficient method of resolving business-to-business disputes, so it's not surprising that it may cost less in that context. Two businesses with more or less equal bargaining power will choose arbitration voluntarily. They will have done so because they are both sincerely interested in resolving their dispute with minimal expense. This mutual interest will also motivate both sides to cooperate in limited discovery, stipulations of undisputed aspects of the case, and a streamlined presentation of evidence. Such cooperation will inevitably lower the costs of deciding the case.

On the other hand, if arbitration is imposed by a more powerful party, it is more likely that that party's interest was not in lowering litigation costs but in using the costs of arbitration to bludgeon its adversary.  Under the Federal Arbitration Act, it is possible to coerce a reluctant party into arbitration. What the law cannot coerce is a conciliatory spirit in a hard-nosed litigant. The combination of the "friendly" arbitration tribunal with a party determined to use scorched-earth tactics can mean shockingly high costs. It may be inevitable that arbitration between businesses and their customers, workers, and franchisees will be more costly than business-to-business arbitration.

# American Arbitration Association
*Dispute Resolution Services Worldwide*

2200 Century Parkway, Suite 300
Atlanta, GA  30345

| STMT. DATE | AMOUNT DUE |
|---|---|
| 4/02/01 | 7,375.00 |

| CASE # |
|---|
| 30- 181-00625-00 02 MCH |

## INVOICE / STATEMENT

Jerome E Speegle
Zieman, Speegle, Hoffman & Jackson, L.  L.C.
P.O. Box 11
Mobile AL 36601

Representing Fit Enterprises, Inc.
Re: American Club Systems

Payment Due Upon Receipt

Please Detach and Return with Payment to the Above Address

Please Indicate Case No. on Check

✄ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# American Arbitration Association
*Dispute Resolution Services Worldwide*

2200 Century Parkway, Suite 300
Atlanta, GA  30345

NAME

Jerome E Speegle
Zieman, Speegle, Hoffman & Jackson, L.  L.C.
P.O. Box 11
Mobile AL 36601

Representing Fit Enterprises, Inc.
Re: American Club Systems

| STMT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 4/02/01 | 30- 181-00625-00 02 MCH | .00 | 750.00- | 8,125.00 | 7,375.00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 3/28/01 | 1358572 | Arbitrator Compensation for 2 days of he aring and 3 days of study time (your 1/ 2 share) | 7,375.00 | | |
| | | | | | 7,375.00 |
| 3/28/01 | 1358573 | Case Service Fee to cover administrative hearing fees, conference calls, expres s mail, etc. | 750.00 | | |
| 3/30/01 | | Cancellation: Case Service Fee to cover administrative | | 750.00- | |

Remarks:   For any inquiry please call: 404-325-0101
This Statement only reflects payments posted up to 04/02/01.

| TOTAL BALANCE DUE | 7,375.00 |
|---|---|

Please Indicate Case No. on Check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | | | |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | | | |
| | REALLOCATION AT CASE END FEES | | | |
| | NEUTRAL COMPENSATION/EXPENSES | 7,375.00 | | 7,375.00 |



EXHIBIT

G

## Exhibit H: Market of Choice?

According to its website,[10] the mission of the National Association of Securities Dealers (NASD) is "to facilitate capital formation by creating the markets of choice–operated and regulated to achieve the most liquid, cost-efficient, technologically advanced, and fair securities markets in the world–for the benefit and protection of investors."

But there is no market, and no choice, for small investors when it comes to dispute resolution. All cases must be referred to NASD Dispute Resolution, Inc. With no competition between NASD and the court system, and no competition among private dispute resolution providers, there is no incentive to achieve the "cost-efficiency" that NASD cites as its goal.

These documents raise questions about the efficiency of arbitration. Exhibit H-1 is an excerpt from an NASD award. The investor was awarded damages of $23,750, but the total cost to the parties to adjudicate the dispute was $19,300. The investor was required to pay $7,500 of these fees, reducing his recovery by almost a third *before* his attorney's fees and other costs were paid. Given the amount of time the arbitrators spent on this case (14 separate sessions), it appears that the panel's expertise in the securities industry was of no help in expediting the determination of this case.

Exhibit H-2 is correspondence from NASD to an investor's attorney. The parties settled their dispute *before* the arbitration hearing. Nonetheless, NASD billed the investor $4,000 for eight hearings that were not conducted.

Would NASD arbitration be cheaper and more efficient if it had to compete with the judicial system or other ADR providers?

11/02/01 FRI 09:28 FAX 9413770037    GRONER, SCHIEB & WILLIAM    Ø005

NASD Dispute Resolution. Inc.
Arbitration No. 99-05579
Award  Page 3

## Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. In this matter, the member firm is a party.

| | |
|---|---|
| Member surcharge | = $1,500.00 |
| Pre-hearing process fee | = $600.00 |
| Hearing process fee | = $2,500.00 |

## Forum Fees and Assessments

The Panel has the authority to assess forum fees for each hearing session conducted. A hearing session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

Two (2) Pre-hearing sessions with a single arbitrator x $450.00 = $900.00
Pre-hearing conferences:    December 20, 2000    1 session
                            April 16, 2001       1 session

One (1) Pre-hearing session with Panel x $1,125.00    = $1,125.00
Pre-hearing conference:    July 5, 2000    1 session

Eleven (11) Hearing sessions x $1,125.00    = $12,375.00
Hearing Dates:    April 10, 2001    3 sessions
                  April 11, 2001    3 sessions
                  April 12, 2001    3 sessions
                  April 27, 2001    2 sessions

Total Forum Fees                                    = $14,400.00

The Panel has assessed $7,200.00 of the forum fees to Claimant.
The Panel has assessed $7,200.00 of the forum fees jointly and severally to Respondents MSDW and Patton.

### FEE SUMMARY

Claimant be and hereby is solely liable for:

| | |
|---|---|
| Initial Filing Fee | = $300.00 |
| Forum Fees | = $7,200.00 |
| Total Fees | = $7,500.00 |
| Less payments | = $1,425.00 |
| Balance Due NASD Dispute Resolution, Inc. | = $6,075.00 |



EXHIBIT

H-1

Sent By: PAGE & BACEK LLP;          770 673 0270;          01 Nov 01 10:11AM;Job 409;Page 2/2



**NASD Regulation, Inc.**

Office of Dispute Resolution
Boca Center Tower 1 * 5200 Town Center Circle * Suite 400 * Boca Raton, FL 33486 * 561-416-0277 * Fax 561-416-2287

November 16, 1998

Sandra L. Malkin, Esq.
Page & Bacek
7000 Peachtree Dunwoody Road
Building No. 2
Atlanta, GA  30328

Subject:     NASD Arbitration Number 97-04660
             C. David Young vs. Nationsbanc Capital Markets, Inc.

Dear Ms. Malkin:

The NASD Regulation, Inc., Office of Dispute Resolution (the "NASD") has been informed that the parties have settled this matter.  Accordingly, I am removing this case from the NASD's arbitration docket.

Pursuant to Rule 10332 of the NASD Code of Arbitration Procedure, the arbitrators in this matter have assessed $9,300.00 in forum fees for the following:

    1 pre-hearing conference conducted with the Chairperson on 9/9/98 @ $300.00;
    1 pre-hearing conference conducted with the panel on 4/28/98 @ $1000.00; and,
    8 sessions @ $1000.00 per session for the hearings scheduled for 11/4/98-11/6/98 and 11/13/98
    but not conducted.

The arbitrators have further ordered that the forum fees are to be split equally between the parties.  An invoice is attached for your convenience.

If you have any questions, please contact me at the number listed below.

Very truly yours,

Kelly J. Sheehan
Legal Assistant
FL/(561)447-4906

KXS:KXS:LC40A
11/98

RECIPIENTS:
    Sandra L. Malkin, Esq., C. David Young
    Page & Bacek, 7000 Peachtree Dunwoody Road, Building No. 2, Atlanta, GA  30328

**EXHIBIT**

H-2

## Exhibit I: Justice? I Can Get It for You Wholesale

Prices are lower in competitive markets. Nowhere is this truth more evident than in the arbitration of employment disputes.

Employment cases come in two types—those involving union workers and those involving non-union employees. As the accompanying exhibit demonstrates, arbitration fees are substantially higher for non-union employees than for workers represented by unions. Here we see two different fee schedules for the same arbitrator, who specializes in employment law. The top schedule is from 1996; below it is the current schedule. In both schedules, the arbitrator's fee is $800 per day for collective bargaining grievance arbitration. Each schedule also specifies a substantially higher fee for other employment cases—$1,400 per day in 1996, and now $1,750.

AAA's administrative fees also differ between union and non-union cases. A non-union employee must pay a flat $500 filing fee for her case to be heard. But for union/management disputes, AAA offers a menu of low-cost options, ranging from $50 to $175.

Why the disparity? It's very simple: Labor union lawyers are free to shop for the best deal in arbitration fees. Union contracts do not lock employees into a particular arbitration provider with a unilateral arbitration clause. If the fees of AAA or its arbitrators are too high, the employee may go elsewhere. The employer also has an incentive to keep fees low. Union workers will not be scared off by the costs of arbitration, because those costs are paid by the union and the employer. Since it is inevitable that all disputes will be arbitrated, the employer wants a low-cost provider.

In contrast, non-union workers are bound to use whichever arbitration provider is named in the arbitration clause. The worker must accept one of the arbitrators named by the provider, so each arbitrator can charge as much as he or she wants. The employer doesn't object, because in the long run, the high fees will deter many more cases from being brought for each one that actually proceeds, resulting in a net gain for the company.



American Arbitration Association

*Dispute Resolution Services Worldwide*

## Schedule of Fees and Conditions of Service

## May 1, 1996

**FEES:**

- For grievance arbitration under collective bargaining agreements:  $800 per hearing day up to 7 hours, $125 per hour for all other services including travel time outside the Bay Area, plus reasonable expenses.

- For all other arbitration and for all mediation services $1400 per hearing day up to 7 hours, $200 per hour for all other services including travel time outside the Bay Area, plus reasonable expenses.

## Compensation

$800 per day for grievance arb. under a collective bargaining agreement ($125/hr if study & hearing time exceeds 7 hrs per day), including travel days. $1750/day or $225/hr for other arb. and med.  Cancellation fee:  $800.00 for grievance arb. and $1750 per hearing and travel days for all others.



EXHIBIT

I

## Exhibit J: "...real benefits to the enforcement of arbitration provisions..."

In its decision in Circuit City v. Adams, the U.S. Supreme Court demonstrated that even our nation's highest ranking jurists have been fooled by arbitration canards. "We have been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context. Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation…"

The employees in these cases would be surprised to hear about reduced litigation costs in arbitration. Sherri Warner was billed $18,260 in arbitration fees (Exhibit J-1). Sidney Krasner was ordered to pay $24,500 in arbitration fees (Exhibit J-2). Barbara Wolfe was assessed an astonishing $42,400 in arbitration fees, reducing her damages award by ten percent (Exhibit J-3).

The Supreme Court concluded the Circuit City opinion with this thought: "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."  But the right to be compensated for earnings lost due to discrimination is diminished in arbitration. The risk/reward ratio that any plaintiff must calculate before pursuing a claim is altered substantially—the thousands of dollars that must be committed to pay arbitration fees upfront increase the amount of money put at risk, while reducing the potential reward. The result is that fewer employees are able to vindicate their right to fair treatment and dignity in the workplace.

# merican Arbitration Association
*Resolution Services Worldwide*

140 West 51st Street, 9th floor
New York, NY 10020

## INVOICE / STATEMENT

| STMT DATE | AMOUNT DUE |
|---|---|
| 1/15/98 | 2,530.00 |

| CASE # |
|---|
| 74- 481-00430-96 01 JMH -R |

**Payment Due Upon Receipt**

Stephen J Gorski
Gorski & Shaiken
170 Columbus Ave., 5th Fl.
San Francisco CA 94133

Representing Sherri I. Warner

Re: Bruno von Buettner Ristow, M.D.

---

**Please Detach and Return with Payment to the Above Address**          **Please Indicate Case No. on Check**

----------------------------------------------------------------------------

ME
Stephen J Gorski
Gorski & Shaiken
170 Columbus Ave., 5th Fl.
San Francisco CA 94133

Representing Sherri I. Warner

Re: Bruno von Buettner Ristow, M.D.

| MT. DATE | CASE # | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 1/15/98 | 74- 481-00430-96 01 JMH -R | .00 | 15,730.00- | 18,260.00 | 2,530.00 |

| DATE | REF # | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 1/08/98 | 7441277 | Arbitrator's Compensation<br>1/2 share for 10 hrs of additional comp | 1,500.00 | | 1,500.00 |

Remarks:  For any inquiry please call: 212-484-4000
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 2,530.00 |
|---|---|

Please Indicate Case No. on Check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE |
|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 250.00 | 250.00 | |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 1,500.00 | 1,500.00 | |
| | REALLOCATION AT CASE END FEES | | | |
| | NEUTRAL COMPENSATION/EXPENSES | 14,880.00 | 12,350.00 | 2,530.00 |



EXHIBIT

J-1

# New York Stock Exchange
# In the Matter of Arbitration Between

**NYSE**

Case: Sidney D. Krasner v Shearson Lehman Brothers. Inc.

**Attorneys:**
For Claimant(s):
I  Michael Bayda Esq. – New York, NY

For Respondent(s):
Joel Finger Esq. – New York, NY

| Date Filed: 11/16/92 | First Scheduled: 08/17/93 | Decided: 11/28/94 |
|---|---|---|

Case Summary: Claimant alleges employment discrimination (violation of the Federal Age Discrimination in Employment Act) resulting in his demotion and later termination.  Claimant also seeks reinstatement or alternatively, money damages.

Product: OTHER    Market:

**Claim Data**

Claim: $4,800,913.00

Punitive: Uns

Atty Fees: $284,961.00

Deposit: $1,000.00

**Award Data**

Award: $679,833.00

Punitive: $0.00

Atty Fees: $85,488.00

Costs: $0.00    Forum Fees:  $49,000.00

Decision: The undersigned arbitrators have decided and determined in full and final settlement of all claims between the parties that: Respondent Shearson Lehman Brothers Inc. shall pay to claimant Sidney D. Krasner the sum of $679,833.00 (Six Hundred and Seventy–Nine Thousand Eight Hundred and Thirty–Three dollars), which sum includes interest.  In addition, respondent shall pay claimant $85,488.00 (Eighty–Five Thousand Four Hundred and Eighty–Eight dollars), in attorneys' fees.  Forum fees, payable to the New York Stock Exchange Inc., are assessed against the parties equally.

Remarks:                                                 pay

**Arbitrators: (D = Dissents)**          **Signatures:**

Karen C. Korins

Joseph J. Vetrano

Felix Wroblewski

| City: New York | State: NY | Date: 11 28/94 | Docket #: 1992–002740 |
|---|---|---|---|

Sessions:  49      Hearing Dates:

| | | |
|---|---|---|
| 02/08/94 (2) | 03/29/94 (2) | 06/27/94 (2) |
| 02/09/94 (2) | 04/11/94 (2) | 07/19/94 (2) |
| 02/16/94 (2) | 04/12/94 (1) | 07/20/94 (2) |
| 02/17/94 (2) | 05/10/94 (2) | 07/25/94 (2) |
| 02/18/94 (1) | 05/16/94 (2) | 08/04/94 (1) |
| 03/04/94 (2) | 05 23/94 (2) | 08/08/94 (2) |
| 03/07/94 (2) | 05 24/94 (2) | 09/22/94 (2) |
| 03/23/94 (2) | 06/03/94 (2) | 11/03/94 (2) |
| 03/24/94 (2) | 06/15/94 (2) | |

**EXHIBIT**

J-2

# New York Stock Exchange
## In the Matter of Arbitration Between

**NYSE**

**Case:** Barbara A. Wolfe v Charles R. Schwab, Lawrence J. Stupski, David S. Pottruck, Ronald W. Readmond, A. John Gambs, III, Charles Schwab & Co., Inc., and The Charles Schwab Corporation

**Attorneys:**

For Claimant(s):
Deboran S. Ballati Esq. – San Francisco, CA

For Respondent(s):
Bartlett A. Jackson Esq. – San Francisco, CA
Maureen E. McClain Esq. – San Francisco, CA

| | | |
|---|---|---|
| **Date Filed:** 06/03/93 | **First Scheduled:** 02/08/94 | **Decided:** 8-19-94 |

**Case Summary:** Claimant, a former executive vice president, alleges that she was wrongfully terminated from her position by respondents, consisting of member firms and senior management. As a result of that action claimant alleges breach of contract, breach of covenant of good faith and fair dealing, sex and age discrimination, termination in violation of public policy, retaliation, tortious inducement of breach of contract and intentional infliction of emotional distress. Claimant seeks damages of $10,000,000.00, damages for emotional distress in the amount of $10,000,000.00, punitive damages in the amount of $50,000,000.00, attorney's fees and costs. Respondents Charles Schwab & Co., Inc. and The Charles Schwab Corporation counterclaim for alleged breach of fiduciary duties, return of confidential corporate documents, retraction of alleged disparaging statements and other declaratory relief. Respondents Charles Schwab & Co., Inc. and The Charles Schwab Corporation also seek attorney's fees and costs.

| **Product:** | **Market:** |
|---|---|

| **Claim Data** | | **Award Data** | |
|---|---|---|---|
| Claim: $10,000,000.00 | CC/3rd Pty: Uns | Award: $425,000.00 | CC 3rd Pty: $0.00 |
| Punitive: $50,000,000.00 | Punitive: $0.00 | Punitive: $0.00 | Punitive: $0.00 |
| Atty Fees: $677,999.79 | Atty Fees: $1,162,814.58 | Atty Fees: $0.00 | Atty Fees: $0.00 |
| Deposit: $1,500.00 | Deposit: $350.00 | Costs: $0.00 | Costs: $0.00 |
| | | Forum Fees: $82,800.00 | |

**Decision:** The undersigned arbitrators have decided and determined in full and final settlement of all claims between the parties that: Claimant, Barbara A. Wolfe, is awarded the sum of $425,000.00 to be paid by Respondents Charles Schwab & Co., Inc. and The Charles Schwab Corporation. There is no award of pre-judgment interest. All claims against Respondents Charles R. Schwab, David S. Pottruck, Lawrence J. Stupski, Ronald W. Readmond and A. John Gambs, III are denied. Claimant's claims against all respondents under the statutes for sex discrimination, age discrimination and retaliation, are denied. The counterclaim of respondents Charles Schwab & Co., Inc. and The Charles Schwab Corporation against claimant Barbara A. Wolfe is denied. Each party shall bear its own costs and attorney's fees. The New York Stock Exchange forum fees in the amount of $82,800.00, consisting of 55 hearing sessions and one discovery conference, are assessed one half against claimant Barbara A. Wolfe and one half against respondents Charles Schwab & Co., Inc. and The Charles Schwab Corporation.

**Remarks:** A discovery conference was held with arbitrator Robert L. Gorman, Esq., on October 18, 1993.

| **Arbitrators (D = Dissents)** | **Signatures:** |
|---|---|
| Robert L. Gorman | |
| Shirley Conti | |
| John B. Sisson | |

| | | | |
|---|---|---|---|
| City: San Francisco | State: CA | Date: | Docket #: 1993- |

EXHIBIT
J-3

## Exhibit K: Cost of Going to Court

Exhibit K is a receipt for filing a lawsuit in federal court. While the expression, "making a federal case out of it" implies that a federal lawsuit is a big deal, it is in fact much cheaper to file a federal case than an arbitration.

Every year, federal, state, and local governments spend $93.14 per American to maintain public court systems.[11] This means that, over an adult lifetime, each of us will pay some $5,000 in taxes to support courts that we are likely to call upon only once or twice. When that occasion arises—because of a wrongful firing, a defective new home, mistreatment by an HMO, or some other personal crisis—is there a benefit to relinquishing the right to go to court and instead paying thousands of dollars more for arbitration?



Mon Jul 16 12:56:07 2001

UNITED STATES DISTRICT COURT

CHICAGO        , IL

Receipt No.   103 10760
Cashier        nadine

Check Number:  180

DO Code     Div No
 4624        1

Sub Acct Type Tender     Amount
1:510000  N    2          90.00
2:086900  N    2          60.00

Total Amount      $     150.00

NEW CASE 01C5485

cn

**EXHIBIT**

K

<u>Section Two</u>

# Arbitration Costs and Court Costs Compared

## Arbitration Costs: Four Hypothetical Cases

This chart compares forum costs among three major arbitration providers and the Cook County, Illinois trial court, which we chose as representative of a typical urban court.  The provider organizations are the American Arbitration Association (AAA), National Arbitration Forum (NAF), and Judicial Arbitration and Mediation Services/Endispute (JAMS).

By forum costs, we mean only the fees the plaintiff must pay to the court or arbitration providers. Forum costs are only part of the overall transaction costs of litigation, which also can include attorney fees and litigation expenses (e.g. expert witness fees, court reporter fees, photocopy costs, and service of process). For a discussion of whether overall transaction costs can be lower in arbitration than in court, see pages 61-67.

The cost chart estimates how much it would cost a claimant to initiate and proceed through four hypothetical arbitrations.  With the exception of the first case, a small claim, we assume the claimant will avail himself of all opportunities to gather information through discovery, present evidence and arguments, and obtain a written explanation of the ruling that are available to litigants in court.  For the small claim we assume that the claimant will accept a "desk arbitration" in which she will not appear in person.

Our time estimates are cautious in the sense that we imagine vigorously contested cases: that is, keeping the experience of Stephanie Paul (See Exhibit B) in mind, we assume that in the three high-stakes cases the respondent will decline to respond to at least one discovery request, necessitating the involvement of the arbitrator to resolve a discovery dispute; and that the respondent will file a dispositive motion (either a motion for involuntary dismissal or motion for summary judgment). Of course it is possible that the respondent's attorneys will cooperate in the spirit of a "friendly tribunal." But there is no guarantee of such cooperation, and a claimant must prepare for the worst in budgeting for arbitration costs. When parties are unable to agree on matters such as discovery compliance, scheduling, or stipulations, more hours of arbitrator time are necessary.

We assume in each hypothetical case one subpoena, one discovery request, and one request for a continuance or cancellation, each of which is common in litigation. We assume also that non-party witnesses voluntarily comply with subpoenas (if they did not, filing one or more lawsuits would be necessary, increasing total forum costs).

Our cost figures are based on information from each arbitration provider's website and consultation with the providers' representatives.  JAMS' fees were estimated through direct consultation with a company representative, and based on fee schedules and information

provided directly to Public Citizen (JAMS does not publish its fees online).  The American Arbitration Association's website is http://www.adr.org, the National Arbitration Forum's website is http://www.arb-forum.com, and Judicial Arbitration and Mediation Services/Endispute's website is http://www.jamsadr.com.  Our estimates do not include costs of serving process.

The first hypothetical case is a small consumer claim for under $2,500, which we estimate to require no more than three hours of an arbitrator's time, conducted as a document review rather than an in-person hearing.  An example would be a dispute over cellular or PCS phone service (arbitration clauses are ubiquitous in the telecommunications industry).

Second is a consumer claim for $20,000, estimated to require around 20 hours of arbitrator time. Our hypothetical case is a consumer fraud claim against a mortgage lender for funding a predatory lending transaction. Proving such a claim could require testimony from a mortgage broker and testimony regarding the lender's knowledge of home improvement scams.

Third is an employment discrimination claim for $60,000; our example is a hostile work environment/sexual harassment claim requiring three days (or 24 hours) of arbitrator time. We anticipate somewhat extensive hearings for such a case, which would require testimony from the claimant's former co-workers.

Fourth is a major consumer claim for $80,000, also estimated to require 24 hours of arbitrator time.  Examples would be a claim for a defectively built house or for medical malpractice, requiring testimony from expert witnesses as well as from occurrence witnesses and the parties. We assume that only one arbitrator is hearing the case, although many arbitration clauses in the construction and health insurance spheres require panels of three arbitrators, which would result in higher costs.

## COURT COSTS v. ARBITRATION COSTS

| | Cook County Circuit Court | | | | AAA | | | | NAF | | | | JAMS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $2,500 Claim | $20,000 Claim | $60,000 Claim | $80,000 Claim | $2,500 Claim | $20,000 Claim | $60,000 Claim | $80,000 Claim | $2,500 Claim | $20,000 Claim | $60,000 Claim | $80,000 Claim | $2,500 Claim | $20,000 Claim | $60,000 Claim | $80,000 Claim |
| Filing Fee | $81 | $221 | $221 | $221 | $125 | $375 | $500 | $1,250 | $50 | $200 | $600 | $800 | N/A | N/A | N/A | N/A |
| Admin. Case Mgmt. Fee | No fee | No fee | No fee | No fee | N/A | N/A | $450 | $750 | N/A | N/A | N/A | N/A | $250 | $750 | $750 | $750 |
| Hearing/ Arbitrator Fees | No fee | No fee | No fee | No fee | N/A | N/A | $2,400-$4,200 | $2,400-$4,200 | N/A | $2,300 | $6,500 | $6,500 | $450-$900 | $3,000-$6,000 | No fee | $3,600-$7,200 |
| Room Fee | No fee | No fee | No fee | No fee | N/A | N/A | $450 | $450 | No fee | No fee | No fee | No fee | No fee | No fee | No fee | No fee |
| Subpoena Fee | No fee | No fee | No fee | No fee | No fee | No fee | No fee | No fee | $10 | $75 | $75 | $75 | No fee | No fee | No fee | No fee |
| Discovery Request Fee | No fee | No fee | No fee | No fee | No fee | No fee | No fee | No fee | $10 | $150 | $150 | $150 | No fee | No fee | No fee | No fee |
| Motion Fees | No fee | No fee | No fee | No fee | N/A | No fee | * | * | N/A | $900 | $1,500 | $1,750 | * | * | * | * |
| Contin-uance Fee | No fee | No fee | No fee | No fee | N/A | No fee | $150 | No fee | N/A | $100 | $100 | $100 | No fee | No fee | No fee | No fee |
| Post-Hearing Memo | No fee | No fee | No fee | No fee | * | * | * | * | N/A | $250 | $750 | $750 | * | * | * | * |
| Written Findings | No fee | No fee | No fee | No fee | * | * | * | * | $50 | $650 | $1,250 | $1,500 | * | * | * | * |

**TOTAL FORUM COSTS:** Cook County | AAA | NAF | JAMS

| | Cook $2,500 | Cook $20,000 | Cook $60,000 | Cook $80,000 | AAA $2,500 | AAA $20,000 | AAA $60,000 | AAA $80,000 | NAF $2,500 | NAF $20,000 | NAF $60,000 | NAF $80,000 | JAMS $2,500 | JAMS $20,000 | JAMS $60,000 | JAMS $80,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $2,500 Claim | $81 | | | | $125 | | | | $120 | | | | $700-$1,150 | | | |
| $20,000 Claim | | $221 | | | | $375 | | | | $4,625 | | | | $3,750-$6,750 | | |
| $60,000 Claim | | | $221 | | | | $3,950-$5,750 | | | | $10,925 | | | | $750 | |
| $80,000 Claim | | | | $221 | | | | $4,850-$6,650 | | | | $11,625 | | | | $4,350-$7,950 |

| | $2,500 | $20,000 | $60,000 | $80,000 | $2,500 | $20,000 | $60,000 | $80,000 | $2,500 | $20,000 | $60,000 | $80,000 | $2,500 | $20,000 | $60,000 | $80,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent increase compared to court | N/A | N/A | N/A | N/A | 154% | 170% | 1,787%-2,602% | 2,195%-3,009% | 148% | 2,093% | 4,943% | 5,260% | 864%-1,420% | 1,697%-3,054% | 339% | 1,968%-3,597% |

\* For AAA and JAMS, we assume these functions will be billed for as part of the arbitrator's hourly fees.

## How Arbitration Costs Add Up

While court fees will seldom amount to more than a couple hundred dollars, arbitration fees can run into the thousands, prompting one federal judge to describe them as "staggering."[12]

For example, in Cook County Circuit Court, the filing fee for an $80,000 consumer claim is $221. Under the American Arbitration Association's rules of procedure, the filing fee for the same claim is $1,250. Filing fees are only the beginning, because each action requested of an arbitrator incurs additional costs. For instance, a court would require no additional fee for the judge to issue written findings of fact and conclusions of law. However, the National Arbitration Forum's (NAF) rules of procedure mandate a $1,500 fee for such findings in an $80,000 case. AAA and JAMS arbitrators would bill by the hour to write such an explanation. The arbitration provider organization may also charge fees for the privilege of exercising various procedural steps, such as discovery.

Arbitration can fees add up to a gross disparity from those of the courts. For example, the total forum cost for a $60,000 employee claim in Cook County is $221. The total forum cost for the same claim before an NAF arbitrator is $10,925. The percent difference between these two fora is 4,943%. For the $80,000 consumer claim, the cost disparity between civil court and NAF is $221 versus $11,625, a 5,260% difference. These high costs are not restricted to NAF; for the same $80,000 claim, AAA would charge the plaintiff up to $6,650, and JAMS would charge up to $7,950, amounting to a 3,009% and 3,597% difference in cost, respectively.

**$2,500 Consumer Claim**

Cook County Circuit Court
The filing fee for civil claims between $1,000 and $2,500 is $81. There are no additional fees.
**Total = $81 for the consumer.**

AAA
Under its special consumer rules for claims under $10,000, AAA charges the consumer a $125 filing fee to initiate arbitration, with the business required to pay an additional $625. (AAA reports that in some instances, consumers have demanded arbitration under its consumer rules, yet the business that propounded the arbitration clause naming AAA has refused to pay its share of the fee.) This fee covers a document review hearing only; if the claimant wants an in-person hearing, then fees under AAA's commercial rules apply, with a $750 filing fee and the arbitrator's hourly fees split between the parties.
**Total = $125 for the consumer.**

NAF
Unlike AAA and JAMS, NAF has fixed session fees for hearings with its arbitrators. For small claims, the consumer pays $50 to initiate arbitration, and the business pays a $250 administrative fee. If the consumer wants the same in-person hearing he is entitled to in court, the in-person hearing fee is $75 for the consumer and $150 for the business. Consumers pay $10 for each subpoena and discovery request. The consumer must also pay $50 for written findings of fact and law.
**Total = $120 for the consumer ($50 filing fee + $10 for subpoena + $10 for discovery request + $50 for written findings).**

JAMS
JAMS estimates that individual arbitrators charge from $150 to $300 an hour per party, but explains that rates may vary as "panelists are independent contractors and set their own rates." Each party must pay a "case-management fee" of $250 per day.
**Total = $700 to $1,150 for the consumer ($250 case management fee + $450 to $900 arbitrator fees *[$150 to $300 an hour for 3 hours]*).**

Commentary:
At first blush, NAF fees would appear to be a good deal for consumers. Are they?

We believe that the NAF arbitration procedures are unlikely to be used by consumers. We believe that many mandatory arbitration clauses naming NAF are primarily vehicles through which banks and telecom companies may prohibit consumer participation in class actions.[13] As such, NAF's fee structure for small claims may be set artificially low to show a pro-consumer face to judges scrutinizing the arrangement for unconscionablity.

Most individual disputes between a customer and a credit card issuer arise from improper charges, and in the past have usually been adjusted to the consumer's satisfaction through informal chargeback procedures, at no cost to the consumer. We expect this to continue in most

instances, certainly those in which less than $250, the amount of NAF's fee to a business, is at stake.

The greater danger to consumers arises from systematic, across-the-board practices by a bank or telecom company that have a relatively small impact on individual consumers but, in the aggregate, amount to large-scale fraud. For example, some credit card contracts specify a variable interest rate pegged to the bank's "announced" prime rate. The "announced" prime rate could be an inflated figure bearing no resemblance to the unannounced, *de facto* prime rate actually charged to the bank's best commercial customers.[14] Some banks have made deceptive statements about "teaser" interest rates that attract new cardholders and charged significantly higher rates.[15] Other scams include charging undisclosed "processing fees,"[16] and posting payments to customers' accounts sometime after a check is received, so as to charge customers "late fees."[17]

"The Better Business Bureau of Metro Washington D.C. now receives more complaints about telephone companies than about those in any other industry—even more than auto dealers and home remodelers, who in the past have incurred the most consumer wrath. A survey of 28 state utility commissions shows that customer complaints filed against the nation's two largest long-distance firms—AT&T Corp. and WorldCom—have tripled in two years." Caroline Mayer, "Dial 'C' for Confusion: Unclear Telephone Bills Spur Customer Complaints, Lawsuits," *Washington Post*, July 28, 2000. Among common telecom scams are adding time to customers' bills for calls that do not take place, charging local calls as long-distance calls, billing for time when customers received busy signals, Charles Lunan , "Telephone firm OKs settlement," *Ft. Lauderdale Sun-Sentinel*, August 16, 1995 and advertising low long distance rates but instead charging customers much higher rates. In re MCI Non-Subscriber Telephone Rates Litigation, MDL 1275 (S.D. Ill.)

Such unfair and deceptive practices would be unlikely to come to the attention of individual consumers. They are most likely to be rooted out by attorneys, in consultation with experts, obtaining company documents through court discovery proceedings. In short, they can be remedied only through class action lawsuits. Assuming that individual consumers could uncover a sophisticated billing fraud on their own, even when arbitration fees amount to just $120 most claims are still likely to have "negative values" (forum costs exceeding overcharge amount). By requiring the adjudication of all claims through arbitration, and prohibiting participation in class actions, the bank or telecom provider may effectively insulate itself from accountability.

**$20,000 Consumer Claim**

Cook County Circuit Court
The filing fee for civil claims over $15,000 is $221.  There are no additional fees.
**Total = $221 for the consumer**.

AAA
For consumer claims under $75,000, AAA now caps the claimant's fees at $375, and requires the business to pay the balance.
**Total = $375 for the consumer**.

NAF
The filing fee is $150, plus 1% of the excess over $15,000; thus, for a $20,000 claim, this fee is $200.  NAF rules require that the party demanding a hearing  pays the hearing fee; since the claimant has the burden of proof, the claimant is responsible for most of these fees. The in-person hearing fee is $500 for the initial "session," and $450 for each additional "session." A session represents three hours of arbitrator time.

Consumers pay $75 for a subpoena, $150 for discovery requests, and $100 for continuance requests.  Our hypothetical assumes at least one discovery dispute arising from the defendant's refusal to respond to a discovery request. When the claimant asks an NAF arbitrator to order compliance, he will incur a "Non-dispositive Order fee" of $250, rather than the hourly billing of the arbitrator's time. For this reason, we have lowered our arbitrator time estimate by three hours, the length of one NAF "session".

In our hypothetical, we assume that the defendant company files a dispositive motion (a motion to dismiss or motion for summary judgment). In arbitration, a defendant filing such a motion can gin up forum costs, placing a considerable burden on the claimant. In our hypothetical, the defendant would be required to pay NAF's Request Fee for Dispositive Orders, which is equal to a Document Hearing fee, in this instance, $650. NAF rules also require that "A Party filing an objection to a Request shall pay a fee equal to all or part of the fee for the Request, as determined by the Forum." This means that if, as is customary in litigation, the plaintiff files a response to the motion, the plaintiff must also pay $650. Again, because our hypothetical assumes that some of the arbitrator's hourly fees will be incurred in ruling on a dispositive motion, we have reduced our estimate of arbitrator time by three hours.

For the right to file a post-hearing memorandum, the consumer must pay one-half of the fee for one hearing session. To receive a written opinion with findings of fact and law, the requestor must pay the fee for an NAF document hearing unless the parties agree to split the costs or a written opinion is mandated by the arbitration agreement. In practice, businesses prefer not to receive written findings since they may provide grounds for a court appeal, and many business-drafted clauses actually forbid the arbitrator from issuing one.
**Total = $4,625 for the consumer ($200 filing fee + $2,300 hearing fees *[5 sessions = $500 + $450 x 4]* + $75 subpoena fee + $150 discovery fee + $100 continuance fee + $250 non-dispositive order fee + $650 objection to dispositive motion fee + $250 post-hearing memo fee + $650 for written findings**.

<u>JAMS</u>

For three days of hearings, the case management fee would be $750, and 20 hours of arbitrator time at $150 to $300 per hour would cost between $3,000 and $6,000.

**Total = <u>$3,750 to $6,750 for the consumer</u> ($750 case management fee + $3,000 to $6,000 arbitrator's fees *[$150 to $300 an hour for 20 hours]*).**

**$60,000 Employment Claim**

This is a hypothetical employment claim for sexual harassment, unlike the other three, which are consumer claims.  Two arbitration providers have different fee schedules for employment claims.

Cook County Circuit Court
The filing fee for civil claims over $15,000 is $221.  There are no additional fees.
**Total = $221 for the employee**.

AAA
For employment claims, AAA charges a $500 filing fee and a $150 administrative fee per hearing.  AAA arbitrators in Illinois average approximately $200-$350 per hour, split evenly between the parties.  The room rental fee for this claim is around $450.  Additional fees include a $150 cancellation fee.
**Total =  $3,950 to $5,750 for the employee ($500 filing fee + $450 administrative fee *[3 hearings = $150 x 3]* + $2,400 to $4,200 hearing fees *[$200 to $350 an hour for 24 hours = $4,800 to $8,400 divided by the parties]* + $450 room fee + $150 cancellation fee)**.

NAF
The filing fee is $150, plus 1% of the excess over $15,000; thus, for a $60,000 claim, the filing fee is $600.  The in-person hearing fee is $1,500 for the initial session, and $1,000 for each additional session, paid by the party requesting the hearing.  The employee pays $75 for a subpoena, $150 for discovery requests, and $100 for continuance requests.

Again, our hypothetical assumes at least one discovery dispute arising from the defendant's refusal to respond to a discovery request, with the claimant incurring a "Non-dispositive Order fee" of $250, rather than the hourly billing of the arbitrator's time.  Again, we have lowered our arbitrator time estimate by three hours, the length of one NAF "session."

We also assume that the employer files a dispositive motion (a motion to dismiss or motion for summary judgment) and that the plaintiff files a response to the motion, incurring the objection fee equal to a Document Hearing fee, which in this case is $1,250.  Again, because our hypothetical assumes that some of the arbitrator's hourly fees will be incurred in ruling on a dispositive motion, we have reduced our estimate of arbitrator time by three hours.
**Total = $10,925 for the employee ($600 filing fee + $6,500 hearing fee *[6 sessions = $1,500 + $1,000 x 5]* + $75 subpoena fee + $150 discovery fee + $100 continuance fee + $250 non-dispositive order fee + $1,250 objection to dispositive motion fee + $750 post-hearing memo fee + $1,250 for written findings)**.

JAMS
JAMS does not charge the employee for the arbitrator's fees, making its employment arbitrations considerably less costly to the employee than those of AAA and NAF. JAMS charges the employee only the $250 per day case management fee.
**Total =  $750 for the employee ($250 daily case management fee x 3 days)**.

<u>Commentary</u>:

This comparison points out an interesting fact: arbitrator fees need not be split between both parties, but can be assigned primarily to the party that insisted upon arbitration. JAMS insists that employers using its services pay all the arbitrator's fees. This practice is closer to customary etiquette in American society – as Miss Manners puts it, "there is no age or condition in which it is proper for one person to issue an invitation and then tell the person who is invited to pay the bill."[18]

JAMS' rule is a good one, because employment arbitrations can be—and have been, as noted in Exhibit J —much longer and more expensive than our hypothetical case. For instance, in <u>Warner v. Ristow</u>, a woman alleging sexual harassment was billed $18,260 by the American Arbitration Association. Employment arbitrations administered by the New York Stock Exchange have resulted in even higher forum fees: in <u>Krasner v. Shearson Lehman Brothers</u>, 49 hearing sessions were held at a charge of $24,500 to the plaintiff; in <u>Wolfe v. Charles Schwab</u>, 55 hearing sessions and one discovery conference were held at a charge to the plaintiff of $41,400.

**$80,000 Consumer Claim**

Cook County Circuit Court
The filing fee for civil claims over $15,000 is $221.  There are no additional fees.
**Total = $221 for the consumer**.

AAA
For claims over $75,000, AAA charges a $1,250 filing fee, and a $750 "case management fee." Arbitrators' fees average approximately $200-$350 per hour, and are split evenly between the parties.  The room fee for these claims is around $450.
**Total = $4,850 to $6,650 for the consumer ($1,250 filing fee + $750 administrative fee + $2,400 to $4,200 hearing fees *[$200 to $350 an hour for 24 hours = $4,800 to $8,400 divided by the parties]* + $450 room fee)**.

NAF
The filing fee is $150, plus 1% of the excess over $15,000; thus, for a $80,000 claim, the filing fee is $800.  The in-person hearing fee is $1,500 for the initial session and $1,000 for each additional session, paid by the party requesting the hearing.  Consumers pay $75 for a subpoena, $150 for discovery requests, and $100 for continuance requests.

Again, assuming one discovery dispute arising from the defendant's refusal to respond to a discovery request, the claimant incurs the "Non-dispositive Order fee" of $250, rather than the hourly billing of the arbitrator's time, and the arbitrator time estimate is reduced by three hours, the length of one NAF "session".

We again assume that the defendant files a dispositive motion and that the plaintiff files a response to the motion, incurring the objection fee equal to a Document Hearing fee, which in this case is $1,500. Because our hypothetical assumes that some of the arbitrator's hourly fees will be incurred in ruling on a dispositive motion, we reduce the estimate of arbitrator time by three hours.
**Total = $11,625 for the consumer ($800 filing fee + $6,500 hearing fee *(6 sessions = $1,500 + $1,000 x 5)* + $75 subpoena fee + $150 discovery fee + $100 continuance fee + $250 non-dispositive order fee + $1,500 objection to dispositive motion fee + $750 post-hearing memo fee + $1,500 for written findings)**.

JAMS
For three days of hearings, the case management fee would be $750, and 24 hours of arbitrator time at $150 to $300 per hour would cost between $3,600 and $7,200.
**Total = $4,350 to $7,950 for the consumer ($750 case management fee + $3,600 to $7,200 arbitrator fees *[$150 to $300 an hour for 24 hours]*)**.

Commentary:
At what point do arbitration costs become so onerous that courts will find an arbitration clause unconscionable? On December 11, 2000, the U.S. Supreme Court ruled in Randolph v. Green Tree Financial Corp. that an arbitration clause's silence on the costs and fees of arbitration does not, without evidence of prohibitive costs, render it unenforceable.  Randolph had a financing

agreement with a mandatory arbitration clause, and sought to litigate a Truth in Lending Act (TILA) violation.  When she argued that the costs of bringing her claims before an arbitrator were too high, the Court simply stated that "the 'risk' that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement."

Several other federal courts have rejected claims that potential costs of arbitration would create undue harshness.  Courts have held that they must resolve doubts about costs under a valid arbitration clause in favor of arbitration, Bowie v. Edison Sec. Corp., 2001 WL 1076128 (N.D. Tex., Sep 11, 2001), and that the possibility that a claimant could be required to pay a share of the arbitration costs, including part of an arbitrator's fees, is not, by itself, a sufficient reason to invalidate an arbitration clause, Boyd v. Town of  Hayneville, Alabama, 144 F.Supp.2d 1272, 1280 (M.D. Ala. 2001). See also Lyster v. Ryan's Family Steak Houses, Inc., 239 F.3d 943, 947 (8th Cir. 2001). Some other courts have been more sympathetic to consumers and employees, but generally speaking, it has been difficult for claimants to avoid arbitration on the basis of its high cost.

Section Three

# Analysis:
# A Closer Look at Arbitration Costs

## I. Impact of Arbitration Costs on the Ability to Vindicate Rights

This report finds four ways by which arbitration impedes the ability of individuals and the public at large to vindicate their legal rights. These impediments arise from three basic differences between the public court system and private arbitration:

1) The public court system receives taxpayer subsidies while arbitration does not;
2) The public court system is the only tribunal with mandatory jurisdiction and the power to enforce its orders and awards; and
3) The public court system's proceedings are a matter of record and constitute precedents for future cases.

## A. The Cost Barrier

Any tribunal costs are a potential barrier to asserting rights, as the Supreme Court noted years ago in a decision relating to the relatively low cost of filing a divorce case in court. [19] As the "Arbitration Costs and Court Costs" chart in Section Two indicates, the costs of submitting most claims to arbitration are drastically higher than the costs of filing a lawsuit in the publicly subsidized court system. Because these costs are so substantial, they can be expected to cause people of low- or moderate- income to forego prosecution of their claims. As former Solicitor General Rex Lee observed:

> For a person or company of means, utilization of the courts involves simply an economic decision driven by net-worth-maximizing motives. That is, the decision will be controlled by an assessment whether the litigant's net worth will be greater or less if he goes to litigation. For the poor, by contrast, the cost of litigation would constitute an absolute barrier so that the indigent, unlike his or her wealthy neighbor, could not make the same rational judgment whether to litigate. And the barrier will of course be higher if it includes the cost of running the court…
>
> For many people—including many who would not qualify under any traditional standard for measuring indigency—bearing the total cost of a decision to go ahead with litigation would probably preclude such a decision. [20]

The hurdle posed by costs is heightened by the fact that most people in a situation requiring legal redress are financially distressed. A claim against a predatory lender will generally arise when a

borrower can't afford to make mortgage payments; a claim for employment discrimination arises when a worker has been fired; and so on.

A mandatory arbitration clause's drafter may use this cost barrier as a shield from lawsuits. Any business enterprise that expects to be liable to customers or employees for a breach of contract or illegal activity may seize this opportunity to effectively immunize itself from lawsuits. A business could have various motivations, ranging from benign to fraudulent.

- A business could feel that it is not violating any of its obligations and needs to insulate itself from what it considers "frivolous" lawsuits.
- An employer may not make any effort to monitor its supervisory personnel or workplaces for signs of discrimination, and wants to avoid anticipated lawsuits.
- A corporation may take an aggressive attitude of pushing the ethical envelope with its customers, and seek to erect barriers against class actions that would expose unlawful practices.
- A builder, finding that the quality of its construction is suffering due to shortages of qualified workers, might wish to deflect lawsuits from homebuyers that it fully expects in the course of its business.
- An enterprise that knowingly engages in fraudulent activity, such as predatory lending or home improvement scams, may utilize the arbitration cost barrier as an essential element of its modus operandi. [21]

Indeed, there is some circumstantial evidence that companies or industries that have been found to have engaged in, tolerated, or facilitated fraudulent schemes began using arbitration clauses shortly after settling lawsuits:

*Predatory Lending*. In 1999, WMC Mortgage Co., a subprime lender, was sued for financing a "loan flipping" scam masterminded by a sophisticated fraud ring in St. Paul, Minnesota. WMC settled the claims of the homeowners victimized by the scam[22]—and then began including arbitration clauses in all its borrowers' loan documents.

*Poultry Industry Cheating*: In 1996, poultry packer ConAgra was sued for systematically shaving the weights of birds delivered to its plants by contract chicken growers. ConAgra eventually settled the suits for millions of dollars.[23] But ConAgra, and other poultry processors, have guaranteed that they will never face such lawsuits again. Contracts with poultry growers now contain arbitration clauses that ban class actions and prevent any claims of arbitrary or unfair treatment from going to court.

As long as the enterprise has sufficient advantage, either in sophistication or bargaining power, it can almost always slip an arbitration clause into a lengthy contract, an employment handbook, or pile of closing documents. In the event that a consumer or worker should find the clause and object, that individual has identified him or herself as rights-conscious, allowing the enterprise to terminate the relationship immediately and eliminate a potential source of future litigation.

## B. Uncertainty About Costs

Assuming that a claimant does have the ability to front arbitration costs, it is still impossible to make a rational calculation as to whether to proceed without knowing what those costs will be. While the "Arbitration Costs and Court Costs" chart provides some guidance as to the expected costs of an arbitration proceeding, the arbitration process does not lend itself to the degree of certainty about forum costs that the court system provides. This is because of uncertainty about (1) the amount that the claimant will be required to deposit in order to initiate the process and (2) the ultimate cost of arbitrator fees.

Under AAA's procedures, one may not be able to get information about what the arbitrators' hourly fees will be until after the initial arbitration fee is paid. This is because, unless the parties have previously agreed upon who will serve as arbitrator, only after the filing fee is paid does AAA provide the parties with a list of potential arbitrators. [24]

Virginia attorney Tom Domonoske recounts that when he agreed to represent a consumer client in an arbitration against a lender, AAA provided the names and fee information of five possible arbitrators. Each party was allowed to strike two names from the list. The arbitrators charged fees in the following amounts: (1) $400 per day; (2) $1,000 per day; (3) $1,200 per day; (4) $2,000 per day; and (5) $200 per hour. Each party struck two different panelists, leaving one seemingly agreeable to both sides. However, when the lender learned the identity of the arbitrator, it was able to "backstrike" him by retaining another member of the arbitrator's law firm, requiring the arbitrator to recuse himself due to conflict of interest. As a result, AAA appointed an arbitrator of its own choosing, whose fee was $800 per day.

The next step in the process was a planning conference with the AAA case administrator and the arbitrator. It was estimated that the arbitration hearing would take one day. Following this, approximately three months after the AAA process started, Domonoske received an e-mail from the AAA administrator requesting a deposit to cover "one day for the hearing, one day for study time, one day for travel time, and travel expenses." Domonoske expected the arbitrator to bill a minimum of $1,200 for the claimant's portion.

Uncertainty about ultimate costs can lead to a perverse "sunk costs auction" dynamic. In a sunk costs auction, as the parties bid against each other for an object, they must pay out cash for each incremental bid. As the parties commit their cash, they do not know how much they will ultimately be required to spend; but do know that if they stop bidding before their opponent, they will have forfeited all the cash laid out previously. The absurd result is that a party may end up spending more than the object is worth—a frequent outcome when this game is simulated in a classroom is that a bidder spends $30 or more to purchase a $20 bill.

To some degree, this dynamic is present in any litigation, but the problem is severely aggravated in arbitration. First, it is much more important to accurately estimate the value of a claim. Several distinct types of damages may be potentially recoverable in a case, with some items of damages nearly certain to be awarded, while others are "borderline." In order not to waive one's right to recover the "borderline" items, the claimant must pay the graduated filing fee

corresponding to the highest potential amount—an investment of hundreds or thousands of additional dollars that need not be risked in court litigation.

Second, the claimant does not know whether his adversary intends to cooperate in keeping hourly arbitrators' fees low or to pursue a scorched-earth strategy. In the latter course, the respondent can file summary judgment motions or refuse to provide discovery, requiring the claimant to advance additional arbitrator fees. Whether the respondent will pursue such a course will not be known until after the process has been initiated. This can be a problem in court, too, but the stakes are much lower. Moreover, a court case can be pursued on a contingency fee basis, with the claimant's attorney assuming the risk that an adversary will escalate the time commitment involved.

It appears that the sunk costs auction dynamic was a factor in both the <u>Hundley-Paul</u> case (Exhibit B) and <u>Malkani</u> case (Exhibit C). In the <u>Hundley-Paul</u> case, the respondents pursued a scorched-earth strategy. Costs were increased to such an extent that the claimant was forced to drop out of the "auction," forfeiting all the money she had advanced. In the <u>Malkani</u> case, after the arbitration had begun, it was apparent that the claimant would be awarded damages only under the narrowest interpretation of the law. Had this been known earlier, the claimant would not have proceeded because the arbitration costs added to his attorney's fees ultimately exceeded the amount he was awarded. Both of these cases could have been pursued in court at an acceptable risk, but in arbitration an accurate risk/reward assessment was not possible. This is why most potential claimants who are bound by arbitration clauses will, after consultation with counsel, decide not to pursue their cases.

## C. Costs of Companion Cases and Satellite Litigation

Arbitrators can assume some duties of judges, but not all. They may only assume the powers delegated to them by the parties to an arbitration agreement. They cannot adjudicate issues that a party has withheld from their consideration, compel actions by non-parties, or enforce their awards. As such, if any party refuses to fully submit to or cooperate with the arbitration tribunal, court litigation becomes necessary.

<u>Companion Cases Under One-Way Mandatory Arbitration Clauses</u>

Few arbitration clauses drafted by parties with superior bargaining power operate on a "two-way" basis. Most of these clauses allow the dominant party to retain the right to go to court. [25] For instance, in a mortgage transaction the borrower will be required to arbitrate claims against the lender, but the lender may avail itself of foreclosure proceedings. An employee will be required to arbitrate a claim of discrimination or for unpaid commissions, but the employer may go to court to enforce a covenant not to compete. Under these circumstances, claims and counterclaims cannot be adjudicated in the same tribunal, even if they involve an identical issue such as fraud.

Consequently, costs of litigation are increased substantially. Imagine a judicial foreclosure case initiated by a lender in which the borrower charges she was victimized by predatory lending practices. In order to defend against the foreclosure, the borrower will have to prove at trial that

she was a victim of fraud. But in order to recoup fees paid to the lender, she will have to prove the same facts constituting fraud at an arbitration proceeding, with witnesses' testimony and lawyers' arguments repeated.

Multi-Party Litigation

Another peculiar problem posed by mandatory arbitration occurs with multi-party litigation. While the courts generally disfavor inefficient "piecemeal litigation," the U.S. Supreme Court has held that in multi-party cases the Federal Arbitration Act "requires piecemeal resolution when necessary to give effect to an arbitration agreement. Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." [26]

For example, the California Association of Realtors' standard purchase contract contains a mandatory arbitration clause providing that any disputes arising between the buyer and seller must go to arbitration; but it remains silent as to the broker's participation.

Brokers thus maintain a choice if a dispute arises involving both them and their clients—they may submit to arbitration, or refuse to participate. Suppose a buyer purchases a home, and then discovers a huge drainage problem that may cost over $100,000 to fix.  The buyer claims that both the seller and broker were aware and should have advised accordingly.  The buyer's only recourse against the seller is to submit to arbitration, but the buyer cannot force the broker into the same process.  Thus, should the broker not consent to arbitration, the buyer must sue the broker in court, while arbitrating the dispute with the seller at the same time.

Again, doing so would require the claimant to do everything twice—proceed in two different fora with identical witnesses, evidence and arguments, compounding legal costs. [27]

Satellite Litigation

"While arbitration is a creature of contract between the parties, all too often information crucial to the resolution of a dispute is within the control of non-parties," says AAA on its website. [28] An arbitrator may issue subpoenas but has no power to enforce them. As JAMS notes on its website, one problem "of obtaining information within the ADR process is that the powers of the court are not available to compel full compliance." [29] AAA's website cautions that "wasteful collateral disputes often revolve around the use of subpoenas. These disputes may take on added complexity in arbitration due to largely overlapping state and federal jurisdiction and access to both arbitral and judicial forums."

Should a non-party witness refuse to comply with a subpoena, a lawsuit must be initiated in the court having jurisdiction, with the witness made a party and served by process. In the Northern District of Illinois, this would require payment of a $150 civil filing fee as well as the attorney fees for at least one appearance in court. Matters are complicated further, however, when the non-party witness does not reside in the district of the jurisdictional court. In such instances, it will be necessary to file suit in two federal district courts—"the home court, which determines the subpoena's validity and directs reissuance of the subpoena… [and] the target court for actual

enforcement. This is much more burdensome than enforcing a subpoena returnable in a judicial proceeding," AAA concedes.

Similarly, an arbitrator has no power to enforce an award. "Winning an arbitration award may not immediately end the dispute, especially when it comes to collecting payment from the losing party," AAA's website warns.  Where arbitration is entered into in a good faith effort to quickly resolve a dispute, enforcement will not be an issue. But if arbitration has been used instead in a bad faith effort to avoid the legal consequences of misconduct, a losing party may refuse to pay an award and require the prevailing party to go to court to enforce it. This again would require the payment of a civil filing fee and appearances before a judge.

### D. Information Costs Arising from Arbitration

Information costs attributable to arbitration are of two types—increased costs to the parties and increased costs to the public at large. Both types of costs arise from the fact that arbitration proceedings take place in private. Court proceedings take place wholly in public view: the time, place and date of every court call are public information, and the public is free to attend. Pleadings and dispositions are contained in files accessible to anyone who visits the courthouse, and much information is available online as well. Jury verdicts are reported by companies specializing in such information. Finally, appellate decisions, as well as many federal trial court decisions, are published and provide guidance as to the current state of the law as well as the predilections of individual judges.

<u>Added Costs to the General Public</u>

How the public is affected when adjudications are not made generally known is succinctly stated by Henry Manne:

> If business firms can rely upon future courts to apply the law in the same way they have in the past—that is in accordance with the doctrine of precedent or *stare decisis*—they will be able to make business decisions with less uncertainty and therefore lower transaction costs. This development can be an enormous "public good" in any economy. Even in a totally honest system, there will always be an uncertainty about how a new issue will be resolved. But, as a body of case law develops and builds, that community which uses that area of law will experience less and less economic uncertainty and thus lower costs. Accordingly, each litigated case with a published opinion—and therefore a settled rule of law—adds to the social capital of the economy.

> If, on the other hand, disputes are privately settled with no publication of the results and no way of enforcing the doctrine of precedent, this enormous positive externality will be lost to the economy. [30]

Some arbitration decisions are published, but their value as precedent is limited for two reasons. First, the doctrine of *stare decisis* requires only that judicial, not arbitral, decisions are binding. Second, as Posner and Landes note:

Private judges may have little incentive to produce precedents. They will strive for a fair result between the parties in order to produce a reputation for impartiality, but why should they make any effort to explain the result in a way that would provide guidance for future parties? To do so would confer an external, uncompensated, benefit not only on future parties but also on competing judges. If anything, [private] judges might deliberately avoid explaining their results because the demand for their services would be reduced by rules that, by clarifying the meaning of the law, reduced the incidence of disputes. [31]

<u>Added Costs to Litigants</u>

The added information cost to litigants arises from a litigant's need to be familiar with an arbitrator's background in order to take advantage of the selection process. As James Acret noted in the *Construction Arbitration Handbook*: [32]

> The most important tactical function performed by a lawyer in an arbitration proceeding, or by the party if there is no lawyer, is the selection of the arbitrator. It is the potential for exercising some degree of control over selection of the arbitrator that gives the system of arbitration, as opposed to litigation, one of its most appealing qualities. This is not a point at which to save time, trouble, or expense. Consideration should be given to a potential arbitrator's age, education, experience, background, and profession. It is also essential to obtain specific information from someone who is personally acquainted with the prospective arbitrator. Such information includes: has the person had experience as an arbitrator and actually rendered awards; is the person likely to be biased against a subcontractor, contractor, architect, engineer, or owner; is the arbitrator likely to be cognizant of the professional reputations of the parties or their witnesses; and is the arbitrator intelligent, patient, judicious, decisive, impulsive? If such information cannot be acquired, the potential arbitrator should be stricken from the list. On balance, it is better to accept the arbitrator appointed by the AAA than to leave an arbitrator on the list without developing personal information.

Obtaining this information can be difficult, because arbitration outcomes are not a matter of public record. Parties who frequently resort to arbitration, as in the labor/management context, will not be excessively burdened—attorneys will likely have their own "book" on arbitrators from past experience. But in areas in which arbitration is uncommon, such as consumer or non-union employment disputes, claimants and their attorneys are unlikely to recognize the names of proposed arbitrators or to find other persons who have had experience with them.

To the extent that records of arbitration outcomes are publicly available, they come at a price. For instance, Securities Arbitration Commentator, Inc. can provide profiles of arbitrators, but a $200 fee is required to access their database, and fees for reports on individual arbitrators' histories range from $15 to $25.

## II. Economics of Arbitration Costs

This section explores the question of why arbitration costs are so high.

### A. Trade-Offs Between High Forum Costs and Benefits of Arbitration

If private arbitration requires parties to pay substantial sums for an adjudication that they may essentially get for free from the public court system, what explains its continued use among parties of equal bargaining power? Arbitration will be used in spite of its relatively steep price when its benefits in reduced litigation costs outweigh the increased forum costs.

The rationale for arbitration as an alternative to litigation is stated most succinctly in the American Arbitration Association pamphlet, *Guide to Arbitration for Business People*:

> People want to do business, not argue about it.

> But in the world of trade and commerce, disputes are inevitable. Parties might disagree as to their individual rights and obligations no matter how carefully a contract is written. This can lead to delayed shipments, complaints about quality of merchandise, claims of nonperformance of contracts, and similar misunderstandings. And, even with the best of intentions, parties often perform less than they promise.

> These controversies seldom involve great legal issues. On the contrary, they concern the same evaluation of facts and interpretation of contract terms that people and their attorneys are accustomed to dealing with every day. Consequently, when differences arise out of day-to-day commercial affairs, parties often prefer to settle them privately and informally, in the kind of businesslike way that encourages continued business relationships. That is what commercial arbitration is for.

> Arbitration is the referral of a dispute to one or more impartial persons for final and binding determination. It is private and informal, designed for quick, practical, and economical settlements.

This classic formulation of the case for arbitration suggests several reasons why parties would pay the additional costs of private arbitration. Robert Coulson, then president of the American Arbitration Association, wrote in 1986:

> Why do so many executives include arbitration clauses in their contracts?

> Based upon AAA surveys, the following reasons seem most persuasive. Business firms prefer to have their disagreements decided by people who are experts. Arbitrators, unlike judges, can be chosen for their business experience. AAA panels include engineers, business consultants, accountants, and many other specialized experts, as well as attorneys.

The simplicity of arbitration is also an inducement. No company wants to have its funds tied up for extended periods of time. The arbitration process can move promptly, which is especially important in disputes between builders and contractors over performance payments or between business partners who cannot agree about the division of assets.

Arbitration can take place in a private, informal atmosphere where business people feel comfortable. There is less chance that trade secrets will be disclosed to competitors or that a firm's reputation will be placed in jeopardy. In arbitration, confidentiality is honored.

Because the award is generally not subject to appeal, arbitration results in a final and binding decision. Many parties prefer that decisions be final, rather than facing the prospect of extended appellate litigation. Again, most Americans want to stay out of court. [33]

Thus, expertise, speed, confidentiality, informality, and finality are offered as the primary reasons to choose arbitration over litigation. It is easy to see these advantages in the business-to-business context. Consider the Travel Agent Arbiter Program, which arbitrates disputes between travel agents and the Airline Reporting Corporation (ARC). This program, formed out of negotiations among the American Society of Travel Agents, ARC, and the airline industry, provides quick resolution of disputes (usually relating to the travel agent's responsibility for stolen ticket stock) without interrupting the business relationship between the agent and ARC. A board of directors, with equal representation from the agent community and airline industry, oversees the Arbiter. Agents are charged no fee for contesting a case before the Arbiter. [34]

While arbitration's unique qualities may be valued by business executives when resolving business-to-business disputes, it is much more difficult to imagine how the benefits of arbitration would offset its costs in a consumer/business or employee/employer dispute. Issues of common law fraud, negligence, or discriminatory conduct do not involve judgments uniquely suited to experts; rather, they require judgments as to what a "reasonable person" would do or feel—ordinarily the province of jurors. Indeed, in choosing jurors, attorneys usually exercise peremptory challenges against venirepersons who have expertise or experience in the subject matter of a case.

Speedy disposition of cases is no longer uncommon in our court systems. Experiments in case management and discovery innovations over the past decade have revealed new techniques for judges to use in expediting lawsuits. Most courts have adopted one or more of these techniques, which generally involve the judge using his or her authority to move cases along by setting discovery deadlines and early, firm trial dates. [35]

Court delays are not a universal problem. The most recent study of delays found median times from filing to trial vary from 17.5 months in Fairfax County, Virginia to about five years in Cook County, Illinois,[36] and thus the benefits to be gained from a speedy arbitration process differ from jurisdiction to jurisdiction. Some scholars believe that delays are a function of local "legal

cultures," [37] each of which places a different value on speedy resolution of cases. If delays are produced by local attitudes rather than by courts, then the length of arbitration processes may vary in proportion to the speed of local dockets.

Finally, parties who want a case to move more quickly are also free to waive their right to a jury trial and instead hold a bench trial before a judge, which is estimated to be forty percent faster than a trial by jury. [38]

Individuals have different needs than businesses with regard to confidentiality. These needs have often been met by public courts. Courts have protected the privacy of victims of sexual misconduct by impounding court files or ordering the use of pseudonyms. Courts have also impounded files in cases in which litigants might attract tabloid coverage or other prurient interest. Privacy is not likely to be such a pervasive need among consumers engaging in routine transactions that arbitration would be chosen for this reason at the time of entering into the transaction. [39]

It is also unclear how the informality of an arbitration setting is useful outside the traditional commercial setting. Because a consumer and business are unlikely to have a "continuing business relationship," the "friendly tribunal" envisioned by AAA is not as likely to materialize. In many instances, the business will have already terminated the relationship, as where a builder has walked off the construction site, or a lender has instituted foreclosure proceedings.

In the employment discrimination context, arbitration is the least informal step in the claim process. Employment discrimination charges are required by law to be investigated by fair employment practice agencies. These agencies typically require the parties to go through fact-finding, conciliation, and mediation before litigation.

## B. Can Arbitration Be Cheaper than Litigation?

Interestingly, Coulson did not include in his discussion a claim often made by advocates of arbitration: cost savings. Going back to 1923, proponents have asserted that "arbitration saves money." Yet there appears to be no report or study finding that litigants, by giving up free use of a public court system, can actually save money through private adjudication. [40] As Acret noted in 1985: "It is assumed sometimes that arbitration proceedings are less expensive than litigation, but this is by no means always true. Expense factors must be traded off; although Construction Industry arbitrators usually serve for one or two days without compensation, thereafter they must be paid." [41] Needless to say, now that AAA arbitrators no longer are required to serve one day at no charge, arbitrations are still more costly.

A review of the literature on arbitration finds no scholarly writing setting forth a theory behind claims of arbitration cost savings. Some commentators have suggested scenarios under which arbitration could reduce overall transaction costs of litigation. However, closer review of these scenarios finds that the cost savings attributable solely to arbitration *per se* apply only in a small category of cases; and that many of the procedural qualities of arbitration that produce these savings can be duplicated in ordinary court litigation.

Expertise

One can imagine a dispute between a merchant and manufacturer over the quality of a shipment of goods located in a warehouse. The merchant has rejected the goods as nonconforming; storage charges are accruing. If an arbitrator whom both sides view as an expert on the quality of such goods would be willing to come to the warehouse and summarily find for either party, the dispute could be settled quickly, there would be no need for lengthy expert witness testimony, and the goods could be disposed of.[42] Similar dynamics have no doubt contributed to the longevity of the AAA Construction Industry Tribunal, which, composed of persons having experience or expertise in construction, could decide cases without hearing the type of expert testimony that a judge or jury would need to explain the facts of a construction dispute. The savings in legal fees through less extensive procedures alone could offset the charges for arbitration.

Unfortunately, as noted above, expertise is unlikely to be helpful in deciding most cases involving consumers or employees. A comparison of a traditional commercial dispute subject to voluntary arbitration to the types of disputes subject to arbitration under adhesion contracts demonstrates the difference.

Arbitration has customarily been used in the international cotton trade. "Cotton is a very variable commodity, and peculiarly difficult to classify into agreed grades; furthermore each bale is different. The variations are of commercial importance, and efficient operation of the market required that disputes be dealt with rapidly, and by experts. The more difficult it is to establish objective systems of grading and quality control based on samples or definitions, the more essential it is to have a system employing trusted experts who simply decide the matter… Quite apart from the delay and cost involved, it would have been ridiculous to accept a jury decision, necessarily based on evidence from expert brokers, rather than to accept a direct decision of a panel of experts."[43]

Consider now the standards employed in typical consumer, employment, and franchisor/franchisee cases. A homeowner who asserts that she has been cheated in a predatory lending transaction would have to prove fraud. In Delaware, the jury would be given this instruction to determine whether a fact was material: "A fact is important if it would cause a reasonable person to decide to act in a particular way, or if the maker of the misrepresentation knew another person would regard it as important."[44] In an age discrimination case, for the plaintiff to prevail the jury must find "that his age was one of the reasons the defendant discharged him."[45] In an Automobile Dealers Day-in-Court Act case, the issue before the jury is "whether the defendant acted in good faith and whether its actions amounted to coercion and intimidation."[46]

In each of these cases, expertise does not bear upon the most significant issues in the case. Instead, the fact-finders must apply their common sense, their observations of and experiences with human beings, and their collective judgment as to the reasonableness of a course of action. Indeed, no court would even allow an expert to testify as to her opinions on these issues. Arbitrator expertise reduces costs when it removes a redundant step in the adjudicative process—

the presentation of expert testimony to lay fact-finder. A case in which this step would not take place will realize no cost savings.

Lower Discovery Costs

Another hypothesized source of potential cost savings through arbitration is the reduction of discovery procedures. According to this theory:

> Depositions, virtually unlimited during litigation, are rare in arbitration. The number of depositions needed in litigation, of course, will depend on the case's complexity and number of potential witnesses.

> Depositions require parties to pay for court reporters, witness fees and transcribing fees for the deposition. Additional costs include lost work time by employees.

> ***

> By far, the greatest cost-saving advantage to arbitration is likely to be found in the area of attorney's fees. Attorneys may spend countless hours with depositions, in addition to interrogatories... Although rarely used during arbitration, interrogatories are a routine part of litigation.

> Another reason the discovery process generates significant attorneys' fees is the almost inevitable use of motions to resolve discovery disputes. These disputes consume dozens to hundreds of hours of attorney time. Compared to litigation, time-consuming and costly discovery disputes are rare in arbitration. This may be due in part to the fact that there is normally less time before the hearing to wage such battles. [47]

Some attorneys would quarrel with the assertion that there is always less extensive discovery in arbitration. However, it is certainly true that many arbitration clauses on their face either restrict or ban discovery.

Because reliable information on discovery costs was obtained by the Federal Judicial Center several years ago, it is possible to attempt to quantify the costs of discovery as well as project cost savings that might come from a process that restricts discovery.

The Federal Judicial Center surveyed attorneys about specific closed cases that they had litigated. The survey found:

- In 15 percent of the cases, no formal discovery took place.
- The median total litigation cost per case was $13,000, about half of which was attributable to discovery. The median total litigation cost for plaintiffs was $10,000, and for defendants was $15,000. In other words, on average, the cost of discovery for plaintiffs was about $5,000 and for defendants was $7,500.

- Fifteen percent of the attorneys felt that discovery expenses, in relation to the amount of money at stake in the lawsuit, were high. Eighty five percent of the attorneys felt the discovery expenses were about right or low, or had no opinion.
- Only nine percent of the attorneys felt that the discovery process had yielded too much information in relation to the informational needs of the case. Defendants' attorneys were more likely to hold this opinion (11 percent) than plaintiffs' attorneys (6 percent). [48]

Three conclusions are apparent from this survey. First, discovery was deemed excessive, either in dollar cost or the amount of information produced, in a relatively small percentage of the 85 percent of cases in which discovery took place. Second, excessive discovery is more of an issue for defendants than for plaintiffs.

Third, the dollar costs involved in discovery are not particularly high relative to the costs of opting out of court-managed discovery and into an arbitration process, unless the case involves exceptionally high stakes. The amount at stake in the median case, for which litigation costs averaged $13,000, was $150,000. If discovery costs in the median case were cut in half by utilizing an arbitration procedure, the resulting savings would be $2,500 for the plaintiff and $3,250 for the defendant. However, for the plaintiff to avail himself of these savings by taking the case to AAA arbitration, his filing fee and "case service fee" would be $3,750—more than offsetting half the discovery costs before the arbitrator has been paid. Discovery cost savings would be more of a factor in high-end cases. At the 95th percentile of federal cases, where $5 million is at stake, discovery costs can amount to $150,000 per party. Here, AAA arbitration, with an $11,000 filing fee, could indeed result in cost savings if a 50 percent cut in discovery expenses can be realized.

In any event, most judges have come to agree with the proposition that shortening time to trial provides less time to engage in costly discovery, and have instituted policies of firm, short trial dates with discovery cut-off dates. Thus, in most jurisdictions, it is unnecessary to go to arbitration to obtain lower discovery costs.

It is quite possible that the cost savings said to arise from arbitration are caused not by the process but rather by the underlying attitudes toward dispute resolution that lead the parties to choose arbitration as their forum. AAA and other arbitration providers clearly market their services to parties who prefer a less confrontational means of adjudication. Thus, parties who voluntarily submit a case to arbitration after a dispute has arisen will be more likely to narrow discovery requests, make admissions and stipulations, and agree on other routine matters.

When arbitration has not been chosen jointly and voluntarily after a dispute has arisen, an "informal" tribunal is being imposed on parties who may not feel such a tribunal is appropriate. AAA has suggested in its testimony before the House Judiciary Committee that "a pre-dispute clause is the only way to get people to arbitrate." [49] This is the fundamental paradox behind arbitration—it is a process designed for parties with the "best of intentions" whose disputes involve "misunderstandings," but is being required in those cases that businesses expect to generate the most antipathy. The fanciful term "coercive harmony" has been coined to describe this paradoxical situation.

In any event, saving legal fees and expenses through reduced discovery is not a tradeoff that a consumer or employee claimant is likely to find appealing. First, as noted above, discovery in low-end and middle-range cases is more costly to the defendant than to the plaintiff. Second, many consumer-initiated lawsuits are brought by attorneys on a contingency-fee basis. The contingency fee has been called the "poor man's key to the courthouse" because it requires little if any out-of-pocket payments by the consumer. The requirement of a large upfront filing fee and deposit toward arbitrator fees severely restricts, or eliminates, the advantage a consumer has under the contingency fee system.

Third, the claimant is more likely than the defendant to need information obtainable only through discovery. In an employment discrimination case, for instance, the plaintiff's counsel often must explore the defendant's state of mind when the plaintiff was discharged. Extensive document discovery, and numerous depositions, may be necessary to determine whether the reason given by the employer for discharging the plaintiff was a pretext.

Simplification

A simplified, streamlined arbitration proceeding has the potential to lower costs.

> Arbitration, in theory, saves time and money. If administered properly, arbitration offers the potential for significantly shorter "trial" time. The length of malpractice trials varies considerably; recent evidence suggests that the median trial length is five days, but a significant number of much longer trials occur. Arbitration hearings can be shorter in part because there is no need to select, instruct, or manage a jury. In addition, conflicts over evidentiary issues are minimized because arbitration hearings are typically less formal than a jury trial. [50]

Relaxing the rules of evidence to permit hearsay testimony, such as testimony by affidavit or deposition, or the use of business records without "foundation" testimony, can shorten proceedings. However, all of these savings can be accomplished in a public courtroom, if the parties are willing to stipulate to uncontested facts and admissibility of documents. Parties are also free to waive a jury trial and submit to a "bench trial" before a judge.

Arbitration could particularly benefit consumers if it were simplified to the point that it makes retaining an attorney unnecessary. An example of such an arbitration procedure is the Better Business Bureau's Auto Line program for resolving warranty and "lemon law" disputes with automakers. The consumer need not draft legal pleadings or obtain service of process to initiate a case. Moreover, BBB arbitrators are charged with "the responsibility of ensuring all information needed to make a fair decision has been presented or submitted by the parties, or has been obtained [by the arbitrator] in a manner that gives all parties the opportunity to comment on the information." BBB instructs its arbitrators that "there is no burden of proof in the legal sense in the BBB Auto Line program. As you conduct the hearing, please remember the parties may not have expertise in presenting a case at the arbitration hearing. Consequently, you are responsible for taking reasonable steps to ask both parties for any information you feel is necessary in order to render a fair decision." [51]

AAA and NAF arbitrators would appear, according to their rules of procedure, to have the power to undertake independent research or investigation or prod a pro se party to present evidence in the same manner as BBB arbitrators. However, AAA does not go nearly as far as BBB in requiring arbitrators to assist pro se parties. AAA training materials caution their arbitrators not to provide guidance that might create an appearance that the arbitrator is no longer impartial. They urge that, while guidance should be liberally given, it should be primarily aimed at helping self-represented parties understand their role and responsibility under AAA's rules and procedures. They urge arbitrators not to let an attorney take advantage of a self-represented party's lack of legal representation by filing numerous motions, making "technical" objections, using legal terminology, and to grant postponement requests by parties who are seeking time to hire an attorney. They do not urge arbitrators to seek out information favorable to a pro se party.

It must also be borne in mind that any activity undertaken by an arbitrator to protect the interest of a pro se litigant will incur a fee. This fee would differ significantly from the standard contingency fee utilized by claimants' counsel, because the party would be required to deposit the fee in advance and would be liable for it even if that party did not prevail. In the event that the respondent filed a motion to dismiss or motion for summary judgment, an arbitrator performing the same research or investigation as the claimant's attorney would most likely do so at a higher fee, because the claimant will not have shopped for an attorney fee lower than the arbitrator's fee. Some claims, such as those for medical malpractice, cannot be proven without expert testimony and it would hardly be appropriate for an arbitrator to secure an expert witness for a claimant.

In short, it is difficult to imagine how arbitration's simplified procedures could advantage individuals in more than a few categories of routine cases. Unfortunately, businesses are unlikely to agree to arbitration in those categories because it is not in their interest. Lemon law claims obviously fit the type of case in which arbitration can be pro-consumer, but the BBB Auto Line program exists only because it is mandated by the Federal Trade Commission. As one lawyer familiar with the process concludes, arbitration "does not avoid employment of attorneys." [52]

<u>Lack of Appeals</u>

Proponents of arbitration are undoubtedly correct that the limited, narrow grounds upon which an arbitration award can be appealed will reduce litigation costs. Parties will avoid paying court reporters to record or transcribe hearings or appellate attorneys to write briefs.

However, these savings come at rather high costs. As noted earlier, the lack of appealability of arbitration awards generates high information costs for the public at large. Litigants suffer from the inability to rectify errors of law made by arbitrators. All 52 court systems in the United States have appellate tribunals to correct errors. Not a single state is confident enough in its trial judges' decisions to forgo appealability of their orders—only arbitration providers have such certitude.

The same benefits arising from non-appealability can be achieved without incurring additional arbitration costs, because parties who are so inclined may litigate a case in court and agree not to appeal. This frequently occurs in the context of "high-low" agreements, where a plaintiff agrees to a cap on a jury verdict in exchange for a guaranteed minimum recovery. The high-low

agreement ensures lack of appealability while transferring money to the claimant rather than to arbitration providers.

Fees as Bludgeon: High Arbitration Costs as Incentive to Lower Other Costs?

A fifth reason offered for arbitration cost savings merits mention in passing. Because it contradicts some of the other reasons, it is not offered frequently. According to former Judge John K. Trotter of JAMS, "The only cost in the private system is the hourly charge of the judge. Because the parties are paying that cost, it becomes much more efficient. They manage their time more effectively. Cases go much more expeditiously." [53]

Under this theory, the fact that each individual issue brought to the arbitrator's attention will incur a fee to the parties acts as a deterrent to filing motions to compel discovery or motions for summary judgment, and encourages them to streamline presentation of their cases. This theory has interesting implications.

First, it acknowledges that it is not by informality or by reduction in scope or means of discovery that arbitration inherently generates cost savings; rather, the high cost of arbitrator fees forces the parties to refrain from making an issue of minor matters. This begs the question—if two parties are genuinely interested in keeping costs low, why wouldn't they engage in the same cooperative behavior if they were in court? Indeed, if litigation costs are higher in court, wouldn't parties have even *more* incentive to "manage their time effectively" in court than in arbitration? They could make similar stipulations to a judge, and avoid incurring not only additional litigation costs but also the expenses of an arbitrator.

The second implication relates to parties of unequal economic power. If the amount that the claimant can afford to pay toward arbitration fees is lower than the amount the respondent can pay, the respondent can refuse to cooperate with discovery requests and can file dispositive motions until the claimant's resources are exhausted. This is what happened in the Stephanie Paul case. (See Exhibit B)

Until recently, AAA followed the fees-as-bludgeon theory and assessed a quarterly $150 "processing fee" on parties. As AAA explained in a letter to a consumer's attorney, "In 1992 the Commercial and Construction Industry Arbitration Rules were revised to empower our clients in monitoring and controlling the administrative costs of their arbitration. In that regard, a processing fee will be charged to each party 180 days from the date of this letter and every 90 days thereafter. We encourage your cooperation in resolving this claim as quickly as possible and wish to assist you in doing so." [54]

AAA later abandoned this policy.

## C. Advantages to One Party Arising from Arbitration Outcomes

Savings to a party can result from the differences in the outcomes of claims sent to arbitration. A defendant may be advantaged either from systematically lower awards or by a greater percentage of awards in its favor. Savings from outcomes could more than offset higher forum costs.

According to one expert, conventional wisdom "suggests that arbitrators tend to 'split the difference' in deciding disputes; also, many observers believe that arbitrators are less moved by sympathy for the weaker party than are judges or juries, although this remains anecdotal." The key factor is whether a party anticipates being a plaintiff or a defendant in potential claims, and "defendants prefer arbitration over litigation." [55]

It appears that arbitrators simply do not render awards as high as do judges and juries. The table below compares awards issued by arbitrators in medical malpractice cases under Kaiser Permanente's arbitration program in California to awards rendered by judges and juries. It appears that arbitrators render awards that on average are between 20 and 50 percent of the median awards rendered in court. Under Kaiser's arbitration program, Kaiser is required to pay the arbitrators' fees. While Kaiser incurs increased forum costs by arbitrating the claims, it appears that Kaiser in the long run recoups those costs because awards are so much lower. [56]

### Medical Malpractice Awards: Arbitration versus Litigation

| System | Mean Award | Median Award |
|---|---|---|
| Kaiser Arbitration [57] | $272,971 | $102,740 |
| Jury Verdict Research Database [58] | $2,173,637 | $500,000 |
| Bureau of Justice Statistics Database (1992)[59] | $857,000 | $200,000 |
| Bureau of Justice Statistics Database (1996)[60] | Not available | $286,000 |

Three theories are offered as to why awards will be lower in arbitration than in the court system. The first is the "repeat player effect," in which there is a systematic bias in favor of a party that is a future source of fees to the arbitrator. If one party is expected to regularly select arbitrators in future proceedings, an arbitrator will have an incentive to keep awards within a range he perceives to be acceptable to the repeat player. There is anecdotal evidence to support this theory. [61]

The favoring of parties likely to bring repeat business could come from an arbitration provider organization as well as from individual arbitrators. A recent study of proceedings instituted under the Internet Corporation for Assigned Names and Numbers (ICANN) Uniform Domain Name Dispute Resolution Policy (UDRP) suggests that such a phenomenon is at work in UDRP arbitrations. According to the researcher, the National Arbitration Forum, which administers UDRP proceedings, is assigning cases to six arbitrators who frequently rule for complainants.[62]

The second theory is that the panel from which arbitrators are selected will consist of persons sympathetic to the defendant. AAA's Construction Industry Tribunal uses only arbitrators who are connected with the construction industry. In a case involving two parties involved in that industry, the arbitrators' expertise and experience will help streamline the proceedings. In a case involving a party inside that industry and a party outside that industry, however, the dynamic may be different. In a case brought against a builder by a homebuyer, it is likely that the

arbitrators will have sympathy for their colleague and lack identification with the homebuyer. Thus, a homebuilder, by insisting on arbitration of his claim before the AAA, will gain a more sympathetic hearing than he would from a jury that might be inclined to identify with the consumer. A similar dynamic figures in NASD securities industry arbitrations. [63]

In selecting a jury to hear a trial, attorneys are always careful to challenge prospective jurors who may be sympathetic to the opposing party—jurors who might think, "There but for the grace of God go I!" But industry-dominated tribunals essentially guarantee that some, or all, of an arbitration panel will be sympathetic to the industry-connected party in insider/outsider disputes. [64]

The third explanation might be called the "Solomon effect": a tendency of arbitrators to split the difference in rendering awards. As one commentator notes:

> Arbitrators, unlike judges, often have an incentive to make disputants equally happy or unhappy because they are paid by the parties rather than by the state. Since risk averse parties are more likely to agree on an arbitrator who has a reputation for moderate decisions than one who consistently renders all or nothing awards, arbitrators who want to encourage repeat business will seek a reputation for moderation rather than extremism in their decisionmaking. Other arbitrators may render compromise decisions in order to preserve a relationship between the disputing parties. An arbitrator who views himself in a conciliatory rather than a 'judging' role may render a compromise decision in order to save face for all concerned.

> Whatever the reasons, there is little doubt that arbitration decisionmaking is different from the decisionmaking that goes on in courts. Suggestive facts and some reported cases indicate that arbitration awards often mask decisions based on non-legal factors that compromise rather than adjudge on an 'all-or-nothing' basis the parties' conflicting claims. [65]

The habit of arbitrators to split the difference benefits defendants far more than claimants. Statistics show that claimants in contract cases win about 62 percent of trials.[66] A company that anticipates being a defendant in contract cases will also anticipate being the loser in most of those cases. To the extent that arbitrators are expected to split the difference, a defendant can limit its exposure.

## D. Are Arbitration Costs Insulated from Market Discipline?

We hypothesize four general reasons why there will be a market demand for binding arbitration services:[67] (1) two parties desire arbitration for its informality, confidentiality, speed or finality; (2) two parties desire arbitration because the expertise of the arbitrator or streamlined process will save litigation costs; (3) one party desires arbitration because it results in lower awards, lowering that party's liability exposure; and (4) one party desires arbitration because its high costs or ban on class action procedures provide a barrier to most or all liability exposure. The explicit rationales given by policymakers for encouraging arbitration include the first two

reasons but not the second two. Indeed, the second two types of demand for arbitration, as part of adhesion contracts, would be unintended consequences of the Federal Arbitration Act.

Three unusual facts about arbitration costs raise questions about the extent to which market forces can be exerted on prices for arbitration in the adhesion contract context. First, the use of mandatory arbitration clauses has increased since AAA abandoned its policy of requiring the arbitrator to serve one day without pay—the exact opposite effect on demand that would be expected when prices increase. Second, while the costs of pursuing a claim in the National Arbitration Forum are substantially higher than the costs of going to the public court system, NAF's advertised costs, as indicated in our cost comparison chart, are much lower than those of AAA and JAMS. Third, compensation for arbitrators in the private arbitration sphere is substantially higher than in the non-traditional sphere (such as court-annexed arbitration). This section of our report discusses the dynamics of arbitration prices.

Arbitration Prices in a Perfectly Competitive Market- The "Multi-Door Courthouse"

Analysis of arbitration prices must begin with the concept of what has been called the "multi-door courthouse." In this setting, arbitration competes for "customers"—litigants—with court litigation and other dispute resolution alternatives. Dispute resolution providers, including the courts, each must market a service that is fast, fair, inexpensive, and tailored to the needs of the parties. As former Vice President Dan Quayle stated in his 1991 report on this subject, the ability to choose from among alternatives is essential.[68] Choice is what creates the incentive to provide efficient dispute resolution services. One law and economics scholar explained how arbitration fits into such a scheme:

> … litigants could choose from a variety of dispute resolution options at different prices. A private version of the traditional system with the full panoply of discovery rights and procedural protections, including trial by jury, might be a high-cost option. The market would not provide dispute resolution modes that did not attract enough customers to make them profitable.  In this sense, choices about the nature of the process would be made by the market. Changes in the mode of dispute resolution would be introduced by entrepreneurs seeking to capture market share by introducing more attractive dispute resolution options.[69]

Needless to say, litigants would be best able to choose the ideal dispute resolution process after the dispute has arisen. At that point, both the claimant and respondent would know the nature of the dispute, the amount of money at stake, the resources available to pursue or defend the claim, and would have the time and incentive to investigate the advantages and drawbacks of each dispute resolution process and provider. The litigants could knowledgeably weigh any additional costs of arbitration against the benefits enumerated by Coulson, supra, and choose the one best serving their needs. They also would be free to choose a blend of judicial and arbitral processes—for example, litigating in the courts during the discovery and pre-trial motion phases, and then submitting to arbitration after discovery is completed and dispositive motions are decided. The competition among providers would force down arbitration prices.

On the other hand, if arbitration is unilaterally imposed on a pre-dispute basis as a term in a contract of adhesion, the potential claimant is unable to shop among alternate dispute resolution processes or providers. Only the potential defendant chooses, and that party may see a high-cost option, with its barrier to claims by the less well-off, as better suiting its needs.

The difference is best illustrated by AAA's fee structure for arbitration of insurance claims. An insurance claim can be subject to arbitration by a pre-dispute clause in an insurance policy, or submitted to arbitration by both parties after the dispute has arisen. From 1989 to 2000, AAA had in effect "Dispute Resolution Procedures for Insurance Claims," which it marketed as an "inexpensive" way to resolve claims disputes. In this program, each party paid a $150 filing fee plus $150 to cover the arbitrator's fee.

However, this program was intended only for cases submitted on a *post-dispute* basis. Arbitration under a pre-dispute clause was governed by AAA's Commercial Rules, with their much higher filing fees and regular hourly arbitrator fees. For example, a health insurer's denial of coverage for a bone marrow transplant, submitted post-dispute under the Insurance Claims Procedures, would cost the consumer $300. But for a case governed by a pre-dispute clause, AAA charges a much higher fee. For instance, Tammy Sharpton, who arbitrated such a case in 1997, was charged $5,290.23, *eighteen times* what AAA would have charged had it been competing with other arbitration providers and the courts.[70]

The lack of competition could also lead to less efficiency in the public court system. Quayle and other conservatives envisioned that competition from ADR would force judges and court administrators to make the judicial process more attractive.

<u>Effect of AAA Decision to Bill for First Day of Arbitrators' Time</u>

Prior to 1994, AAA arbitrators were required to donate their time for the first day of their service. When this requirement was abandoned, the cost of AAA arbitration rose substantially. Ordinarily the demand for an AAA tribunal would be expected to drop off—yet, surprisingly, AAA was named in more business/consumer and employer/employee arbitration clauses *after* the change than before. What explains this development, which turns the economist's demand curve inside out?

When arbitration systems are selected pre-dispute, and imposed on a take-it-or-leave-it basis, the arbitration provider has only one customer to please—the business that drafted the clause. If it is in the interest of the business to make the system slow and costly to consumers, which it is if the business wishes to avail itself of a cost barrier, then that is the type of service that will result.

While the use of mandatory arbitration clauses in contracts of adhesion has risen, it appears that, as the economist would expect, the use of arbitration in business-to-business disputes is declining. A recent survey by two Cornell University professors found that most corporate counsel see a decline in the use of arbitration outside of the employment and commercial contexts. Respondents to the survey were divided over whether arbitration actually saves corporations money, with one commenting that arbitration "can be every bit as expensive and burdensome as civil litigation." In "most types" of business-to-business disputes, such as

intellectual property, corporate finance, and even construction, formerly a mainstay of arbitration, the researchers found that "mediation is a popular alternative to litigation, but arbitration is not." Their report concluded that "where the stakes are very high, corporations prefer to fight their battles in front of judges rather than in front of mediators or arbitrators." [71]

National Arbitration Forum's Small Claims Prices

What explains the disparity between NAF's prices and those of AAA and JAMS?

*Consumer-Initiated Arbitrations*

We believe that NAF has kept its advertised costs for "consumer claims" lower because it is not being used as a shield from individual lawsuits but rather as a shield from class action lawsuits and also by some companies to lower costs of its affirmative litigation. A prohibition of participation in a class action, if contained in an arbitration clause, is cloaked with the protection of the Federal Arbitration Act (FAA). If a court decides that FAA is implicated, the clause can only be challenged on the basis of unconscionability. If the arbitration procedures under the clause are inexpensive, they are more likely to withstand an unconscionability challenge. Indeed, NAF markets itself to corporate general counsels on the basis that it can fend off class actions while maintaining low prices to consumers. If a credit card issuer anticipates that it will be a defendant only in classwide litigation, it has no need to find an arbitration provider with high fees. NAF tends to be named quite often in arbitration clauses propounded by credit card issuers, which are unlikely to be sued over individual transactions. Because individual claims are highly unlikely, NAF can set artificially low prices for consumer claims.

Perhaps more indicative of realistic prices for consumer arbitration are the prices charged by NAF for arbitrating disputes between consumers and moving companies. Disputes involving goods lost or damaged during shipping are subject to arbitration under the Interstate Commerce Commission Termination Act of 1995.[72]  Under this law, registered moving companies must offer arbitration, but may not require binding arbitration on a pre-dispute basis. If the dispute involves a claim for $5,000 or less and the shipper requests arbitration, the arbitration is binding on the parties. But if the dispute involves a claim for more than $5,000 and the shipper requests arbitration, arbitration is binding on the parties only if the carrier agrees to arbitration. The costs must be shared equally between the parties, though an arbitrator may determine which party should pay the final costs. The law also requires government oversight of the carriers' established dispute resolution plans.

The American Moving and Storage Association (AMSA), an industry trade group, operates an arbitration program through the National Arbitration Forum. "The arbitration procedures provided under this program have been developed by the AMSA as a less costly alternative to the court system in settling disputes involving loss and damage claims," states the group's Consumer Handbook.

The NAF's fee is $400 for claims up to $10,000. For larger claims, the fee is $400 plus 1 percent of the amount over $10,000. The mover and consumer equally split the fee. The Federal Motor Carrier Safety Administration estimates that claims range from $500 to $10,000. The AMSA

reported the average amount paid on a claim (in 1995) was $610. It will be noted that the price to consumers for this program is *four times* the $49 price for "consumer arbitration" advertised on the NAF website, giving further credence to the suspicion that the NAF fee schedule is set artificially low.

The AMSA/NAF arbitration program is perhaps the only true example of the "multi-door courthouse" scenario applied to consumers. Because participation by consumers is voluntary, the consumer actually gets to choose between an arbitration program and going to court. If the combination of price and convenience make the NAF route more appealing than going to court, it will attract claims; otherwise it will not. The arbitration process offers convenience—the consumer need not go to the courthouse either to file the claim or for a hearing. There is no need to draft pleadings, determine the mover's agent for service of process, nor walk a summons and complaint to the sheriff's office. On the other hand, the arbitration may cost as much as $100 more than filing a lawsuit. In any event, the consumer weighs the costs and benefits and makes a choice. It would appear that the price of this arbitration program accurately reflects the market for consumer arbitration.

*Business-Initiated Arbitrations*

Credit card issuers tend to initiate a great deal of affirmative litigation—routine collection suits against delinquent cardholders. Ordinarily, card issuers must navigate a two-step process to collect debts: first, obtain or register a judgment against the debtor in the debtor's home county; second, enforce the judgment through supplementary proceedings (e.g. wage deduction, garnishment). The first step requires at least one court appearance by an attorney, and may also require a trial if the debtor demands one. A trial, or even the threat of one, requires that a representative of the card issuer travel to the court to authenticate bills that would otherwise constitute hearsay. If a judgment has been obtained in one jurisdiction, but the debtor has moved to another jurisdiction before the judgment has been collected upon, the creditor must obtain exemplification of the judgment in the first jurisdiction followed by registration of the judgment in the new jurisdiction. This is costly in both court filing fees and attorney fees.

NAF arbitration proceedings allow credit card issuers to sidestep the first part of the court process. Credit card billing statements may be submitted to arbitrators without the requirement of in-person testimony; and there is no need to hire local counsel to obtain the award. The award can be enforced in any jurisdiction without need for invoking foreign judgment procedures. The creditor is free to concentrate its attention on the wage deduction and garnishment proceedings, which actually produce cash. In spite of these potential advantages, only one credit card issuer, First USA, regularly uses NAF arbitration for collections.

Because NAF arbitration is being used affirmatively, while AAA and JAMS are named in arbitration clauses primarily for defensive purposes, the market dictates lower filing fees. NAF charges businesses filing fees for routine claims which can be lower than court filing fees if the debtor does not file any response. It appears that debtors file responses in only about ten percent of cases, and pay voluntarily in another twenty percent. [73]

<u>Reduced Costs to Consumers in Non-Traditional Arbitration Programs</u>

Private arbitration providers such as AAA, NAF and JAMS do not represent the only types of arbitration programs in use in the United States. Other types of arbitration are used regularly, at little or no cost to the consumer. The most familiar programs are the chargeback services offered by credit card issuers to resolve disputes between cardholders and merchants. There is no additional cost to the consumer to challenge a merchant's billing of an improper charge. An official of the credit card issuer requests information from both sides to the dispute and makes a summary ruling in a process similar to an informal desk arbitration.

Pursuant to the Magnuson-Moss Warranty Act, most automobile manufacturers participate in a mandatory, but non-binding arbitration program administered by the Better Business Bureau. There is no cost to the consumer to file a claim. Arbitrators, whom BBB terms "volunteers," are paid only $100 for each hearing.

Numerous state courts require that civil cases be referred to non-binding arbitration hearings. There is no additional cost to litigants to participate in this process. In Cook County, Illinois' program, arbitrators are paid $75 per hearing.

Each of the three programs described above is government-mandated, and so the actual costs of the program are spread out among consumers. Because the claimants are not required to bear the costs, they are not discouraged from bringing claims in the first instance. With regard to the chargeback and warranty programs, businesses bear the costs of administration and have an incentive to keep those costs low.

<u>Lack of Price Competition Arising from Use of Pre-Dispute Agreements</u>

There is a tremendous difference between arbitration agreements that bind "one-shot" litigants and those that are entered into by more sophisticated parties. A pre-dispute "agreement" to arbitrate cannot be truly knowing and voluntary, because the one-shot player does not contemplate the consequences of submitting a hypothetical, yet-to-arise claim to arbitration. He will not be familiar with the costs of arbitration relative to ordinary court costs. He also will not be in a position to shop among arbitration provider organizations, or for individual arbitrators, at the time he subscribes to the clause. There is thus no opportunity to find affordable arbitration services.

The option of post-dispute arbitration, on the other hand, can be of tremendous benefit to both parties. Both parties evaluate whether the unique characteristics of arbitration, such as expertise or confidentiality, provide benefits that outweigh the increased forum costs. More importantly, the parties are free to shop for the lowest price. The effects of competition are clearly visible in the lower costs of NAF business-initiated arbitration. While most arbitration clauses are one-way, requiring only the weaker party to arbitrate claims, NAF encourages businesses to submit their claims against consumers to arbitration as well. NAF thus competes with local courts to provide a speedy, inexpensive and efficient avenue for businesses to obtain awards in routine collection matters.

The fact that lawyers are willing to serve as arbitrators for BBB and court-annexed programs for almost nominal remuneration suggests that the costs charged by arbitrators in the private systems could be larger than the market requires. While there may of course be a quality differential between "volunteer" and professional arbitrators, it is also true that many lawyers are willing to serve as arbitrators for relatively low pay because it can be interesting, personally rewarding and a change-of-pace. Indeed, prior to 1994, AAA arbitrators generally contributed their services in smaller cases that took only a day of their time.

Commercial arbitration providers have not systematically sought people willing to serve as arbitrators on a *pro bono* or nominal fee basis. Instead, they keep their pools of arbitrators small, allowing arbitrators within private arbitration programs charge higher fees. As AAA indicates on its website, "Following a nationwide effort over the last several years to streamline our regional panels, our roster, now significantly smaller and more select, is comprised of the finest group of neutrals in the history of the Association. Consequently, openings on the roster are extremely limited and are based primarily on caseload needs and user preferences. Even candidates with strong credentials do not always gain admission." [74]

In spite of that restriction, however, parties to voluntary arbitration are still free to negotiate lower fees from arbitrators. In fact, arbitrators often charge lower fees for deciding labor (union/management) cases than cases involving non-union employees bound by mandatory arbitration clauses. This is because unions, as repeat players, can demand lower fees, while non-union employees are locked into the arbitration provider designated by their employer.

It was shortly after AAA changed its policy and allowed arbitrators to charge hourly fees for their first day of work that arbitration clauses gained increased popularity in business-drafted consumer and non-union employee contracts—precisely the opposite effect from what a competitive marketplace would be expected to produce. Arbitration was not chosen for its cost-efficiency but as a barrier to claimants, so an increased cost made it more attractive to businesses. If arbitration providers were required to compete on a post-dispute basis according to the "multi-door courthouse" model, it is certain that the arbitration providers would find arbitrators willing to serve for lower pay, which would make the process much less costly.

### E. Are Fee Waivers/Deferrals a Solution?

AAA and NAF both say they will consider granting waivers or deferrals of fees to claimants who cannot afford arbitration. [75] But Stephanie Paul, whose arbitration costs were so high that she had to drop her case, was denied her request for a fee waiver by AAA.

Fee waivers are an insufficient solution for two reasons. First, they are inadequate. A waiver of filing fees still leaves the claimant responsible for advancing half the cost of the arbitrator's hourly fees and expenses. These make up the lion's share of arbitration costs. AAA grants fee waivers to claimants whose income is less than 200 percent of the federal poverty line. This would require full payment of fees by a single person earning more than $17,720.

Second, fee waivers do not reduce costs—they shift costs. The costs of operating a private legal system are substantial. The same support personnel that expedite cases at a courthouse, such as

file clerks and court administrators, are also necessary to manage arbitration cases. Arbitration provider organizations handle fewer cases over larger geographic areas, so the economy of scale in a court clerk's office cannot be achieved, increasing the administrative cost per case. Thus, while it costs the Clerk of the Circuit Court of Cook County an average of $44.20 to administer a case, [76] AAA's administrative cost per case averages $340.63, [77] about 700 percent more.

If a consumer-to-business case's administrative costs are not borne by the consumer or business party, those costs will be shifted to the more regular users of arbitration. These include labor unions, which would pass along the costs in the form of higher dues, and the traditional commercial users that make up the bread-and-butter caseload of arbitration.

Shifting costs to these users would be particularly perverse. Business-to-business and labor/management cases are the cases for which arbitration makes the most economic sense: cases voluntarily referred to arbitrators whose expertise can expedite resolution. If these users were forced to absorb the costs of cases such as Stephanie Paul's, where arbitration was used involuntarily and inefficiently, the price of arbitration could become so high as to divert traditional arbitration cases back to the court system.

A few courts have required the party compelling arbitration to bear the fees associated with it. Some businesses voluntarily agree to bear these costs. But while this approach relieves the consumer or employee from paying arbitration forum costs, it does not address other increased transaction costs, such as duplicative presentations caused by one-way arbitration clauses or multiple steps in multiple forums to enforce subpoenas.

# III. Consequences of Arbitration Costs

Why do capitalist nations have publicly-supported court systems if private arbitrators can resolve disputes? It is not because the public has an interest in adjudicating individual disputes; it is because the very existence of a court system induces *voluntary* compliance with contracts and respect for rights of others.

The true nature of a right or of a contract is, after all, the ability it gives one to go to court, have a judge declare a violation, and have the sheriff enforce the judge's decision. If there is no ability to see a judge, whether public or private, and invoke the power of the sheriff, the right or contract is meaningless.

## Erosion of Deterrence of Unlawful Conduct

As columnist Robert Samuelson has noted, "Capitalism derives its strength from the power of self-interest and the ingenuity of the human spirit. But its weaknesses also stem from human nature, which can convert the quest for riches into self-deception and dishonesty." [78] The courts are the necessary backstop for ensuring the vitality of our free enterprise system. Loss of effective access to the courts can be expected to alter the character of exchange in our economy. "If victims must incur a cost to assert their claims for compensation, then they may assert fewer claims. Consider an extreme case in which litigation costs exceed the compensatory damages. Victims will not bring suit, and so the potential injurers will not receive the signal from the tort-liability system that what they are doing is unacceptable." [79] In other words, if the cost of obtaining a judgment is increased by $10,000, a party to a contract may feel free to cheat the other if that party can't afford the fees.

At its most extreme, underhanded business operators may design arbitration schemes to render themselves immune from *any* liability. The *Los Angeles Times* reported in 1997 on a real estate swindler who created his own "Southern California Arbitration Association," staffed by cronies, to hear any disputes arising from his activities. [80]

Another motivation behind the use of arbitration clauses has been to eliminate the threat of class action litigation. As Judge Frank Easterbrook has noted, "Class actions have procedural and substantive advantages. Procedurally, the class action concentrates litigation in a single forum, where it may be resolved more readily than a series of suits could be. Substantively, the class action permits the aggregation and litigation of many small claims that otherwise would lie dormant. At least in principle, the class action provides compensation that cannot be achieved in any other way; although the costs of litigation may consume much of the benefit, the device still serves a deterrent function by ensuring that wrongdoers bear the costs of their activities." [81]

With this deterrent effect absent, an unscrupulous business executive may feel free to overcharge consumers by small amounts that would not be worth seeking to recover in individual lawsuits. This is a particular problem in the consumer credit area. Consumer protection statutes such as the Real Estate Settlement Practices Act are aimed at stopping kickbacks and padded fees, which often amount to no more than a few hundred dollars. Without the ability to enforce these statutes on a classwide basis, lenders "might get away with piecemeal highway robbery by committing

many small violations that were not worth the time and effort of individual plaintiffs to redress." [82]

While arbitration clauses allow those injured by fraud to file individual claims, to do so is impracticable "where there are small harms to a large number of people which would… go unaddressed because the cost to the individual of suing would far exceed any possible benefit to the individual." [83]

## Potential for Disorder

The other consequence of lack of access to the courts is the potential for disorder.

> The public dispute resolution system is usually considered a public good. Without the state enforcing a system of rights, such as the rights to bodily integrity, sanctity of contract, and private property, the only remedy for rights violation, that is, for violence, theft, or breach of promise would be private enforcement or vigilantism. As Locke expressed this idea, "Want of a common judge with authority puts all men in a state of nature." …
>
> Binding dispute resolution by neutral judges with the authority to enforce their decisions is a public good, because it preserves public order. The public peace is a good consumed by all, and if the peace is effectively established, none can be excluded from it. [84]

Of course, as to the two parties involved in an individual dispute, resolution is a private good, and can be accomplished through any mechanism, public or private. When both parties are able to afford the alternative dispute resolution procedure, there is no impact on others. But if the aggrieved party is unable to afford the procedure, lawlessness may result. Lacking a legal remedy, the party may rely on self-help with its attendant risk of violence. In post-communist Russia, with its undeveloped rule of law, contracts are frequently enforced through intimidation by mafia toughs. If the cost of threatening or using violence is lower than the cost of initiating arbitration, a rational actor may choose that course.

An accompanying danger is a chilling effect on economic activity. An individual may desire to start a chicken growing operation or sandwich shop franchise, but be deterred from doing so because he perceives an inability to enforce fair treatment by his partner. A couple may want to have a dream home built, but instead purchase an existing house if they fear a new home warranty is unenforceable. The perverse effect is that the least sophisticated individuals will engage in transactions covered by arbitration, compounding the likelihood of cheating and the resulting inefficiencies. If perceptions of arbitration abuse become widespread, shortages result and businesses suffer, eventually the market will force arbitration clauses to be abandoned. But in the short run, economic growth will slow.

**Fairness**

A system in which wealthy litigants have access to a publicly subsidized resolution of their dispute but individuals do not produces a situation of the type often referred to as "corporate welfare." Prominent conservative legal scholars have bemoaned the fact that litigants need not bear the actual cost of using the court system. Former U.S. Solicitor General Rex Lee, noting that the cost of operating the average American courtroom has been estimated as ranging from $400 to $600 per hour, asked "Why… should the public subsidize a lawsuit between Greyhound and IBM, or between Litton Industries and AT&T? Surely others are more in need of public welfare benefits. Yet, in each of those suits the public paid the bill for thousands of hours of court time— at several hundred dollars per hour—to determine which of these corporate giants owed the other money… For obvious reasons, the case for public funding of the courtroom costs for poor people is stronger than for people of means." [85] Richard Posner has suggested that those who can afford to pay the actual costs of court litigation should do so, leaving the present, lower court filing fees available only to those who cannot. [86]

The trend toward imposing arbitration upon consumers and employees has brought about the opposite of the situation Lee and Posner advocated—individuals must now pay the actual costs of resolving their claims, while wealthy litigants may have their disputes resolved at public expense. To return to the predatory lending example cited earlier, mortgage lenders have access to a publicly subsidized forum to adjudicate their foreclosure cases, while borrowers are forced to bear the actual costs of having their counterclaims decided. This is an inequitable allocation of public resources.

# Conclusion

It is sometimes said that "character is what you do when nobody is watching." When the arbitration cost barrier prevents access to the courts, the drafter of an arbitration clause finds himself in a position where, in a figurative sense, no one is watching him. In these circumstances, "character" truly takes on great importance. Individuals' own consciences will become the primary motivation to engage in fair play. For those who believe that human nature is basically benign, this will not raise great concern. For those who believe that recent years have seen a decline in adherence to traditional values, this will cause alarm. Some social commentators, notably William Bennett, argue that "our society now places less value than before on what we owe others as a matter of moral obligation [and] less value on social conformity, respectability, and observing the rules."[87]

Bennett's pronouncements on this subject are seen as strident by some, but many attorneys who represent consumers would probably agree with his views. Often when close scrutiny is given to seemingly routine business transactions, investigators find evidence of overreaching, corner-cutting, or outright fraud—and this with the courts available to redress such misconduct. With access to the courts shut off by arbitration clauses, such misconduct can only be expected to increase. Ultimately, this will be the greatest cost of arbitration.

---

## Endnotes

[1] Hearing Transcript, "Fairness and Voluntary Arbitration Act," House Judiciary Subcommittee on Commercial and Administrative Law, June 8, 2000.

[2] Statement on NAF website www.arb-forum.com

[3] Michael Siconolfi, "Investors' Fees For Arbitration To Go Higher," *Wall Street Journal*, August 28, 1990.

[4] Sarah Eder, corporate spokeswoman, quoted in Jeffry Kosoff, "AT&T fine print keeps complaints from court," *Portland Oregonian*, December 14, 2001.

[5] Hearing Transcript, "Fairness and Voluntary Arbitration Act," House Judiciary Subcommittee on Commercial and Administrative Law, June 8, 2000.

[6] Id.

[7] Court-annexed ADR requires litigants to participate in non-binding arbitration prior to a full-fledged trial. It is similar to, but not the same as, mandatory arbitration in the private sector. As government-funded activity, it is the only type of arbitration for which raw data is accessible.

[8] Deborah R. Hensler, "ADR Research at the Crossroads," 2000 J. Disp. Resol. 71, 77 (2000).

[9] General Accounting Office, *Securities Arbitration: Actions Needed to Address the Problem of Unpaid Awards* (June 2000)

[10] www.nasd.com

[11] Bureau of Justice Statistics Bulletin, *Justice Expenditures and Employment in the United States* (1995)

[12] Ting v. AT&T, C01-02969 (N.D.Cal. January 15, 2002).

[13] As one attorney who defends banks in consumer fraud lawsuits has written: "It is anticipated that virtually all major banks and lending institutions will implement consumer arbitration procedures within the next five years. Lenders that have not yet implemented arbitration programs should promptly consider doing so, since each day that passes brings with it the risk of additional multimillion-dollar class action lawsuits that might have been avoided had arbitration procedures been in place." Alan S. Kaplinsky and Mark J. Levin, "Excuse Me, But Who's The Predator? Banks Can Use Arbitration Clauses as a Defense," 24 *Business Law Today* May/June, 1998. Edward Anderson, Managing Director of the National Arbitration Forum, has used this as a selling point for NAF's services. See "Do An LRA: Implement Your Own Civil Justice Reform Program Now," *The Metropolitan Corporate Counsel*, August, 2001.

[14] See Briggs Transportation Co. v. Second Northwestern National Bank, 406 N.W.2d 7 (Minn. 1987).

[15] See "Credit Card Issuer MBNA Corp Settles Lawsuit over Ads," *Philadelphia Inquirer*, September 26, 2000.

[16] See "Metris to refund $3.2 million; 62,000 card customers affected," *Minneapolis-St. Paul Star-Tribune*, May 5, 2001.

[17] See "Chase settling card suit for at least $22.2 million," *Houston Chronicle*, September 21, 2000.

[18] Judith Martin, "There's a world of good deportment to embrace," *Contra Costa Times*, Sunday, July 1, 2001

[19] Boddie v. Connecticut, 401 U.S. 371 (1971).

[20] Rex E. Lee, "The American Courts as Public Goods: Who Should Pay the Costs of Litigation?" 34 Cath. U.L. Rev. 267 (1985).

[21] "In one time transactions with large stakes, the promisor may show little regard for for the loss that breach imposes on the promisee. Indeed, the promisor's concern may not go beyond his or her liability. If liability is the promisor's only concern about breach, he or she will perform when it costs less than liability for breach and breach when performing costs more than the liability for breach." Cooter & Ulen, *Law and Economics* (2000)

[22] Steve Brandt, "Lender learns hard way about 'flipping'," *Minneapolis-St. Paul Star Tribune*, July 12, 1999.

[23] Kate Shatkin and Dan Fesperman, "Chickens: The New Pecking Order," *Baltimore Sun*, March 2, 1999.

[24] This is also the practice in arbitrations administered by the American Health Lawyers Association.

[25] For example, one attorney who represents franchisors suggests that, "with careful drafting and measured enforcement of contract terms, a franchisor should be able to structure franchise agreements and auxiliary contracts so that it (or its affiliates) can litigate certain types of claims, while preserving its right to require franchisees to arbitrate their claims against the franchisor." Edward Wood Dunham, "Enforcing contract terms designed to manage franchisor risk" 19 Franchise L.J. 91 (2000).

[26] Moses H. Cone Hospital v. Mercury Construction Corp., 460 U.S. 1 (1983).

[27] See Rossi, "What to do with that pesky arbitration clause," *Knight-Ridder Tribune*, June 15, 2001.

[28] www.adr.org

[29] www.jamsadr.com

[30] Henry G. Manne, "Law and Economics and the Rule of Law—The Sixteenth Annual National Student Federalist Society Symposium on Law and Public Policy—1997: Panel I: What is the 'Law' in Law and Economics?" 21 Harv. J.L. & Pub. Pol'y 11 (1997).

[31] William M. Landes & Richard Posner, "Adjudication as a Private Good," 8 J. Legal Stud. 235, 238 (1979).

[32] James Acret, Construction Arbitration Handbook (1985).

[33] Robert Coulson, *Business Arbitration—What You Need To Know (*3d Ed. 1986).

[34] See Tricia Holly, "Leveling the Playing Field,"  *Travel Agent*, March 5, 2001.

[35] See Judicial Conference of the United States, *The Civil Justice Reform Act of 1990: Final Report*, May 1997 (Recommending that federal judges set "early, firm trial dates, such that the trial is scheduled to occur within 18 months after the filing of the complaint"). According to statistics collected by the Administrative Office of the U.S. Courts, the average time to trial of a federal case has ranged between 18 and 20 months from 1995 through 2000. http://www.uscourts.gov/cgi-bin/cmsd2000.pl

[36] Michael Heise, "Justice Delayed?: An Empirical Analysis of Case Disposition Time," 50 Case W. Res. L. Rev. 813 (2000). More recent data shows that Cook County's time-to-disposition has decreased to 39.3 months. See Rooney, "Law division chief moves to cut disposition rate," *Chicago Daily Law Bulletin* , March 8, 2002.

[37] Id.

[38] George L. Priest, "Justifying the Civil Jury," in *Verdict: Assessing the Civil Jury System* (1993).

[39] Indeed, it is not clear that confidentiality has been a reason for businesses to desire arbitration. In 1996, the Federal Judicial Center conducted a study of 601 federal lawsuits in which one or both parties requested a protective order that would have kept discovery materials confidential. Although at least one party in each of these 601 cases felt that confidentiality was an important consideration, in only 10 of the cases did the parties opt for arbitration. Interestingly, 123 of the cases involved business-to-business disputes. See Wiggins et al, *Protective Order Activity in Three Federal Judicial Districts: Report to the Advisory Committee on Civil Rules*, April 1996.

[40] The National Arbitration Forum issued a press release on March 21, 2001 claiming that "Arbitration can save parties 70-80% of the cost of litigating [employment discrimination] cases." We contacted NAF seeking substantiation of this claim but NAF was unable to provide any.

[41] Acret, supra note 32.

[42] This type of arbitration has been referred to as *folklore arbitration*. "Although arbitration has always comprehended a wide spectrum of processes, its appeal for commercial parties may be understood by envisioning arbitration in its purest and simplest form: a merchant huddled over shipping crates at dockside, pronouncing on the quality of goods to resolve a dispute between brethren in trade." Thomas Stipanowich, "Punitive Damages and the Consumerization of Arbitration," 92 Nw. U. L. Rev. 1 (1997).

[43] A.W. Brian Simpson, "Contracts for Cotton to Arrive: The Case of the Two Ships Peerless," 11 Cardozo L. Rev. 287 (1989).

[44] Superior Court of Delaware, Civil Pattern Jury Instruction §16.1.

[45] 1999 Fifth Circuit Pattern Jury Instruction §11.2

[46] 1999 Fifth Circuit Pattern Jury Instruction §13.1

[47] Todd H. Thomas, "Arbitration can reduce litigation costs," *HR Focus*, March 1, 1993. See also  Thomas B. Metzloff , "The Unrealized Potential of Malpractice Arbitration," 31 Wake Forest L. Rev. 203 (1996): "Arbitration hopefully reduces the amount of discovery required."

[48] Willging et al, *Discovery and Disclosure Practice , Problems, and Proposals for Change: A Case-based National Survey of Counsel in Closed Federal Civil Cases*, December 1997.

[49] Hearing Transcript, "Fairness and Voluntary Arbitration Act," House Judiciary Subcommittee on Commercial and Administrative Law, June 8, 2000, at 59.

[50] Metzloff, supra note 47.

[51] Council of Better Business Bureaus, *BBB Auto Line Arbitrator Training Manual* (2001).

[52] David S. Steuer, "A Litigator's Perspective on the Drafting of Commercial Contracts," 1219 PLI/Corp. 539 (2000).

[53] James S. Granelli, "Private Courts Come to Order," *Los Angeles Times* , August 1, 1988.

[54] Letter from AAA Case Administrator Andrew Barton to Morris Tabak, December 28, 1995.

[55] Steuer, supra note 52. It should also be noted that forum costs will usually be higher for claimants than for defendants.

[56] See also Davis S. Schwartz, "Enforcing Small Print to Protect Big Business," 1997 Wis. L. Rev. 33, comparing results of more than 1000 employment disputes decided by juries in California courts with 62 arbitration awards

issued by NASD and NYSE arbitrators over a comparable period. Schwartz found that arbitrators were less sympathetic than juries in discrimination claims, and that mean and median arbitration awards were less than 20% of jury verdict amounts.

[57] Per Sharon Lybeck Hartman, *Second Annual Report of the Office of the Independent Administrator*, December 31, 2000. Approximately 5 percent of the cases in this pool are not medical malpractice cases.

[58] 1993-1999, Jury Verdict Research, *Current Award Trends* (2000).

[59] BJS Special Report, *Civil Jury Cases and Verdicts in Large Counties*, July 1995.

[60] BJS Bulletin, *Civil Trial Cases and Verdicts in Large Counties*, September 1999.

[61] According to the California Research Bureau, *Arbitration in California Managed Health Care Systems*, December 2000, arbitrators selected to serve more than once by Kaiser are more likely than others to rule in Kaiser's favor, while three arbitrators who issued awards in excess of $1,000,000 were not selected again. An arbitrator who ruled against meatpacker IBP in a worker's compensation case was not only told that he would not be retained by IBP for future cases but was not paid for his services. "The chain never stops," *Mother Jones*, July/August 2001.

[62] Michael Geist, *Fair.com? An Examination of Allegations of Unfairness in the ICANN UDRP,* August 2001.

[63] Richard Karp, "Mugged? A decade-long arbitration dispute has left Ira Stitz feeling that the system is rigged," *Barron's,* August 27, 2001.

[64] One commentator suggests that much of this is speculative; "We do not actually know much about whether one-shot consumers do worse in merchant operated arbitration or privatized dispute resolution systems than they do in court or in other fora (or if they do nothing at all). We assume they do fare worse because we assume that dispute resolution systems chosen and maintained by one of the disputants therefore must benefit that disputant. Why else would all these institutional disputants be defending their arbitration systems so vigorously against consumer legal attacks? It is clear that such institutional disputants believe that they do better, and that such systems are cheaper and better for them than other forms of disputing, but we do not really know." Carrie Menkel-Meadow, "Do the 'Haves' Come Out Ahead in Alternative Judicial Systems?: Repeat Players in ADR" 15 Ohio St. J. on Disp. Resol. 19 (1999).

[65] G. Richard Shell, "Res Judicata and Collateral Estoppel Effects of Commercial Arbitration," U.C.L.A. L. Rev. 623 (1988)

[66] BJS Bulletin, *Civil Trial Cases and Verdicts in Large Counties*, September 1999.

[67] Here the distinction between binding and non-binding arbitration is important. The purpose of non-binding arbitration, also called prior resort arbitration, is to give parties an early neutral evaluation of the case in hopes that they will settle in accordance with the award.

[68] President's Council on Competitiveness, *Agenda for Civil Justice Reform in America* (1991): "Provide a choice for resolving disputes: Create 'Multi-Door Courthouses.' Create a multi-door courthouse to permit the parties to choose between several different methods for resolving their dispute."

[69] L. Solum, "Alternative Court Structures in the Future of the California Judiciary: 2020 Vision," 66 S.Cal.L.Rev. 2121 (1993)

[70] According to AAA's Ryan Boyle, AAA dropped its Insurance Claims Procedures because they "were not being used at all." Phone conversation with author, February 15, 2002.

[71] David Lipsky & Ronald Seeber, "In Search of Control: The Corporate Embrace of ADR," 1 U. Pa. J.Lab. & Emp. L. 113 (1998).

[72] 49 U.S.C. 14708.

[73] Per Edward Anderson, National Arbitration Forum, in phone conversation with author.

[74] www.adr.org

[75] Each provider's policies on fee waivers are posted on their websites.

[76] The Clerk of the Circuit Court of Cook County, Illinois had a general operating budget of $90,000,000 in 2000 ($60,000,000 for eight months.) In the first eight months there were 1,357,557 cases filed with the Clerk. Therefore, for every case filed, the Clerk's office spent $44.20. Office of the Clerk of the Circuit Court of Cook County, *Annual Report 2000* http://www.cookcountyclerkofcourt.org/annual2/sld001.htm

[77] The American Arbitration Association spent $67,611,000 on "administration of tribunals" in 2000. They had 198,491 cases filed with their office during that year. Thus, on average, the AAA spent $340.63 per case filed. This figure does not include the expenditures the AAA budget calls "general and administration," which combined with the "administration of tribunals" might more aptly mirror the "general operating budget" of the Clerk's office. If these costs were included, AAA's cost per case would average $377.71. *Proud Past, Bold*

*Future: 75th Anniversary 2000 Annual Report of the American Arbitration Association*
http://www.adr.org/about/annual/annual_report_2000.pdf

[78] Robert Samuelson, "Enron's Creative Obscurity," *Washington Post*, December 19, 2001.

[79] Cooter & Ulen, *Law and Economics* (2000).

[80] Myron Levin, "Know your arbitrator law: Two tales illustrate the risks in an increasingly common feature of contracts," *Los Angeles Times*, January 19, 1997.

[81] In re American Reserve Corp, 840 F.2d 487 (7th Cir. 1988).

[82] Christakos v. Intercounty Title Co., 196 F.R.D. 496 (N.D. Ill. 2000).

[83] Testimony of Rep. Bob Goodlatte to the House Judiciary Committee, July 21, 1999.

[84] Solum, supra note 69. See also Jonathan Varat, "Economic Ideology and the Federal Judicial Task," 74 Calif. L. Rev. 649 (1986): "Legal rules not only keep dispute resolution peaceful, but also provide cohesion and integration in a just social order…those who never litigate and even have no litigable disputes nonetheless are societal users of the judicial system."

[85] Lee, supra note 20.

[86] Richard Posner, *The Federal Courts: Crisis and Reform* (1985).

[87] William J. Bennett, *Index of Leading Cultural Indicators: American Society at the End of the 20th Century* (1999) at 9.